No. 26-1015

# In the United States Court of Appeals for the Seventh Circuit

---

SKYWAVE NETWORKS, LLC, PLAINTIFF-APPELLANT

*v.*

WILLIAM J. DISOMMA, ET AL., DEFENDANTS-APPELLEES

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS (CIV. NO. 24-9650)
(THE HONORABLE GEORGIA N. ALEXAKIS, J.)*

---

**SUPPLEMENTAL APPENDIX**

---

ROBERT Y. SPERLING
ANDREW G. GORDON
JESSICA CAREY
KATHERINE B. FORREST
KRISTINA BUNTING
MICHAEL P. BELLIS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas
  New York, NY 10019*

KANNON K. SHANMUGAM
MASHA G. HANSFORD
DAVIS POLK & WARDWELL LLP
  *1050 17th Street, N.W.
  Washington, DC 20036
  (202) 962-7000
  kshanmugam@davispolk.com*

NATHAN W. RAAB
KRISTA A. STAPLEFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.
  Washington, DC 20006*

*(additional counsel on inside cover)*

CHRIS C. GAIR
GAIR GALLO EBERHARD, LLP
  *One East Wacker Drive, Suite 2600*
  *Chicago, IL 60601*

NEEMA SAHNI
COVINGTON & BURLING LLP
  *1999 Avenue of the Stars, Suite 3500*
  *Los Angeles, CA 90067*

# TABLE OF CONTENTS

Complaint (D. Ct. Dkt. 7)...................................................... Supp. App. 1

First Amended Complaint (D. Ct. Dkt. 90) ....................................Supp. App. 59

Motion to Dismiss (D. Ct. Dkt. 102) ..............................................Supp. App. 119

Petition for Reconsideration (D. Ct. Dkt. 102-1).........................Supp. App. 160

Opposition to Petition for Reconsideration
  (D. Ct. Dkt. 102-2)..........................................................................Supp. App. 170

Skywave Notice of Appeal (D. Ct. Dkt. 123) ................................Supp. App. 182

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| SKYWAVE NETWORKS, LLC,<br><br>              Plaintiff,<br><br>        v.<br><br>WILLIAM J. DISOMMA,<br>PAUL A. GURINAS,<br>MATTHEW HINERFELD,<br>WILLIAM DISOMMA TRUST,<br>PAUL A. GURINAS TRUST,<br>JUMP FINANCIAL, LLC,<br>JUMP TRADING HOLDINGS, LLC,<br>JUMP TRADING, LLC,<br>ECW WIRELESS, LLC,<br>WORLD CLASS WIRELESS, LLC,<br>VIRTU FINANCIAL, INC.,<br>NLN HOLDINGS, LLC,<br>NEW LINE NETWORKS, LLC, AND<br>10BAND, LLC,<br><br>              Defendants. | Civil Action No. 1:24-cv-9650-XXX<br><br>_____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Skywave Networks, LLC ("Skywave") files this Complaint against Defendants William J. DiSomma ("DiSomma"); Paul A. Gurinas ("Gurinas"); Matthew Hinerfeld ("Hinerfeld"); William DiSomma Trust ("DiSomma Trust"); Paul A. Gurinas Trust ("Gurinas Trust"); Jump Financial, LLC ("Jump Financial"); Jump Trading Holdings, LLC ("Jump Trading Holdings"); Jump Trading, LLC ("Jump Trading"); ECW Wireless, LLC ("ECW Wireless"); World Class Wireless, LLC ("World Class Wireless"); Virtu Financial, Inc. ("Virtu"); NLN Holdings, LLC ("NLN Holdings"); New Line Networks, LLC ("NLN"); and 10Band, LLC ("10Band") (collectively,

**Supp. App. 1**

"Defendants") and alleges as follows, based on personal knowledge as to Skywave and Skywave's

acts and on information and belief as to all other matters.

## CONTENTS

INTRODUCTION..........................................................................................................3

PARTIES, JURISDICTION, AND VENUE ..........................................................4

FACTS UNDERLYING THE CAUSES OF ACTION ..........................................9

  Skywave..................................................................................................................9

    Skywave's Technology...................................................................................9

    Background on FCC Licensing.....................................................................13

    Skywave's Discovery of Defendants' Racketeering Scheme........................15

  Defendants' Enterprise ........................................................................................20

    Relationships Between Defendants...............................................................21

    Defendants' Worldwide Trading Network and Associated Trading on that Network.........23

      Defendants' Worldwide Trading...............................................................24

      Defendants' Trading Infrastructure: Illinois .............................................27

      Defendants' Trading Infrastructure: New York/New Jersey .....................29

      Defendants' Trading Infrastructure: Washington .....................................30

      Defendants' Trading Infrastructure: United Kingdom ..............................30

      Defendants' Trading Infrastructure: Continental Europe ..........................31

      Defendants' Trading Infrastructure: Japan ...............................................32

      Defendants' Trading Infrastructure: Brazil...............................................32

      Defendants' Trading Infrastructure: Canada.............................................33

  Defendants' Experimental Licenses....................................................................36

    Elburn I Experimental License ....................................................................36

    Elburn II Experimental License ...................................................................40

    Wayne Experimental License ......................................................................42

    Everett Experimental License ......................................................................44

    Lynnwood Experimental License.................................................................46

  Defendants' Racketeering....................................................................................48

    Defendants' Predicate Acts: Fraud in Applying for, Modifying, and Renewing Experimental Licenses in Violation of 18 U.S.C. § 1343...............................48

    Defendants' Predicate Acts: Unlawful Use of Experimental Licenses for Commercial Trading in Violation of 18 U.S.C. § 1343 ...................................51

**Supp. App. 2**

Skywave's Injury Caused by Defendants' Unlawful Racketeering Conduct..........................53
**CAUSES OF ACTION**.................................................................................................**55**
COUNT I: Violation of 18 U.S.C. § 1962(c) ...........................................................55
COUNT II: Violation of 18 U.S.C. § 1962(d) ..........................................................56
**Prayer For Relief**......................................................................................................**57**
**Demand For Jury Trial**..............................................................................................**57**

## INTRODUCTION

1.      This action arises from Defendants' long-term, continuous racketeering and conspiracy scheme to fraudulently obtain experimental shortwave radio licenses from the Federal Communications Commission ("FCC") to create a commercial trading network,[1] unlawfully use those experimental licenses for commercial trading of financial instruments ("Commercial Trading"), and leverage the ill-gotten advantages of experimental licenses to maximize their own financial benefit and to the detriment of their competitors.

2.      From 2013 to 2016, the Skywave founders developed and began to patent revolutionary trading network technology, which it has continued to develop and improve through the present.  In 2016, Skywave was formed and entered into a ▮▮▮▮▮▮▮ partnership to commercialize its network technology.  With the funding from that partnership, Skywave started to commercialize its trading network technology, including beginning the process to obtain a commercial FCC license to operate a shortwave transmitter under 47 C.F.R. § 73 ("Commercial License").

3.      Skywave's commercialization efforts came to a halt because of Defendants' unlawful activities detailed in this Complaint.  In short, Defendants circumvented U.S. law by fraudulently obtaining experimental FCC licenses—not Commercial Licenses—to operate

---

[1] This Complaint uses the term "trading network" to refer to networks used to trade financial instruments.

3

**Supp. App. 3**

shortwave transmitters under 47 C.F.R. § 5 ("Experimental Licenses"). Defendants then unlawfully used and continue to use those Experimental Licenses for Commercial Trading. Defendants custom-designed the parameters of their Experimental Licenses to separately and collectively give Defendants a dominant speed advantage over traders using other communications systems, including Skywave's planned trading network using a shortwave transmitter under a Commercial License. As a result of Defendants' unlawful activities detailed in this Complaint, Skywave's partnerships fell apart, and its efforts to commercialize its technology were halted.

4. Defendants concealed the true nature of their commercial activities behind an artifice of confidential experimental work and a web of shell companies that directed and controlled (and continue to direct and control) Defendants' racketeering scheme to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

## PARTIES, JURISDICTION, AND VENUE

5. Skywave is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 10525 West US Highway 30, Building 4 C, Wanatah, Indiana 46390.

6. DiSomma is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654. Disomma is also a resident of Illinois.

7. Gurinas is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

**Supp. App. 4**

8.      Hinerfeld is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

9.      DiSomma Trust is a trust with a business address at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.

10.     Gurinas Trust is a trust with a business address at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.

11.     Jump Financial is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

12.     Jump Trading Holdings is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

13.     Jump Trading is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

14.     ECW Wireless is a limited liability company organized and existing under the laws of Delaware with a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.

15.     World Class Wireless is a limited liability company registered to do business in Illinois with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

16.     Virtu is a corporation organized and existing under the laws of Delaware with a place of business at 233 Sout Wacker Drive, Suite 4020, Chicago, Illinois 60606.

5

**Supp. App. 5**

17.     NLN Holdings is a limited liability company organized and existing under the laws of Delaware with a registered agent address at 1209 Orange Street, Wilmington, Delaware 19801.

18.     NLN is a limited liability company registered to do business in Illinois, with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

19.      10Band is a limited liability company organized and existing under the laws of Delaware and has a place of business at 600 West Chicago Avenue, Suite 840, Chicago, Illinois 60654.

20.     This is a civil action, arising under the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

22.     Personal jurisdiction is proper against Jump Financial because it has a principal place of business in the Northern District of Illinois.

23.     Personal jurisdiction is proper against Jump Trading Holdings because it has a principal place of business in the Northern District of Illinois.

24.     Personal jurisdiction is proper against Jump Trading because it has a principal place of business in the Northern District of Illinois.

25.     Personal jurisdiction is proper against DiSomma and DiSomma Trust because DiSomma, through DiSomma Trust, is an owner of Jump Financial, Jump Trading Holdings, and Jump Trading, which all have principal places of business in the Northern District of Illinois.

26.     Personal jurisdiction is proper against Gurinas and Gurinas Trust because Gurinas, through Gurinas Trust, is an owner of Jump Financial, Jump Trading Holdings, and Jump Trading, which all have principal places of business in the Northern District of Illinois.

**Supp. App. 6**

27. Personal jurisdiction is proper against Hinerfeld because he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's general counsel.

28. Personal jurisdiction is proper against ECW Wireless because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois. ECW Wireless has also purposefully availed itself of the benefits and protections of Illinois law through its effective 100 percent interest in World Class Wireless, 50 percent interest in NLN, and 50 percent interest in 10Band, all registered in Illinois and with principal places of business in Illinois. *See supra* ¶¶ 15, 18–19; *infra* Fig. 4. Further, the interests of justice require that co-conspirators not residing in this state be brought before the Court in a single trial.

29. Personal jurisdiction is proper against World Class Wireless because it has a principal place of business in the Northern District of Illinois.

30. Personal jurisdiction is proper against NLN Holdings because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois. NLN Holdings has also purposefully availed itself of the benefits and protections of Illinois law through its effective 50 percent interest in NLN and 50 percent interest in 10Band, both registered in Illinois and with principal places of business in Illinois. *See supra* ¶¶ 18–19; *infra* Fig. 4. Further, the interests of justice require that co-conspirators not residing in this state be brought before the Court in a single trial.

31. Personal jurisdiction is proper against Virtu because it has a place of business in the Northern District of Illinois, and it participated in the activities alleged in this Complaint, a substantial portion of which occurred in this District. Further, Virtu owns approximately 50

**Supp. App. 7**

percent of the control of 10Band—through NLN Holdings and NLN—which operates radio transmission links in this District related to the activities and claims alleged in this Complaint.

32.     Personal jurisdiction is proper against NLN because it has a principal place of business in the Northern District of Illinois.

33.     Personal jurisdiction is proper against 10Band because it participated in the activities alleged in this Complaint, a substantial portion of which occurred in the Northern District of Illinois.  Further, it operates radio transmission links in this District related to the activities and claims alleged in this complaint.

34.     Personal jurisdiction is also proper against all Defendants in the Northern District of Illinois because they engaged in a years' long racketeering scheme to, among other things, defraud the FCC to obtain a shortwave Experimental License to operate a shortwave transmitter located in Elburn, Illinois (which is within this District) and then unlawfully use that transmitter for Commercial Trading.  Defendants have engaged in activities in furtherance of that racketeering scheme in this District by, among other things, engaging in systematic and continuous Commercial Trading using the Elburn, Illinois transmitter.

35.     Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Defendants DiSomma Trust, Gurinas Trust, Jump Financial, Jump Trading Holdings, Jump Trading, World Class Wireless, and NLN are all residents of the Northern District of Illinois. Defendants DiSomma, Gurinas, Hinerfeld, ECW Wireless, Virtu, NLN Holdings, and 10Band all transact business in the Northern District of Illinois, including through activities in furtherance of all Defendants' racketeering scheme in this District by, among other things, engaging in systematic and continuous Commercial Trading using the Elburn, Illinois transmitter.  In addition, Jump and NLN have regular and established places of business in the Northern District of Illinois and they,

8

**Supp. App. 8**

as well as Virtu and 10Band, engage in trading activities and network operations activities in this District.

## FACTS UNDERLYING THE CAUSES OF ACTION

### Skywave

36.     In 2016, entrepreneur Timothy Eloe and inventor Kevin Babich founded Skywave to commercially deploy technology for transcontinental wireless networks for trading.  Skywave's shortwave trading network technology is ideal for all trading strategies that rely on the transmission of time-sensitive data between distant financial markets, like the practice of latency arbitrage in high-frequency trading ("HFT").

*Skywave's Technology*

37.     Skywave developed trading network technology that provides traders with a quantum leap in communications speed, particularly for transoceanic communications.  For example, using Skywave's innovations, trade information can traverse the Atlantic Ocean faster than over traditional networks using a combination of transoceanic optical fiber and microwave, previously the fastest communication method.

38.     Skywave's technology uses shortwave radio to transmit trade information over long distances.  Shortwave radio, which is commonly associated with older technologies like AM radio, had generally been considered antiquated for modern communications before Skywave developed methods to leverage it in new ways.

39.     Radio transmissions typically travel faster than transmissions via optical fiber. However, unlike optical fiber transmissions, most common radio technology—*e.g.*, microwave— require a line of sight between transmitter and receiver.  Such technology is not economically feasible for transcontinental communication because the curvature of the earth blocks line of sight.

**Supp. App. 9**

40.     Shortwave radio, in contrast, is well-suited for transcontinental communication because it does not require a line of sight between transmitter and receiver.  Shortwave radio signals can be refracted—*i.e.*, bounced—off the Earth's ionosphere to effectively transmit information around the curvature of the earth.

41.     But the properties of shortwave radio signals also create challenges for transmitting trading information over long distances.  One such challenge is low bandwidth.  Shortwave radio can only carry a small fraction of the amount of information carried by optical fiber or microwave.  As a result, shortwave signals alone are insufficient to operate a trading network.

42.     Skywave overcame the challenges of trading via shortwave radio signals through its innovative and patented shortwave trading network technology.

43.     The advantages of the increased communications speed provided by Skywave's technology is perhaps best illustrated via HFT and latency arbitrage examples.

44.     HFT is a trading strategy where financial instruments, like stocks and futures, are traded at high frequency to take advantage of small but frequent changes in financial markets.  HFT traders seek to make profits from these small changes by aggregating large quantities of high-frequency trades over time.  While HFT traders might only make a relatively small profit on a single trade, they might make thousands of such trades per minute.

45.     In HFT, successful trades are determined by small fractions of time—nanoseconds, microseconds, and milliseconds. The opportunities that HFT traders seek are often only available at the thinnest slices of time increments.

46.     The fleeting nature of HFT opportunities dictates that the speed of the networks, computers, and algorithms used by each HFT trader will determine whether that trader will be fast enough to capture an opportunity or lose it to a faster trader.  The HFT traders with the fastest

10

**Supp. App. 10**

networks can dominate the opportunities presented by changing conditions in national and international financial markets.

47.     Put simply, for HFT, the fastest network wins and every single millisecond counts. As a matter of illustration, one HFT networking firm spent approximately $300 million to build a domestic network to save 3 milliseconds[2] while another HFT networking firm spent $250 million to build an intercontinental network to save 5 milliseconds.[3]

48.     Similarly, latency arbitrage trading is a form of trading that takes advantage of the time it takes for overseas financial markets to adjust to one another's changes.  Latency arbitrage traders leverage the fact that they can receive signals about overseas market changes several milliseconds before other traders and then make trades before other traders are aware of those overseas changes.

49.     To further illustrate, one example of latency arbitrage trading is trading based on the correlation between the S&P 500 E-Mini ("E-Mini"), which is traded on the Chicago Mercantile Exchange ("CME"), and the DAX future ("FDAX"), which is traded on the Eurex market in Germany.  Specifically, an E-Mini price change can be a predictor of a future FDAX price change—e.g., if the E-Mini price goes up or down, the FDAX price is likely to follow in the same direction.  Critically, however, it takes time (albeit milliseconds) for the FDAX to catch up to the E-Mini, and that delay gives rise to a latency arbitrage trading opportunity.  For instance, when the E-Mini price goes up in Chicago, a U.S. trader with a low latency network can send a

---

[2]     Christopher Steiner, *Wall Street's Speed War*, Forbes (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html.
[3] *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, Can. Broad. Corp. (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

**Supp. App. 11**

trading trigger to buy the FDAX in Germany before the rest of the market drives up the price. Then, having purchased the FDAX at a lower price than the rest of the market, the trader can turn a profit by selling the FDAX at the higher price.

50.     By 2016, Skywave was ready to commercialize its innovative shortwave trading network technology and went to the market in search of development partners.

51.     In October 2016, Skywave executed agreements with ███████████████████ ████████████████████████████████████ and ████████████████████ ████████ . Under the terms of those agreements, ████ would provide █████████████████ ████████████████████████████████████████████████████ and ██████████████████████████████████████████████ .

52.     Skywave planned to implement its innovative shortwave trading network technology through a transcontinental network between the United States and Europe ("Skywave Network").  The Skywave Network would include a shortwave transmitter that Skywave planned to operate under a Commercial License.

53.     Using ███████████████████████ under the Agreements, Skywave engineered and designed the Skywave Network and supporting infrastructure.  From October 2016 through March 2017, Skywave completed the following tasks in building the Skywave Network: (1) assessed and selected transmitter and receiver sites in the United States and Europe; (2) designed, engineered, and completed component specifications for customized transmitters, antennas, and patented fiber back-channel modems and shortwave optimization methods; (3) completed installation of a data center, security elements, connective elements, and microwave dishes; and (4) prepared FCC construction permits and related filings, including applications for

**Supp. App. 12**

developmental FCC licenses.  Skywave also entered into contracts with third parties for the manufacture of transmitters, antennas, and modems for the Skywave Network.

*Background on FCC Licensing*

54.    Transmitting shortwave signals requires a license from the FCC.  FCC licenses not only give a party permission to transmit signals, but they also dictate the details of what can be transmitted, where transmissions can originate, and how those transmissions are sent.  *See* 47 U.S.C. §§ 301, 314.  Section 301 makes clear that any such license is limited to the express terms and conditions of the license: "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license."  *Id.* at § 301.

55.    The FCC forbids "[w]illful false statements made" in FCC license "applications, amendments, and related statements of fact." 47 C.F.R. §§ 5.57(d), 73.3513(d).  Such willful false statements are "punishable by fine and imprisonment" pursuant to 18 U.S.C. § 1001.  *Id.*

56.    There are two types of FCC licenses for shortwave radio transmission relevant to the allegations in this Complaint: commercial and experimental.  The FCC issues Commercial Licenses under 47 C.F.R. § 73 ("Part 73").  A Commercial License provides access for commercial use with certain restrictions.  Specifically, Commercial Licenses (i) have limited bandwidth to transmit data; (ii) are limited to fixed operation frequencies during specified hours; (iii) require emissions masking; and (iv) have high minimum transmission power requirements.  *See* 47 C.F.R. §§ 73.702, 73.751, 73.758.

57.    Experimental Licenses issue under 47 C.F.R. § 5 ("Part 5") and are limited to "experimentation" and "product development."  *Id.* § 5.1(b).[4]  Given that limited purpose,

---

[4] The FCC also issues Experimental Licenses specific to "market trials" under Part 5, but there are no market trial licenses at issue in this Complaint.

**Supp. App. 13**

applicants for Experimental Licenses are allowed to specify their own technical operating parameters.

58.    Defendants custom-designed a portfolio of Experimental Licenses to separately and collectively comprise operating parameters that offer significant advantages over Commercial Licenses. Specifically, Defendants' Experimental Licenses (i) have more bandwidth than a Commercial License; (ii) provide access to and allow instant and frequent switching across a wide frequency range—*i.e.*, "frequency hopping;" (iii) do not have emissions-masking requirements; and (iv) do not have transmission power requirements. With increased bandwidth, Defendants can transmit more data and do so more quickly. With frequency hopping, Defendants can adjust and select the ideal frequency for given ionosphere conditions, which are constantly changing, and thus transmit data at the optimal latency. By relaxing emissions-masking, Defendants reduce the latency attributable to that process, gaining a further speed advantage. Finally, by avoiding the high transmission power requirements, Defendants also avoid the high costs and operational complexities of using high powered tube transmitters.

59.    Importantly, Experimental Licenses do not authorize use of shortwave transmitters for commercial uses, such as Commercial Trading or Defendants' use of the shortwave transmitters in the manner described in this Complaint. For example, 47 C.F.R. § 5.3 sets the operations that are permitted under an Experimental License. None of those operations include Commercial Trading or Defendants' use of the shortwave transmitters in the manner described in this Complaint. While Part 5 also includes "[p]roduct development and market trials," *id.*, those do not authorize Commercial Trading or Defendants' use of the shortwave transmitters in the manner described in this Complaint. Additionally, 47 C.F.R. § 5.601 provides that, for product development trials, "[m]arketing of devices . . . or provision of services for hire is not permitted."

**Supp. App. 14**

By way of another example, 47 C.F.R. § 5.602 enables "provision of services for hire . . . before the radio frequency device has been authorized by the Commission" only if the "device will be operated in compliance with existing Commission rules, waivers of such rules that are in effect at the time of operation, or rules that have been adopted by the Commission but that have not yet become effective." No such rules, waivers, or adopted rules exist that permit Commercial Trading or Defendants' use of the shortwave transmitters pursuant to an Experimental License in the manner described in this Complaint.

*Skywave's Discovery of Defendants' Racketeering Scheme*

60.    In December 2016, Skywave learned that 10Band had filed applications with the FCC to obtain Experimental Licenses to operate shortwave transmitters. 10Band had filed an application to operate in Elburn, Illinois, and the FCC granted that license. Around that time, Skywave and its investors heard rumors in the industry that Jump or Virtu (both trading firms) may be affiliated with 10Band.

61.    In 2017, ███ became concerned that if anyone were to use 10Band's shortwave transmitter under an Experimental License for Commercial Trading, they would have a dominant latency (*i.e.*, speed) advantage over other traders using optical fiber and microwave networks and the Skywave Network, which would operate under Commercial License conditions. *See supra* ¶¶ 56–59. At that time, Skywave was not aware of any information confirming the rumors that Jump or Virtu were affiliated with 10Band or using 10Band's shortwave transmitter for Commercial Trading. Nor was Skywave aware of any data showing or any method to determine whether Jump, Virtu, or others were using Experimental Licenses for Commercial Trading.

62.    ███ did not believe the partnership could reasonably compete against any unlawfully used 10Band Experimental License for Commercial Trading. Given its concern about

15

**Supp. App. 15**

this possibility, ▮ sought to exit the partnership with Skywave and ▮. In March 2017, Skywave, ▮▮▮▮ agreed to release ▮ from the partnership.

63.     Without ▮▮▮▮, Skywave was forced to pause or cancel aspects of its network construction. Although ▮ remained committed to the partnership, ▮ did not provide ▮▮▮▮ that Skywave lost when ▮ left.

64.     In the Fall of 2018, Skywave found ▮▮▮▮▮▮▮▮▮▮▮ Skywave to further develop its innovative shortwave network technology. ▮▮▮ did not, however, agree to ▮▮▮ to complete construction of the Skywave Network.

65.     In early 2019, Skywave and ▮▮▮ went to the market for additional capital investment, but they were unable to raise the funds necessary to complete construction of the Skywave Network.

66.     In 2020, ▮▮▮ asked ▮▮▮ of the Skywave Network construction, but ▮ declined because of its concerns that trading firms may have been using Experimental Licenses for Commercial Trading. ▮ also requested, and Skywave agreed, to dissolve the original partnership.  At that time, Skywave was still not aware of any information showing Jump, Virtu, or any other trading firm was affiliated with 10Band or using 10Band's Experimental Licenses for Commercial Trading.  Nor was Skywave aware of any data showing or any method to determine whether Jump, Virtu, or others were using Experimental Licenses for Commercial Trading.

67.     In October 2020 ▮▮▮ and Virtu entered into a non-disclosure agreement to discuss Skywave's innovative shortwave network technology.  Representatives of ▮▮▮, Skywave, and Virtu subsequently met on or about October 8, 2020.  ▮▮▮

16

**Supp. App. 16**

Supp. App. 17

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

68.     In 2022, Skywave discovered that a German company, Deutsche Börse, offered a market analytics tool called A7. The A7 tool enabled examination of CME and Eurex trading data for evidence of trading using shortwave networks.

69.     Using the A7 tool, Skywave discovered evidence of shortwave trading. For example, the A7 tool showed two different latencies for latency arbitrage trading of the E-Mini (abbreviated as "ES" in Figure 1) and the FDAX (as described above). *See* Fig. 1. First, E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 37 milliseconds later. That 37-millisecond latency indicates trading over networks comprised of conventional optical fiber and microwave transmitters. Second, the A7 data also showed E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 28 milliseconds later. That relatively low 28-millisecond latency indicates trading over networks that included shortwave transmissions.



**Figure 1: XCME/XEUR Latency Data**[5]

70.    In fact, Deutsche Börse's head of quantitative analytics concluded that the A7 latency data showing an approximately 9-millisecond advantage in some trades was evidence of shortwave trading.  Fig. 2.

---

[5]    Stefan    Schlamp,    *Stefan    Schlamp's    Post*,    LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Sept. 2024).

**Supp. App. 18**



**Figure 2: Stefan Schlamp's A7 Analysis**[6]

71.     According to Deutsche Börse's retroactive A7 analysis, trading at shortwave latencies began in 2017, accelerated in 2019, and has dominated CME/EUREX latency arbitrage trading, such as E-Mini-FDAX trading, since 2020.  Correspondingly, trading activity at the relatively slower optical fiber and microwave network latency gradually decreased after shortwave trading commenced.  Fig. 3 (heatmap showing shortwave network trading on "Short-Wave" dotted line and optical fiber and microwave network trading on "MW/Hibernia/MW" line, with white indicating activity and red indicating higher activity).

---

[6]     Stefan     Schlamp,     *Stefan     Schlamp's     Post*,     LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Sept. 2024).

19

**Supp. App. 19**



**Figure 3: XCME/XEUR Network Data**[7]

72.     The rise in shortwave network trading evidenced by these low latencies precisely matches the decline of CME traders who used conventional network technologies (*e.g.*, optical fiber and microwave) and eventually ceased CME/EUREX arbitrage trading because they could not compete due to the low latencies enabled by shortwave networks.

### Defendants' Enterprise

73.     Since 2016, DiSomma, Gurinas, Hinerfeld, DiSomma Trust, Gurinas Trust, Jump Financial, Jump Trading Holdings, Jump Trading, ECW Wireless, World Class Wireless, Virtu, NLN Holdings, NLN, and 10Band have worked and continue to work in concert to advance their shared purpose to defraud the FCC to obtain shortwave Experimental Licenses for Commercial

---

[7]     Stefan     Schlamp,     *Stefan     Schlamp's     Post*,     LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cme-eurex-microwave-activity-7027298230296051712-bW6x (indicating a time of publication 1 year prior to Sept. 2024).

20

Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

*Relationships Between Defendants*

74.     Defendants form a complex network of individuals, trusts, shell companies, trading companies, and other entities that are an association-in-fact enterprise under 18 U.S.C. § 1961(4) to facilitate and conduct Defendants' racketeering scheme.

75.     Figure 4 provides an overview of the relationships between the Defendants.[8]

**Figure 4: Defendants' Enterprise Overview**

---

[8] Figure 4 represents a compilation of the information in Exhibit 1 (FINRA BrokerCheck Report for Jump Trading), Exhibit 2 (10Band Ownership Structure as Submitted to FCC), and Exhibit 3 (Declaration of John P. Madigan on Behalf of NLN Holdings as Submitted to FCC).

21

**Supp. App. 21**

76.     DiSomma (labeled "2" in Fig. 4), Gurinas (labeled "3" in Fig. 4), and Hinerfeld (labeled "1" in Fig. 4) are central figures in the coordination of the racketeering and conspiracy scheme.  DiSomma and Gurinas collectively own a controlling interest in Jump Financial (labeled "6" in Fig. 4) through DiSomma Trust and Gurinas Trust, respectively.  Jump Financial owns a controlling interest in Jump Trading Holdings (labeled "7" in Fig. 4).  Jump Trading Holdings owns a controlling interest in Jump Trading (labeled "8" in Fig. 4).  DiSomma and Gurinas are involved in the management and operation of Jump Financial, Jump Trading Holdings, and Jump Trading (collectively, "the Jump Defendants").  As part of the association-in-fact, the Jump Defendants engage in Commercial Trading using one or more shortwave transmitters operated by 10Band (labeled "13" in Fig. 4) under an Experimental License.

77.     Hinerfeld is the General Counsel for Jump Trading.  Ex. 4.  Hinerfeld signed multiple fraudulent Experimental License applications and other filings on behalf of 10Band.  *See infra* ¶¶ 142–180.  Hinerfeld is also a Board Manager for NLN Holdings (labeled "11" in Fig. 4).  Ex. 5.

78.     Virtu (labeled "14" in Fig. 4) engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License.

79.     NLN Holdings is a joint venture between DiSomma, Gurinas, and Virtu.  Virtu owns a 50 percent interest of NLN Holdings.  DiSomma and Gurinas own a 50 percent interest of NLN Holdings through a web of corporate shells.  DiSomma and Gurinas collectively own a controlling interest in ECW Wireless (labeled "9" in Fig. 4) through DiSomma Trust and Gurinas Trust, respectively.  ECW Wireless owns a controlling interest in World Class Wireless (labeled "10" in Fig. 4).  World Class Wireless owns a 50 percent interest in NLN Holdings (labeled "11"

**Supp. App. 22**

in Fig. 4). NLN Holding is therefore ultimately owned and controlled by DiSomma, Gurinas, and Virtu, which direct the Commercial Trading of the association-in-fact enterprise.

80.     NLN Holdings owns a controlling interest in NLN (labeled "12" in Fig. 4). NLN is also a joint venture of DiSomma, Gurinas, and Virtu. NLN's Board of Directors has been comprised of employees of the Jump Defendants (*e.g.*, John Madigan and Marcus Washko) and Virtu (*e.g.*, Mike Rosenthal and Jason Vopni). NLN owns a controlling interest in 10Band.

81.     10Band applied for Experimental Licenses to operate multiple shortwave transmitters (as explained further below), and in so doing, knowingly made material misrepresentations. 10Band operates shortwave transmitters under Experimental Licenses, and the Jump Defendants and Virtu use those transmitters to engage in Commercial Trading.

82.     DiSomma, Gurinas, Hinerfeld, DiSomma Trust, Gurinas Trust, ECW Wireless, World Class Wireless, Virtu, NLN Holdings, NLN, and 10Band form an association-in-fact enterprise under 18 U.S.C. § 1961(4) to facilitate and conduct Defendants' racketeering scheme. Its purpose is to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

*Defendants' Worldwide Trading Network and Associated Trading on that Network*

**Supp. App. 23**

83.     Figure 5 provides an overview of Defendants' worldwide trading network ("Defendants' Worldwide Trading Network").

**Defendants' Worldwide Trading Network**

**Figure 5: Defendants' Worldwide Trading Network Overview**

<u>Defendants' Worldwide Trading</u>

84.     Defendants operated and continue to operate a worldwide trading network that connects major trading exchanges throughout the world.  Defendants assembled this network using the shortest possible paths between exchanges to ensure that Defendants' trading signals arrive faster than competing signals—allowing Defendants to dominate the trades between these exchanges.  Defendants' network uses a combination of optical fiber, microwave, and shortwave connections between trading exchanges.

85.     Defendants operate computer servers or other equipment inside the data centers where trading exchanges are managed.  These servers are connected to the Defendants' Worldwide

24

**Supp. App. 24**

Trading Network and allow their trades to execute. Operating their servers inside the data centers where trading exchanges are managed, in combination with the unlawful use of experimental shortwave transmitters, provides Defendants with a low-latency network that is faster than networks that do not unlawfully operate shortwave transmitters under Experimental Licenses. Defendants use the lower-latency advantage of their trading network to dominate certain trades across worldwide trading markets.

86. The following example illustrates how Defendants engage in Commercial Trading across the globe using Defendants' Worldwide Trading Network:

a. Defendants operate or use servers in the CME Group Data Center in Aurora, Illinois.

b. When a price change occurs in the E-Mini (managed by servers in the CME Group Data Center), Defendants' servers inside the CME Group Data Center will detect the change faster than other traders' servers that are not co-located in the data center because there are only a few meters of physical separation between Defendants' servers and the servers that manage the E-Mini.

c. Defendants' servers will send a signal to one of their servers at another location that manages a financial instrument that pairs with the E-Mini, such as the FDAX.

d. In this example, Defendants' servers in the CME Group Data Center will send a shortwave trading signal to Defendants' servers in the Deutsche Börse's FR2 Data Center in Frankfurt, Germany, where the FDAX is managed.

e. Because the FDAX is correlated to the price of the E-Mini, when the E-Mini drops in price, Defendants know that the FDAX will likely adjust downward, and they in turn want to sell the FDAX before other traders receive the E-Mini's drop information and the imminent FDAX

25

**Supp. App. 25**

drop. After the FDAX drops in price, the Defendants can purchase the FDAX at the lower price to capture a profit.

f.      With this information and infrastructure, Defendants can use their Experimental Licenses to transmit that trading signal from Illinois to Germany to initiate the sale and buy orders faster than any other trader can legally do via optical fiber and microwave networks alone or a network that includes shortwave transmitters operated under a Commercial License.

87.      Pursuant to the example above, Defendants will transmit the trading signal knowing that the FDAX is likely to adjust.  That signal starts at Defendants' server inside the CME Group Data Center and travels to a microwave link just outside the building where it will be transmitted via microwave until it arrives at Defendants' Elburn, Illinois shortwave transmitter station, which is operated under an Experimental License.  The Elburn shortwave transmitter then sends the trading signal to Germany.  When it arrives, the signal will be received by a shortwave receiving station and then sent via microwave to Defendants' server in Deutsche Börse's FR2 Data Center in Germany.  That server will then send the buy and sell orders to the server that manages the FDAX, which is also housed in the same FR2 Data Center.

88.      In this example, Defendants can sell the FDAX and avoid a loss and position themselves for profit because Defendants' trade signal to sell the FDAX arrives at the Deutsche Börse and is executed before other traders' signals to sell the FDAX over other networks even arrive.  Once the other traders' signals to sell arrive at Deutsche Börse, the market catches up, and the price of the FDAX begins to drop.  Defendants can then unwind the trade for a profit by purchasing the FDAX at the lower market price.  Thus, Defendants beat the market—avoiding a loss and making a profit—through the low latency afforded by their unlawful use of an Experimental License to operate the Elburn transmitter.

**Supp. App. 26**

89.     Defendants have constructed a worldwide network of optical fiber, microwave transmitters, and shortwave transmitters (including U.S. transmitters operated unlawfully under Defendants' Experimental Licenses) to, among other things, leverage the speed of shortwave transmissions to profit from latency arbitrage trading.  Through their network, Defendants trade financial instruments on exchanges across the world, including NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3.

<u>Defendants' Trading Infrastructure: Illinois</u>

90.     Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the CME Group Data Center, located at 2905 Diehl Road, Aurora, Illinois 60502.  Trading exchanges hosted at this data center include the CME, CBOT, NYMEX, and COMEX.[9]

91.     NLN maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center, including transmission links with FCC call signs WRBQ634, WQYE600, WQTW361, WQWG200, and WQZD637.  Exs. 6–9, 49.

92.     10Band maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center, including the transmission links with FCC call signs WRDY580, WRFA817, and WRJC512.  Exs. 10–12.

---

[9] CME Group, Inc. ("CME Group") operates CME, CBOT, NYMEX, and COMEX. William Shepard (labeled "4" in Fig. 4) serves on the Board of Directors of the CME Group. Shepard also owns an interest in Jump Trading.  Saijel Kishan & Matthew Leising, *Don't Tell Anybody About This Story on HFT Power Jump Trading*, Bloomberg (July 23, 2014), https://www.bloomberg.com/news/articles/2014-07-23/don-t-tell-anybody-about-this-story-on-hft-power-jump-trading.

**Supp. App. 27**

93.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the data centers located at 350 East Cermak Road, Chicago, Illinois 60616, including the CH4 Data Center and the CME (collectively, "Cermak Road Data Centers"). Trading exchanges hosted at these data centers include the NASDAQ, ICE, CME, CBOT, NYMEX, and COMEX.

94.    NLN maintains one or more microwave transmission links that transmit data to and from the Cermak Road Data Centers, including the transmission links with FCC call sign WQPE497 and WQZD637. Exs. 13, 49.

95.    10Band operates two shortwave transmission stations in Elburn, Illinois that transmit trading signals to Europe, Japan, and Washington with FCC call sign WI2XNX.

96.    10Band operates one or more shortwave receiving stations in Elburn, Illinois that receive trading signals from Europe (48 kHz), the British Isles (48 kHz), South America (24 kHz), and Asia (12 kHz).

97.    NLN operates a series of microwave transmission links that relay trading signals between Illinois and New York/New Jersey. These include links with FCC call signs WQWX694, WQWX695, WQXF336, WQUL202, WQYX983, WQPP781, WQUL201, WQYT727, WQXK971, WQWF975, WQPI470, WQWF990, WQWF989, WQPZ816, and WQZD637. Exs. 14–27, 49.

98.    NLN, directly or through an intermediary, operates a series of microwave transmission links that relay trading signals between Illinois, New Jersey, and Canada. These include links with FCC call signs WROY220, WQQE624, and WQZD637. Exs. 28–29, 49.

99.    Defendants' facilities in Illinois are connected, through optical fiber or microwave intermediaries, to facilities in Washington.

28

**Supp. App. 28**

Defendants' Trading Infrastructure: New York/New Jersey

100.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NYSE Data Center, located at 1700 MacArthur Boulevard, Mahwah, New Jersey 07430.  Trading exchanges hosted at this data center include the NYSE.

101.    NLN maintains one or more microwave transmission links that transmit data to and from the NYSE Data Center, including the transmission links with FCC call signs WQYZ771, WRZQ793, and WQZD637.  Exs. 30–31, 49.

102.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at a series of affiliated data centers in Secaucus, New Jersey, including the NY2 Data Center, located at 755 Secaucus Road, Secaucus, New Jersey 07094; the NY4 Data Center, located at 275 Hartz Way, Secaucus, New Jersey 07094; and the NY5 Data Center, located at 800 Secaucus Road, Secaucus, New Jersey 07094 (collectively, "Secaucus Data Centers"). Trading exchanges hosted at these data centers include the NYSE, CBOE, BZX, BYX, and BATS.

103.    NLN maintains one or more microwave transmission links that transmit data to and from the Secaucus Data Centers, including the transmission links with FCC call signs WQVP918, WQZD536, WRCR823, and WQZD637.  Exs. 32–34, 49.

104.    10Band maintains one or more microwave transmission links that transmit data to and from the Secaucus Data Centers, including the transmission links with FCC call sign WRFL965.  Ex. 35.

105.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NY11 Data Center, located at 1400 Federal Boulevard Carteret, New Jersey 07008.  Trading exchanges hosted at this data center include the NASDAQ.

29

**Supp. App. 29**

106.    NLN maintains one or more microwave transmission links that transmit data to and from the NY11 Data Center, including the transmission links with FCC call signs WQWH561, WQWE641, WQXF496, WQXM804, WRPF418, and WQZD637.  Exs. 36–40, 49.

107.    10Band operates a shortwave transmission station in Wayne, New Jersey that transmits trading signals to Europe with FCC call sign WI2XNX.

108.    Defendants' facilities in New Jersey are connected, through optical fiber or microwave intermediaries, to a cross-ocean optical fiber network over which they transmit signals to Europe and Brazil.

Defendants' Trading Infrastructure: Washington

109.    10Band operates a shortwave transmission station in Snohomish, Washington that transmits trading signals to Asia with FCC call sign WI2XNX.

110.    10Band operates one or more shortwave receiving stations in Washington to accept incoming shortwave transmissions from transmitters in Illinois and Canada.  For example, 10Band operates a shortwave receiving station at or near 47°5'12.6"N 121°55'21.3"W—a location near Lake Roesiger, Washington.

111.    Defendants' facilities in Washington are connected, through optical fiber or microwave intermediaries, to a cross-ocean optical fiber network over which they transmit signals to Japan.

Defendants' Trading Infrastructure: United Kingdom

112.    10Band has a shortwave reception loop array station located in Burchett's Green, Maidenhead, SL6 6QR in the United Kingdom.  This location receives shortwave signals from Defendants' shortwave transmission stations in New Jersey, Illinois, and Canada.

30

**Supp. App. 30**

113.    Defendants operate a shortwave transmission station in the British Isles that transmits trading signals to the United States (48 kHz).

114.    NLN operates a series of microwave links that relay signals between that location and London, including providing transmission links to the LD4, LD5, and LD6 Data Centers, the LSEG Data Center Docklands, and the NYSE Data Center.  These microwave links transmit on over 200 microwave licenses issued to NLN throughout Europe.

115.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the LD4, LD5, or LD6 Data Centers, located at 2 Buckingham Avenue, Slough Trading Estate Slough, United Kingdom, SL1 4NB.  Trading exchanges hosted at these data centers include the BATS Chi-X.

116.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the LSEG Data Center Docklands, located at Coriander Avenue, London E14 2AA.  Trading exchanges hosted at this data center include the LSE.

117.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the NYSE Euronext Data Center, located at 20 Cranes Farm Road Basildon SS14 3JD.  Trading exchanges hosted at this data center include the NYSE.

<u>Defendants' Trading Infrastructure: Continental Europe</u>

118.    Defendants receive shortwave signals in Germany, either directly or when relayed through microwave transmissions from shortwave receiver sites in other locations in Europe, from Defendants' shortwave transmission stations in New Jersey, Illinois, and Canada.

119.    Defendants operate one or more shortwave transmission stations in continental Europe that transmit trading signals to the United States (48 kHz).

120.     NLN operates a series of microwave links that relay those signals to and from Frankfurt, including providing transmission links to the FR2 Data Center.

121.     Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the FR2 Data Center, located at Kruppstraße 121, 60388 Frankfurt am Main, Germany.  Trading exchanges hosted at this data center include the Deutsche Börse.

<u>Defendants' Trading Infrastructure: Japan</u>

122.     Defendants, directly or through an intermediary, operate a shortwave receiving site near 1342-6 Chikurachō Kawato, Minamiboso, Chiba 295-0014, Japan. This location receives shortwave signals from Defendants' shortwave stations in Washington and Canada.

123.     Defendants operate one or more shortwave transmission stations in Japan that transmit trading signals to the United States (12 kHz).

124.     Defendants, directly or through an intermediary, operate a series of microwave links that relay signals between that location and Tokyo, including providing transmission links to one or more Japan Exchange Group Data Centers.

125.     Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at one or more of the Japan Exchange Group's data centers, including the OSE data center, located in Koto-ku, Tokyo, Japan.  Trading exchanges hosted at this data center include the TSE, OSE, and TOCOM.

<u>Defendants' Trading Infrastructure: Brazil</u>

126.     Defendants, directly or through an intermediary, operate a shortwave receiving site near Bairro do Castanho, Jundiaí - State of São Paulo, Brazil.  This location receives shortwave signals from Defendants' shortwave stations in Canada.

**Supp. App. 32**

127.    Defendants operate one or more shortwave transmission stations in Brazil that transmit trading signals to the United States (24 kHz).

128.    Defendants, directly or through an intermediary, operate a series of microwave links that relay signals between that location to Sao Paolo, including providing transmission links to the B3 Data Center.

129.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the B3 Data Center, located at R. Ricardo Prudente de Aquino, 85 - Res. Tambore III, Santana de Parnaíba - SP, Brazil.  Trading exchanges hosted at this data center include the B3.

Defendants' Trading Infrastructure: Canada

130.    To expand the scope of their scheme, Defendants constructed or had constructed and operated and continue to operate a shortwave transmission station in Ontario, Canada.

131.    The Canadian government issues HF Developmental Licenses, which are comparable to U.S. Experimental Licenses.  Similar to U.S. Experimental Licenses, Canadian HF Developmental Licenses are issued for the purpose of testing new wireless technologies and provide their licensees with advantages that can reduce latency and cost. *See Developmental License Playbook*, Gov't of Can. (Sept. 28, 2022), https://ised-isde.canada.ca/site/spectrum-management-telecommunications/en/licences-and-certificates/developmental-licence-playbook.

132.    In March 2021, Defendants' enterprise formed Canadian company 1291956 B.C. Unlimited Liability Company, which does business as Green Wave Radio.  Although Defendants have attempted to hide their relationship with Green Wave Radio, Jump Trading's affiliate company Jump Operations, LLC ("Jump Operations") registered Green Wave Radio's website address, greenwaveradio.net, on July 20, 2023. *Greenwaveradio.net*, Whois,

33

**Supp. App. 33**

https://www.whois.com/whois/greenwaveradio.net (last accessed Sept. 27, 2024). Jump Operations shares an address with Jump Trading at 600 West Chicago Avenue Suite 600, Chicago, Illinois 60654, and Matthew Hinerfeld lists that same address as his address with the California State Bar.[10]

133.    Green Wave Radio currently transmits shortwave trading signals from Defendants' shortwave transmission station in Ontario, Canada under a Canadian HF Developmental License with call sign CGA984.  This link transmits signals to Defendants' receiving stations in the United Kingdom, Germany, Japan, Brazil, and Washington.

134.    Defendants went to considerable lengths to obfuscate the connection between Green Wave Radio in Canada and 10Band in the United States.  Because the relationship between their respective broadcasting networks could have alerted U.S. authorities to Defendants' scheme to trade on networks which they claimed were merely experimental, Defendants constructed a hidden intermediary to connect their U.S. and Canadian networks rather than connecting them openly.

135.    Defendants created a company called RuralConnect, LLC ("RuralConnect"), which masquerades as a local internet service provider and serves as an intermediary to Defendants. RuralConnect owns a microwave path from Green Wave Radio's transmitter in Ontario to a field near Dunbridge, Ohio, operating with FCC call sign WROX998.  Ex. 41.  Figure 6 below shows an aerial photograph of that link, labelled WROX998.

---

[10] *See Attorney Profile, Matthew Ben Hinerfeld #160961*, State Bar of Cal. (Sept. 2024), https://apps.calbar.ca.gov/attorney/Licensee/Detail/160961.

**Supp. App. 34**



**Figure 6: Hidden Connection Between Defendants' U.S. and Canadian Networks**

136.    NLN operates a microwave link with FCC call sign WQQE624, Ex. 29, which is located across the street from RuralConnect's microwave link near Dunbridge, Ohio.  There are no FCC licenses for microwave links between the NLN link and the RuralConnect link across the street.  Figure 6 shows an aerial photograph of that link, labelled WQQE624.

137.    Instead of connecting these two microwave network links through an FCC license, which might have alerted U.S. regulators, Defendants built or caused to be built a hidden optical fiber cable that travels under a private driveway to connect the RuralConnect microwave link to the NLN microwave link.  Figure 6 shows an aerial photograph of the hidden optical fiber's path between the link labelled WROX998 and the link labelled WQQE624.

138.    This hidden optical fiber cable connects Defendants' shortwave transmission station in Ontario, Canada to Defendants' Worldwide Trading Network.

**Supp. App. 35**

**Defendants' Experimental Licenses**

*Elburn I Experimental License*

139.    Defendants applied for their first Experimental License on September 21, 2016 under FCC Experimental Licensing System File Number 0089-EX-CN-2016 for a 60-month term at a station location in Elburn, Illinois ("Elburn I Experimental License Application").  Ex. 42-A.

140.    The Elburn I Experimental License Application listed 10Band as the applicant.  Ronald Riley signed the application as an "[a]uthorized employee" of 10Band.  The application identified 10Band as a "[c]orporat[e]" applicant.  The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.  10Band requested that the Elburn I Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 42-B.

141.    The FCC granted the Elburn I Experimental License with an effective date of November 10, 2016 and an expiration date of November 1, 2021 ("Elburn I Experimental License").  Ex. 42-C.

142.    On August 31, 2021, 10Band submitted a renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0078-EX-TC-2020 ("Elburn I Experimental License Renewal I").  Ex. 42-D.  Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the Elburn I Experimental License Renewal I.  The application directed mail to a 10Band office but all email correspondence to a NLN email domain.  The FCC granted the Elburn I Experimental License Renewal I, extending the expiration date of the Elburn I Experimental License by 2 years—to November 1, 2023.  Ex.

42-E.  10Band requested that the Elburn I Experimental License Renewal I be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 42-F.

143.    On August 8, 2023, 10Band submitted a renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0277-EX-CM-2022 ("Elburn I Experimental License Renewal II").  Ex. 42-G.  Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation" —signed the renewal application.  The application directed mail to a 10Band office but all email correspondence to a NLN email domain.   The FCC granted the Elburn I Experimental License Renewal II, extending the expiration date of the Elburn I Experimental License by an additional 2 years—to November 1, 2025.  Ex. 42-H.

144.    10Band submitted several other applications for modifications to the Elburn I Experimental License.

a.      The modification application filed on May 1, 2020 under FCC Experimental Licensing System File Number 0078-EX-TC-2020 listed 10Band as the applicant.  Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  Ex. 42-I.  The application identified 10Band as an "[o]ther" applicant.  It directed mail to a 10Band office but all email correspondence to a NLN email domain.

b.      The modification application filed on October 19, 2021 under FCC Experimental Licensing System File Number 0234-EX-CM-2021 listed 10Band as the applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 42-J.  The application identified 10Band as a "[c]orporate" applicant.  It directed mail to a 10Band office but all email correspondence to a NLN email domain.

37

**Supp. App. 37**

c.    The modification application filed on November 25, 2022 under FCC Experimental Licensing System File Number 0277-EX-CM-2022 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 42-K. The application identified 10Band as a "[c]orporate" applicant. It directed mail to a 10Band office but all email correspondence to a NLN email domain.

145.    In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations. In each license application, modification application, and renewal application for the Elburn I Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture. *See* Fig. 7.

38

**Supp. App. 38**

---

**Certification**

THE APPLICANT CERTIFIES THAT:

    a. Copies of the FCC Rule Parts 2 and 5 are on hand; and
    b. Adequete financial appropriations have been made to carry on the program of experimentation which will be conducted by qualified personnel; and
    c. All operations will be on an experimental basis in accordance with Part 5 and other applicable rules, and will be conducted in such a manner and at such a time as to preclude harmful interference to any authorized station; and
    d. Grant of the authorization requested herein will not be construed as a finding on the part of the Commission:
        1. that the frequencies and other technical parameters specified in the authorization are the best suited for the proposed program of experimentation, and
        2. that the applicant will be authorized to operate on any basis other than experimental, and
        3. that the Comission is obligated by the results of the experimental program to make provision in its rules including its table of frequency allocations for applicant's type of operation on a regularly licensed basis.

THE APPLICANT FURTHER CERTIFIES THAT:

    e. All the statements in the application and attached exhibits are true, complete and correct to the best of the applicant's knowledge; and
    f. The applicant is willing to finance and conduct the experimental program with full knowledge and understanding of the above limitations; and
    g. The applicant waives any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the USA.

WILLFUL FALSE STATEMENTS MADE ON THIS FORM ARE PUNISHABLE BY FINE AND/OR IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001), AND/OR REVOCATION OF ANY STATION LICENSE OR CONSTRUCTION PERMIT (U.S. CODE, TITLE 47, SECTION 312(A)(1)), AND/OR FORFEITURE (U.S. CODE, TITLE 47, SECTION 503).

**Figure 7: Exemplary Certification Excerpts from Exhibit 42-A**

146. 10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Elburn I Experimental License:

a. Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn I Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Elburn I Experimental License for purposes other than experimentation in contravention of the certification.

b. Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

39

**Supp. App. 39**

c.      Each renewal application falsely certified that the "[n]ature" of Defendants' activities under Defendants' Experimental Licenses were "experimental."  10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn I Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Elburn I Experimental License for purposes other than experimentation in contravention of the certification.

*Elburn II Experimental License*

147.    Defendants applied for another Experimental License on January 22, 2020 under FCC Experimental Licensing System File Number 0074-EX-CN-2020 for a 24-month term at a station location in Elburn, Illinois ("Elburn II Experimental License Application").  Ex. 43-A.

148.    The Elburn II Experimental License Application listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  The application identified 10Band as a "[c]orporat[e]" applicant.  The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.  10Band requested that the Elburn II Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 43-B.

149.    The FCC granted the Elburn II Experimental License with an effective date of February 12, 2020 and an expiration date of February 1, 2022 ("Elburn II Experimental License"). Ex. 43-C.

**Supp. App. 40**

150. 10Band filed a modification application for the Elburn II Experimental License on May 1, 2020 under FCC Experimental Licensing System File Number 0079-EX-TC-2020. Ex. 43-D. The modification application listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band. The application identified 10Band as an "[o]ther" applicant. The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

151. In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations. In each license application and modification application for the Elburn II Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

152. 10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Elburn II Experimental License:

a. Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Elburn II Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter

41

**Supp. App. 41**

under the Elburn II Experimental License for purposes other than experimentation in contravention of the certification.

b.      Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Wayne Experimental License*

153.    Defendants applied for another Experimental License on January 22, 2020 under FCC Experimental Licensing System File Number 0075-EX-CN-2020 for a 24-month term at a station location in Wayne, New Jersey ("Wayne Experimental License Application"). Ex. 44-A.

154.    The Wayne Experimental License Application listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain. 10Band requested that the Wayne Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates." Ex. 44-B.

155.    The FCC granted the Wayne Experimental License with an effective date of February 14, 2020 and an expiration date of February 1, 2022 ("Wayne Experimental License"). Ex. 44-C.

156.    10Band filed a modification application for the Wayne Experimental License on May 1, 2020 under FCC Experimental Licensing System File Number 0080-EX-TC-2020. Ex.

**Supp. App. 42**

44-D.    The modification application listed 10Band as the applicant.   Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  The application identified 10Band as an "[o]ther" applicant.   The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

157.    In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each license application and modification application for the Wayne Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

158.    10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Wayne Experimental License:

a.    Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Wayne Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Wayne Experimental License for purposes other than experimentation in contravention of the certification.

43

**Supp. App. 43**

b.       Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification.  10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Everett Experimental License*

159.   Defendants applied for another Experimental License on January 22, 2020 under FCC Experimental Licensing System File Number 0077-EX-CN-2020 for a 24-month term at a station location in Everett, Washington ("Everett Experimental License Application").  Ex. 45-A.

160.   The Everett Experimental License Application listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  The application identified 10Band as a "[c]orporat[e]" applicant.  The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.  10Band requested that Everett Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 45-B.

161.   The FCC granted the Everett Experimental License with an effective date of February 14, 2020 and an expiration date of February 1, 2022 ("Everett Experimental License"). Ex. 45-C.

162.   10Band filed a modification application for the Everett Experimental License on May 1, 2020 under FCC Experimental Licensing System File Number 0081-EX-TC-2020.  Ex. 45-D.   The modification application listed 10Band as the applicant.   Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band.  The application identified 10Band as an

44

**Supp. App. 44**

"[o]ther" applicant. The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

163. In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge. In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations. In each license application and modification application for the Everett Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

164. 10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Everett Experimental License:

a. Each license application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis." 10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Everett Experimental License for Commercial Trading by the Jump Defendants and Virtu. In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Everett Experimental License for purposes other than experimentation in contravention of the certification.

b. Each license application and modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification. 10Band

45

**Supp. App. 45**

and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

*Lynnwood Experimental License*

165.   On or about March 2020, NLN acquired substantially all of Western Maritime Broadcast LLC ("Western Maritime"), including Western Maritime's Experimental License, which was initially granted under FCC Experimental Licensing System File Number 0885-EX-CN-2018 for a 24-month term at a station location in Lynnwood, Washington with an effective date of February 8, 2020 and an expiration date of February 1, 2021 ("Lynnwood Experimental License"). Ex. 46-A. On or about March 2020, NLN assigned its rights to the Lynnwood Experimental License to 10Band. *See* Exs. 5, 46-B.

166.   10Band filed an application for consent of assignment of the Lynnwood Experimental License on March 6, 2020. Ex. 46-B. The application listed 10Band as the applicant-assignee. Hinerfeld signed the application as an "[o]fficer" of 10Band.

167.   The FCC granted the assignment of the Lynnwood Experimental License to 10Band effective April 3, 2020. Ex. 46-C.

168.   10Band submitted several other applications for modifications to the Lynnwood Experimental License.

a.   The modification application filed on April 17, 2020 under FCC Experimental Licensing System File Number 0005-EX-AL-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[o]ffice[r]" of 10Band. Ex. 46-D. The application identified 10Band as a "[c]orporat[e]" applicant. The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.

46

**Supp. App. 46**

b.      The modification application filed on November 25, 2020 under FCC Experimental Licensing System File Number 0268-EX-CM-2020 listed 10Band as the applicant.  Hinerfeld signed the application as an "[a]uthorized employee" of 10Band.  Ex. 46-E.  The application identified 10Band as a "[c]orporat[e]" applicant.  The application also directed mail to a Duane Morris LLP office and email correspondence to a Duane Morris LLP email domain.

c.      The modification application filed on December 8, 2020 under FCC Experimental Licensing System File Number 0118-EX-TC-2020 listed 10Band as the applicant.  Hinerfeld signed the application as an "[o]ffice[r]" of 10Band.  Ex. 46-F. The application identified 10Band as an "[o]ther" applicant.  The application also directed mail to a 10Band office but all email correspondence to a NLN email domain.

169.    In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.  In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  In each consent of assignment application and modification application for the Lynnwood Experimental License, 10Band or Hinerfeld acknowledged to the U.S. government that willful false statements made in those applications were punishable by fine, imprisonment, license revocation, and license forfeiture.

170.    10Band or Hinerfeld willfully made at least the following material misrepresentations, *infra* ¶¶ 172–180, with respect to the Lynnwood Experimental License:

47

**Supp. App. 47**

a.      Each consent of assignment application and modification application falsely certified that "[a]ll operations" under Defendants' Experimental Licenses would "be on an experimental basis."  10Band and Hinerfeld knew at the time of the certifications that 10Band had operated or would soon thereafter operate a shortwave transmitter under the Lynnwood Experimental License for Commercial Trading by the Jump Defendants and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the certifications that 10Band would be operating a shortwave transmitter under the Lynnwood Experimental License for purposes other than experimentation in contravention of the certification.

b.      Each modification application falsely stated that equipment used under Defendants' Experimental Licenses was not capable of station identification.  10Band and Hinerfeld knew at the time of the certifications that 10Band's equipment was capable of station identification.

### Defendants' Racketeering

171.    Defendants have fraudulently obtained and renewed several Experimental Licenses for shortwave communications to unlawfully dominate the Commercial Trading market.

Defendants' Predicate Acts: Fraud in Applying for, Modifying, and Renewing Experimental Licenses in Violation of 18 U.S.C. § 1343

172.    Defendants' predicate acts of racketeering include the submission of each license application, modification application, renewal application, consent of assignment application, and confidentiality request for Defendants' Experimental Licenses—each of which constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

173.    Defendants purposefully made the material misrepresentations described in at least Paragraphs 146, 152, 158, 164, and 170 for the purpose of executing Defendants' scheme to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully

**Supp. App. 48**

use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

174.    Each of Defendants' material misrepresentations was false when it was made, and 10Band or Hinerfeld knew it was false.  10Band or Hinerfeld falsely represented that all 10Band's activities and operations under the Experimental Licenses were "experimental" in nature.  Yet 10Band applied for and received Defendants' Experimental Licenses for the purposes of allowing Jump Trading and Virtu to exploit the technical advantages of shortwave transmitters operated under the custom-designed parameters of Defendants' Experimental Licenses to gain a speed advantage over competitors for Commercial Trading.

175.    10Band or Hinerfeld also falsely represented that the modem equipment used under each of Defendants' Experimental Licenses—TrellisWare TW-621—was not capable of broadcasting station identification.  Broadcasting station identification has been possible since the advent of radio broadcasting though the use of equipment that could produce Morse code.  In addition, the TrellisWare TW-621 is an advanced, modern modem.  10Band uses the TrellisWare TW-621 to broadcast station identification information in Canada.  FirstToken, *Shortwave HFT (High Frequency Trading) Station, CGA984 with Morse ID, 20152 kHz, 30 October, 2022*, YouTube (Nov. 5, 2022), https://www.youtube.com/watch?v=yLWMnrRJd7U; Ex. 47.

176.    10Band or Hinerfeld transmitted or caused to be transmitted the identified material misrepresentations over wire communications between 10Band (in Chicago, Illinois) and the FCC (in Washington, DC) in interstate and foreign commerce and did so for the purpose of executing Defendants' scheme to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and

49

**Supp. App. 49**

leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

177.    Through Defendants' electronic communications to the FCC, Defendants unlawfully acquired Experimental Licenses under false pretenses.  Defendants could not have obtained their Experimental Licenses without Defendants' material misrepresentations that all of 10Band's activities and operations under the Experimental Licenses were "experimental" in nature.  *Supra* ¶¶ 54–59, 172–176.

178.    Through Defendants' electronic communications to the FCC, Defendants also unlawfully extended the Elburn I Experimental License under false pretenses.  Defendants could not have obtained either the Elburn I Experimental License Renewal I or the Elburn I Experimental License Renewal II without Defendants' material misrepresentations that all of 10Band's activities and operations under the Elburn I Experimental License were "experimental" in nature.  *Supra* ¶¶ 54–59, 172–176.

179.    Through Defendants' electronic communications to the FCC, Defendants frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under Defendants' Experimental Licenses for the purpose of executing Defendants' scheme.  By repeatedly requesting that the FCC "with[o]ld from public inspection" 10Band's narrative description of its purported experimental work under Defendants' Experimental Licenses, Defendants prevented Skywave and other competitors from investigating and uncovering Defendants' unlawful scheme.

180.    Defendants further frustrated and obfuscated the investigation with material misrepresentations that the equipment used under each of Defendants' Experimental Licenses was not capable of station identification.  As a result of those material misrepresentations, Defendants

**Supp. App. 50**

prevented the FCC, Skywave, and other competitors from investigating the connections between Defendants' network infrastructure. *See supra* ¶¶ 83–138. Had Defendants complied with the station identification requirements for their Experimental Licenses, the FCC, Skywave, and other competitors would have been able to more readily track precisely when Defendants were using 10Band's shortwave transmitters to send shortwave signals and then tie those signals to Commercial Trading data.

181. Skywave is not the only victim of Defendants' fraud in applying for, modifying, and renewing their Experimental Licenses. Defendants' racketeering has also injured financial "pairs traders," who trade pairs, such as the E-Mini/FDAX arbitrage.

182. Skywave has knowledge of pairs traders that have ceased operations due to Defendants' racketeering. Because Defendants unlawfully used and continue to use 10Band's shortwave transmitters under Defendants' Experimental Licenses, they have achieved an approximately 9-millisecond advantage over pairs traders using conventional optical fiber and microwave networks, which enables Defendants to manipulate the pricing of paired assets and to take advantage of favorable asset prices. *See* Fig. 1.

Defendants' Predicate Acts: Unlawful Use of Experimental Licenses for Commercial Trading in Violation of 18 U.S.C. § 1343

183. Defendants' predicate acts of racketeering include each commercial trade made by Defendants using shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, and Lynnwood Experimental License—each of which constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

51

**Supp. App. 51**

184.    Defendants use Defendants' Experimental Licenses to engage in Commercial Trading, contrary to 10Band's and Hinerfeld's sworn representations to the U.S. government that the licenses would be used for research or experimentation.  Defendants developed their extensive, global network to engage in Commercial Trading at major worldwide market exchanges, including the NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3.  *See* Fig. 7.

185.    To date, Defendants have regularly engaged in unlawful Commercial Trading since approximately January 2020 using interstate or intercontinental wires.  *See supra* ¶¶ 83–138.

186.    Virtu has used 10Band's shortwave transmitter under an Experimental License to engage in Commercial Trading.  When Skywave met with Virtu in October 2020 to discuss a potential license to Skywave's network technology, Virtu declined Skywave's licensing offer. Virtu mentioned during the meeting that it had access to 10Band's shortwave network but did not mention whether it was trading over that network.  *See supra* ¶ 67.  At that time, 10Band only possessed shortwave Experimental Licenses from the FCC; it did not have any shortwave Commercial Licenses from the FCC.

187.    Virtu's SEC disclosures also suggest that it is part of joint ventures that use "microwave communication networks" to engage in "trading activities."  Specifically, in its 2024 SEC 10-K Form, Virtu states that it "pay[s] monthly fees for the use of the microwave communication networks" of Virtu's joint ventures "in connection with" those joint ventures' "***respective trading activities***."  Ex. 48 (emphasis added).  One of those joint ventures is NLN Holdings, which owns 10Band.  In addition to owning 10Band, NLN Holdings owns NLN, which operates the microwave communications portions of Defendants' Worldwide Trading Network. *Supra* ¶¶ 83–138.  Virtu specifies that it has a "50.0% noncontrolling interest in one of those joint

**Supp. App. 52**

ventures." *Id.* Virtu has a 50 percent noncontrolling interest in NLN Holdings. *See* Fig. 4. The microwave and shortwave portions of Defendants' Worldwide Trading Network are interconnected into a single trading network that connects worldwide trading exchanges.

188. Jump Trading has used Defendants' Experimental Licenses to engage in Commercial Trading over the shortwave communication rights granted to 10Band. In addition to Jump Trading sharing 10Band's shortwave network with Virtu, *see supra* ¶¶ 67, 186, trading data also suggests that Jump Trading uses 10Band's shortwave network to engage in Commercial Trading, *supra* ¶¶ 83–138.

189. Defendants continue to engage in unlawful Commercial Trading over 10Band's network, including using 10Band's shortwave transmitters in Elburn, Illinois; Wayne, New Jersey; and Lynnwood, Washington, all operated under Defendants' Experimental Licenses.

**Skywave's Injury Caused by Defendants' Unlawful Racketeering Conduct**

190. Due to Defendants' unlawful conduct, Skywave was unable to build and operate the Skywave Network. Defendants' racketeering scheme is the direct and proximate cause of the termination of Skywave's ▓▓▓▓▓ partnership with ▓▓ and ▓▓ and the associated resulting costs and losses.

191. Although Skywave received ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ as part of ▓▓▓▓ Agreement, *supra* ¶ 53 Skywave did not receive the ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ under their agreement.

192. Pursuant to its obligations under the ▓▓ and ▓▓▓▓▓▓, Skywave ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ to develop the network infrastructure. Now, that development work is a sunk cost.

53

**Supp. App. 53**

193.     Additionally, Skywave was forced to pause aspects of its network construction. This delay resulted in further opportunity costs to Skywave and an inability to leverage its innovative technology in the market.  For example, Skywave was unable to (1) complete its purchase transmitters and antennas; (2) close on land acquisitions for U.S. shortwave transmitter locations; and (3) develop shortwave receiver locations in the United Kingdom and Germany.  *See supra* ¶ 53.

194.     As a result of the failure to complete its network construction, Skywave was never able to operate the planned Skywave Network through which ███████████████ .  Under the ██████████████████, ████ had agreed to ███████████████ over the Skywave Network with Skywave and ████.  Thus, the failure to complete the Skywave Network resulted in Skywave's loss of at least ███████████████ .

195.     Due to Defendants' unlawful conduct, Skywave was unable to license its shortwave network technology, know-how, and patents.  Defendants' racketeering scheme is the direct and proximate cause of economic injury to competitor traders, including pairs traders in cross-exchange international markets, who had no choice but to cease trading operations because they could not compete with Defendants' approximately 9-millisecond advantage due to use of shortwave transmitters operated under Defendants' Experimental Licenses.  As the scheme advanced over time, competitor traders relinquished such cross-exchange trading or ceased operations altogether, and Skywave lost potential customers for its shortwave network technology, know-how, and patents.

**Supp. App. 54**

**CAUSES OF ACTION**

**COUNT I: Violation of 18 U.S.C. § 1962(c)**

196.     Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–195 as if fully set forth herein.

197.     Defendants form an enterprise through association-in-fact.

198.     The shared purpose of the enterprise and sub-enterprises and the members thereof is to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

199.     Each Defendant participated in the operation or management of Defendants' enterprise.

200.     Each Defendant contributed to directing the enterprise's affairs.

201.     Defendants and Defendants' enterprise engage in interstate commerce.

202.     Defendants' enterprise engages in a pattern of racketeering, including violations of 18 U.S.C. § 1343.  Defendants' racketeering activities affect interstate commerce.

203.     At least as of 2016, Defendants' racketeering acts exhibit open-ended or closed-ended continuity.  Defendants' racketeering acts all relate to and are in furtherance of the enterprise's shared purpose to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

**Supp. App. 55**

204.    Defendants' racketeering directly and proximately caused and continues to cause injury to Skywave.

## COUNT II: Violation of 18 U.S.C. § 1962(d)

205.    Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–204 as if fully set forth herein.

206.    From 2016, Defendants unlawfully, knowingly and intentionally combine, conspire, and agree together to engage in the aforesaid conduct in violation of 18 U.S.C. § 1962(c), as set forth in Count I of this Complaint.

207.    By facilitating the enterprise's racketeering activities, each Defendant intended to further the shared purpose of the enterprise to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

208.    Defendants' violations of 18 U.S.C. § 1343 were in furtherance of Defendants' conspiracy to conduct an enterprise designed to defraud the FCC to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses to unfairly maximize the financial benefit that Defendants derive from trading financial instruments at their competitors' expense.

209.    Defendants' violations of 18 U.S.C. § 1343 have directly and proximately caused and continue to cause injury to Skywave.

**Supp. App. 56**

## PRAYER FOR RELIEF

WHEREFORE, Skywave requests the following relief:

A.      Entry of judgment holding each Defendant liable for violating 18 U.S.C. § 1961 *et seq.*;

B.      An injunction restraining each Defendant, and Defendants' officers, agents, employees, affiliates, and all other persons in concert with, in participation with, or for them from (i) any further unlawful direct or indirect use of Experimental Licenses in the possession of any Defendant; and (ii) any other unlawful trading practice directed towards obtaining for any Defendant maximum financial benefit or acting to the detriment of competitors;

C.      An award of damages—including without limitation Skywave's lost profits and amounts by which Defendants have been unjustly enriched—due to Defendants' racketeering together with pre-judgment and post-judgment interest;

D.      An award of damages—including without limitation treble damages, attorney fees, and litigation costs—in accordance with the civil remedy provisions of 18 U.S.C. § 1964(c); and

E.      Any and all additional legal and equitable relief that may be available under law and that the court may deem proper.

## DEMAND FOR JURY TRIAL

Skywave hereby demands a trial by jury on all issues so triable.

Dated: October 7, 2024

**Supp. App. 57**

Respectfully submitted,

_/s/_ Jeanne M. Gills_____

| | |
|---|---|
| Justin Wilcox (*pro hac vice* pending) | Jeanne M. Gills (IL 6225018) |
| Goutam Patnaik (*pro hac vice* pending) | James Dasso (IL 6193545) |
| Jamie Dohopolski (*pro hac vice* pending) | Ariba A. Ahmad (IL 6343233) |

DESMARAIS LLP
1899 Pennsylvania Avenue, NW, Suite 400
Washington, D.C. 20006
Tel: 202.451.4900
Fax: 202.451.4901
jwilcox@desmaraisllp.com
gpatnaik@desmaraisllp.com
jdohopolski@desmaraisllp.com

FOLEY & LARDNER LLP
321 North Clark Street, Suite 3000
Chicago, Illinois 60654-4762
Tel: 312.832.4500
Fax: 312.832.4700
jmgills@foley.com
jdasso@foley.com
aahmad@foley.com

Steven Balcof (*pro hac vice* pending)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Tel: 202.351.3400
Fax: 202.351.3401
sbalcof@desmaraisllp.com

Justin M. Sobaje (*pro hac vice* pending)
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, California 90071
Tel: 213.972.4500
Fax: 213.486.0065
jsobaje@foley.com

*Attorneys for Skywave Networks, LLC*

58

**Supp. App. 58**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| SKYWAVE NETWORKS, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>WILLIAM J. DISOMMA,<br>PAUL A. GURINAS,<br>MATTHEW HINERFELD,<br>JOHN MADIGAN,<br>JUMP TRADING, LLC, and<br>VIRTU FINANCIAL, INC.,<br><br>    Defendants. | Civil Action No. 1:24-cv-9650<br><br>Judge Georgia N. Alexakis<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

Skywave Networks, LLC ("Skywave") files this First Amended Complaint against Defendants William J. DiSomma ("DiSomma"); Paul A. Gurinas ("Gurinas"); Matthew Hinerfeld ("Hinerfeld"); John Madigan ("Madigan"); Jump Trading, LLC ("Jump Trading"); and Virtu Financial, Inc. ("Virtu") (collectively, "Defendants") and alleges as follows, based on personal knowledge as to Skywave and Skywave's acts and on information and belief as to all other matters.

1

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 3

PARTIES, JURISDICTION, AND VENUE .......................................................................... 5

I.     BACKGROUND ...................................................................................................... 8

    A.   High-Frequency Trading (HFT) ........................................................................ 8

    B.   Skywave's Efforts To Launch And Commercialize Its Shortwave Network .................. 10

    C.   FCC Licensing ............................................................................................. 13

    D.   Defendants' Shortwave Activities ..................................................................... 16

       i.    Defendants' Commercial Trading Network............................................ 16

       ii.   The HFT Enterprise's Experimental Licenses ...................................... 21

II.    DEFENDANTS' CONDUCT .................................................................................... 27

    A.   Conducting Or Participating In A RICO Enterprise ............................................. 27

       i.    Defendants' Ordinary Business ........................................................ 27

       ii.   The HFT Enterprise ....................................................................... 29

       iii.  Defendants' Association With The HFT Enterprise................................. 30

       iv.   Defendants' Pattern Of Racketeering Activity ..................................... 31

          1.   *Fraudulent Filings With The FCC* .................................................. 32

          2.   *Unlawful Commercial Trading* ..................................................... 37

    B.   Conspiring To Conduct Or Participate In A RICO Enterprise ............................... 39

       i.    Defendants' Intent To Effect A Racketeering Scheme............................ 39

       ii.   Defendants' Agreement To Effect A Racketeering Scheme ..................... 39

       iii.  Defendants' Overt Acts In Furtherance Of Their Conspiracy ................... 40

    C.   Skywave's Discovery Of Defendants' Racketeering Scheme ............................... 41

    D.   Skywave's Injury ......................................................................................... 49

    E.   Injury To Other Traders ................................................................................ 50

III.   CAUSES OF ACTION ........................................................................................... 54

    A.   COUNT I: Violation Of 18 U.S.C. § 1962(c)..................................................... 54

    B.   COUNT II: Violation Of 18 U.S.C. § 1962(d) ................................................... 58

PRAYER FOR RELIEF ..................................................................................................... 59

DEMAND FOR A JURY TRIAL ........................................................................................ 60

**Supp. App. 60**

## **INTRODUCTION**

1.      Since at least 2016, Defendants have continuously directed, controlled, managed, and conducted the affairs of an enterprise through a pattern of racketeering activity.  In 2016, Defendants created a high-frequency trading ("HFT") enterprise comprised of 10Band, LLC ("10Band") (the "HFT Enterprise").  Defendants' purpose for the HFT Enterprise was—and continues to be—to build and operate a HFT network that includes shortwave radio infrastructure (the "HFT Network").  Beginning in 2016, Defendants directed the HFT Enterprise to apply for, modify, renew, assign, and request confidentiality for *experimental* Federal Communications Commission ("FCC") shortwave radio licenses pursuant to 47 C.F.R. § 5 ("Experimental Licenses").  Experimental Licenses are limited to "experimentation," "product development," and "market trials" (*id.* § 5.1(b)) and are advantageous because they allow applicants to specify their own technical operating parameters.  Defendants directed the HFT Enterprise to falsely state, falsely promise, or materially misrepresent to the FCC that the requested licenses were for experimental use and tailored them to have significant advantages over competing networks.  Then—once those Experimental Licenses were granted—Defendants directed and controlled the HFT Enterprise to trade financial instruments ("Commercial Trading")—in violation of the Experimental Licenses—unlawfully leveraging the ill-gotten advantages of the HFT Enterprise's HFT Network at the expense of other market participants, including Skywave.

2.      Defendants also conspired to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity.  At least as early as 2016, Defendants intended to obtain Experimental Licenses through false statements, false promises, or material misrepresentations and to unlawfully use the Experimental Licenses for Commercial Trading beyond the scope of "experimentation," "product development," and "market trials."  Defendants

**Supp. App. 61**

agreed to use the HFT Enterprise to enact their scheme. Defendants devised and enacted their scheme by directing and conducting the HFT Enterprise to apply for Experimental Licenses and knowingly make false statements, false promises, or material misrepresentations in the HFT Enterprise's FCC license applications. Defendants then used those Experimental Licenses to unlawfully engage in Commercial Trading.

3.     From 2013 to 2016, the founders of Skywave developed revolutionary trading network technology, which Skywave continues to develop and improve today. In 2016, Skywave was formed and entered a ██████████ partnership to commercialize its network technology. With the funding from that partnership, Skywave started to commercialize its trading network technology, including beginning the process to obtain a commercial FCC license to operate a shortwave transmitter under 47 C.F.R. § 73 ("Part 73 License").

4.     Skywave's commercialization efforts were derailed by Defendants' unlawful conduct, which is detailed further below. Defendants—through the HFT Enterprise—fraudulently obtained and misused Experimental Licenses because such licenses allow applicants to tailor their own technical operating parameters. By doing so, Defendants ensured that the HFT Enterprise's HFT Network would have a dominant speed advantage over other communications networks— like Skywave's nascent HFT network with a Part 73 License or the networks of other parties granted non-Experimental Licenses by the FCC. Because it could not compete with the HFT Enterprise's HFT Network, Skywave's partnerships fell apart, it was unable to find new partners, it was forced to halt its efforts to commercialize its technology, and it lost access to markets and trading profits it would have acquired from operating its shortwave network.

5.     Skywave is not the only victim of Defendants' misconduct. Defendants' misconduct also injured financial "pairs traders" like Sean and Douglas Drendel ("the Drendel

4

**Supp. App. 62**

Brothers"). In 2015, the Drendel Brothers launched Bruder Trading Inc. ("Bruder") to trade pairs, such as the S&P 500 E-Mini ("E-Mini")/DAX future ("FDAX").[1] Then, in 2021, Bruder was forced to cease trading because it was unable to compete with the HFT Enterprise's HFT Network.

6.       Defendants directed, controlled, managed, and conducted the affairs of the HFT Enterprise, including by creating the HFT Enterprise to build and operate the HFT Network, investing in the HFT Enterprise, holding leadership positions in the HFT Enterprise, directing the HFT Enterprise to apply for, modify, renew, assign, and request confidentiality for Experimental Licenses, submitting certifications on behalf of the HFT Enterprise in FCC filings, directing the HFT Enterprise to facilitate Defendants' Commercial Trading via its HFT Network, and conducting Commercial Trading via the HFT Network.

7.       Defendants concealed the true nature of their commercial activities behind an artifice of confidential, experimental work and a web of shell companies that obscured the connection between the HFT Enterprise and Defendants' racketeering scheme. Meanwhile, Defendants shared trading infrastructure, including the HFT Network, and coordinated their activities to carry out their scheme.

## PARTIES, JURISDICTION, AND VENUE

8.       Skywave is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 10525 West US Highway 30, Building 4 C, Wanatah, Indiana 46390.

9.       DiSomma is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654. DiSomma is also a resident of Illinois.

---

[1] Pairs trading is based on a correlation between two assets.

5

**Supp. App. 63**

10. Gurinas is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

11. Hinerfeld is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

12. Madigan is an individual with a business address at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

13. Jump Trading is a limited liability company registered to do business in Illinois, with its principal place of business at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654.

14. Virtu is a corporation organized and existing under the laws of Delaware, with a place of business at 233 South Wacker Drive, Suite 4020, Chicago, Illinois 60606.

15. This is a civil action arising under the Racketeer Influenced Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

17. Personal jurisdiction is proper against Jump Trading because it has a principal place of business in the Northern District of Illinois.

18. Personal jurisdiction is proper against DiSomma because DiSomma, through the William DiSomma Trust ("DiSomma Trust"), is an owner of Jump Trading, which has a principal place of business in the Northern District of Illinois.

19. Personal jurisdiction is proper against Gurinas because Gurinas, through the Paul A. Gurinas Trust ("Gurinas Trust"), is an owner of Jump Trading, which has a principal place of business in the Northern District of Illinois.

6

**Supp. App. 64**

20.    Personal jurisdiction is proper against Hinerfeld because he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's general counsel.

21.    Personal jurisdiction is proper against Madigan because he regularly transacts business on behalf of Jump Trading in the Northern District of Illinois as Jump Trading's Technologist and Manager of Telecom Infrastructure.

22.    Personal jurisdiction is proper against Virtu because it has a place of business in the Northern District of Illinois, and it participated in the activities alleged in this First Amended Complaint, a substantial portion of which occurred in this District.  Further, Virtu controls approximately 50 percent of 10Band, which operates radio transmission links in this District related to the activities alleged in this First Amended Complaint.

23.    Personal jurisdiction is also proper against all Defendants in the Northern District of Illinois because they devised and enacted a yearslong racketeering scheme to, among other things, defraud the FCC and the Commercial Trading market.  Defendants devised and enacted their scheme by obtaining Experimental Licenses to operate shortwave transmitters located in Elburn, Illinois (which is within this District); making false statements, false promises, or material misrepresentations in applications for Experimental Licenses and modification applications, renewal applications, and confidentiality requests for those Experimental Licenses that their operations would only be experimental; misusing the Experimental Licenses for Commercial Trading; and leveraging the ill-gotten advantages of their Experimental Licenses at their competitors' expense.

24.    Venue is proper in this District under 28 U.S.C. § 1391 and 18 U.S.C. § 1965.  Jump Trading is a resident of the Northern District of Illinois.  DiSomma, Gurinas, Hinerfeld, Madigan,

**Supp. App. 65**

and Virtu all transact business in the Northern District of Illinois, including through activities in furtherance of all Defendants' racketeering scheme in this District by, among other things, misusing their Experimental Licenses and engaging in systematic and continuous Commercial Trading using the Elburn, Illinois transmitters.  In addition, Jump Trading has a regular and established place of business in the Northern District of Illinois, and Jump Trading and Virtu engage in trading activities and network operations activities in this District.

## I.     BACKGROUND

### A.  High-Frequency Trading (HFT)

25.     HFT is a trading strategy where financial instruments, like stocks and futures, are traded at high frequency to take advantage of small but frequent changes in financial markets. High-frequency traders seek to make profits from these small changes by aggregating large quantities of high-frequency trades over time.  While high-frequency traders might only make a relatively small profit on a single trade, they might make thousands of such trades per minute.

26.     In HFT, successful trades are determined by small fractions of time—nanoseconds, microseconds, and milliseconds.  The opportunities that high-frequency traders seek are often only available at the thinnest slices of time increments.

27.     The fleeting nature of HFT opportunities dictates that the speed of the networks, computers, and algorithms used by each high-frequency trader determines whether a trader will be fast enough to capture an opportunity or lose it to a faster trader.  Only high-frequency traders with the fastest networks can dominate the opportunities presented by changing conditions in national and international financial markets.

28.     Put simply, for HFT, the fastest network wins the trade and reaps the economic benefits, and every millisecond counts.  As a matter of illustration, one HFT networking firm spent

**Supp. App. 66**

approximately $300 million to build a domestic network to save 3 milliseconds[2] while another HFT networking firm spent $250 million to build an intercontinental network to save 5 milliseconds.[3]

29.     Similarly, latency arbitrage trading is a form of trading that takes advantage of the time it takes for overseas financial markets to adjust to one another's changes.  The key for latency arbitrage is the speed (or low latency) of the network used by a trader.  To make a profit, latency arbitrage traders leverage the fact that they can receive signals about overseas market changes hundreds of microseconds to one millisecond before other traders and then make trades before other traders are aware of those overseas changes.

30.     To further illustrate, one example of latency arbitrage trading is trading based on the correlation between the E-Mini, which is traded on the Chicago Mercantile Exchange ("CME"), and the FDAX, which is traded on the Eurex market in Germany.  Specifically, an E-Mini price change can be a predictor of a future FDAX price change—*e.g.*, if the E-Mini price goes up or down, the FDAX price is likely to follow in the same direction.  Critically, however, it takes time (albeit milliseconds) for the FDAX to catch up to the E-Mini, and that delay gives rise to latency arbitrage trading opportunities.  For instance, when the E-Mini price goes up in Chicago, a U.S. trader with a low latency network can send a trading trigger to buy the FDAX in Germany before the rest of the market drives up the price.  Then, having purchased the FDAX at a lower

---

[2] Christopher Steiner, *Wall Street's Speed War*, Forbes (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html.
[3] *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, Can. Broad. Corp. (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581.

**Supp. App. 67**

price than the rest of the market, the trader can turn a profit by selling the FDAX at the higher price.

**B. Skywave's Efforts To Launch And Commercialize Its Shortwave Network**

31.     In 2016, entrepreneur Timothy Eloe and inventor Kevin Babich founded Skywave to commercially deploy technology for transcontinental wireless networks for trading. Skywave's shortwave trading network technology is ideal for all trading strategies that rely on the transmission of time-sensitive data between distant financial markets, like the practice of latency arbitrage in HFT.

32.     Skywave developed trading network technology that provides traders with a quantum leap in communications speed, particularly for transoceanic communications. For example, using Skywave's innovations, trade information can traverse the Atlantic Ocean faster than it could over traditional networks that used a combination of transoceanic optical fiber and microwave, previously the fastest communication method.

33.     Skywave's technology uses shortwave radio to transmit trade information over long distances. Shortwave radio, which is commonly associated with older technologies such as AM radio, had generally been considered antiquated for modern communications before Skywave developed methods to leverage it in new ways.

34.     Radio transmissions typically travel faster than transmissions via optical fiber. However, unlike optical fiber transmissions, most common radio technology—*e.g.*, microwave—requires a line of sight between transmitter and receiver. Such technology is not economically feasible for transcontinental communication because the curvature of the earth blocks the line of sight.

**Supp. App. 68**

35.    Shortwave radio, in contrast, is well-suited for transcontinental communication because it does not require a line of sight between transmitter and receiver.  Shortwave radio signals can be refracted—*i.e.*, bounced—off the Earth's ionosphere to effectively transmit information around the curvature of the earth.

36.    Skywave planned to implement its innovative shortwave trading network technology through a transcontinental network between the United States and Europe ("Skywave Network").  The Skywave Network would include a shortwave transmitter that Skywave planned to operate under a Part 73 License.

37.    Skywave received microwave licenses in September and October 2016 for building out the Skywave Network through its radio license holding company, Spectrum Holding Company, LLC.

38.    On December 15, 2015, and February 19, 2016, the Skywave founders met with FCC officials, including Mindel De La Torre, the Chief of the International Bureau, to present Skywave's plans for a Part 73 License for the Skywave Network and seek guidance from the FCC panel.  During Skywave's February 19 meeting with the FCC, the FCC panel declared its support for the proposed Part 73 License.  Skywave proposed to design a multi-use Part 73 License that would split transmission periods between Commercial Trading and public broadcasting of higher art musical performances.  The musical performances were to be funded in part by the Commercial Trading activities on the Part 73 Licenses.  The FCC panel encouraged Skywave to proceed with filing its application for a Part 73 License.

39.    By 2016, Skywave was ready to commercialize its innovative shortwave trading network technology and went to the market in search of development partners.

11

**Supp. App. 69**

40.     In October 2016, Skywave executed agreements with ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ ▮▮▮. Under the terms of those agreements, ▮▮ would ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The parties agreed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

41.     Upon consummation of those agreements, ▮▮▮, Skywave, and ▮▮ proceeded as a unified team, working to build a trading operation in which ▮▮▮▮▮▮▮▮▮▮▮, Skywave would supply the low-latency network, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮. Skywave had the key elements to commercialize the Skywave Network— ▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and FCC endorsement of Skywave's proposed Part 73 License.

42.     Using ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under the agreements, Skywave engineered and designed the Skywave Network and supporting infrastructure. From October 2016 through March 2017, Skywave completed the following tasks in building the Skywave Network: (1) executed a radio programming and broadcast contract, hired a studio engineer and a station manager, and began development of a broadcast studio; (2) took steps to buy transmitter and receiver sites, including assessing and selecting transmitter and receiver sites in the United States and Europe; (3) hired three radio engineers and two network specialists to support the Skywave Network infrastructure; (4) designed, engineered, and completed component specifications for customized transmitters, antennas, and patented fiber back-channel modems and shortwave

12

optimization methods; (5) completed installation of a network operations center, data center, security elements, connective elements, and microwave dishes; and (6) met with the FCC and prepared FCC construction permits and related filings, including applications for FCC licenses. Skywave also entered into contracts with third parties for the manufacture of transmitters, antennas, and modems for the Skywave Network.

### C. FCC Licensing

43.     Transmitting shortwave signals requires a license from the FCC.  In addition to providing a party permission to transmit signals, FCC licenses dictate the details of what can be transmitted, where transmissions can originate, and how those transmissions can be sent.  *See* 47 U.S.C. §§ 301, 314.  Section 301 makes clear that any such license is limited to the express terms and conditions of the license: "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license."  *Id.* § 301.

44.     The FCC forbids "[w]illful false statements made" in FCC license "[a]pplications, amendments, and related statements of fact."  47 C.F.R. §§ 5.57(d), 73.3513(d).  Such willful false statements are "punishable by fine and imprisonment" pursuant to 18 U.S.C. § 1001.  *Id.*

45.     At least two types of FCC licenses for shortwave radio transmission are relevant to the allegations in this First Amended Complaint: commercial and experimental.  A Part 73 License provides access for commercial use with certain restrictions.  For example, Part 73 Licenses (i) have limited bandwidth to transmit data; (ii) are limited to fixed operation frequencies during specified hours; (iii) require emissions masking; and (iv) have high minimum transmission power requirements.  *See* 47 C.F.R. §§ 73.702, 73.751, 73.758.

46.     Experimental Licenses issue under 47 C.F.R. § 5 ("Part 5") and are limited to "experimentation," "product development," and "market trials."  *Id.* § 5.1(b).  Given those limited

**Supp. App. 71**

purposes, applicants for Experimental Licenses are allowed to specify their own technical operating parameters for the transmission equipment for which they seek an Experimental License.

47.    Defendants custom designed a portfolio of Experimental Licenses for their HFT Enterprise to separately and collectively comprise operating parameters that offer significant advantages over Part 73 Licenses or other non-Experimental Licenses from the FCC.  Specifically, Experimental Licenses (i) have more bandwidth than a Part 73 License; (ii) provide access to and allow instant and frequent switching across a wide frequency range—*i.e.*, "frequency hopping"; (iii) do not have emissions-masking requirements; and (iv) do not have transmission power requirements.  With increased bandwidth, Defendants can transmit more data and do so more quickly.  With frequency hopping, Defendants can adjust and select the ideal frequency for given ionosphere conditions, which are constantly changing, and thus transmit data at the optimal latency. By relaxing emissions masking, Defendants reduce the latency attributable to that process, gaining a further speed advantage.  Finally, by avoiding the high transmission power requirements, Defendants also avoid the high costs and operational complexities of using high-powered tube transmitters.

48.    Importantly, Experimental Licenses do not authorize use of shortwave transmitters for commercial uses, such as Commercial Trading.  For example, 47 C.F.R. § 5.3 sets forth the operations that are permitted under an Experimental License.  None of those operations include Commercial Trading.  While Part 5 also includes "[p]roduct development and market trials," *id.*, those trials do not authorize for-hire Commercial Trading, such as the Commercial Trading conducted by Defendants using 10Band's Experimental Licenses.  Additionally, 47 C.F.R. § 5.601(c) provides that, for product development trials, "[m]arketing of devices . . . or provision of services for hire is not permitted."  By way of another example, 47 C.F.R. § 5.602(a) enables

14

**Supp. App. 72**

"provision of services for hire . . . before the radio frequency device has been authorized by the Commission" only if the "device will be operated in compliance with existing Commission rules, waivers of such rules that are in effect at the time of operation, or rules that have been adopted by the Commission but that have not yet become effective."  No such rules, waivers, or adopted rules permitting Commercial Trading under the HFT Enterprise's Experimental Licenses exist.

49.     Additionally, 47 C.F.R. § 5.5 provides that a market trial is "[a] program designed to evaluate product performance and customer acceptability ***prior to*** the production stage[] and typically requires testing a specific product under expected use conditions to evaluate actual performance and effectiveness" (emphasis added).  Defendants' regular use of the HFT Enterprise's shortwave infrastructure and Experimental Licenses for Commercial Trading exceeds this threshold from product evaluation to full commercial production.  For example, in a report and order from 2013, the FCC directly addressed commentator concerns about Experimental License holders soft launching their products and services under the guise of market and product development trials in an attempt to "game" the licensing processes.  *See* Ex. 51 at 805–08.  There, the FCC adopted rules for product development trials indicating that the licensee must not market devices or offer services for hire.  *Id.* at 808.  The FCC also clarified that market trials have requirements that licensees retain ownership over all equipment, can sell the equipment only to another licensee similarly authorized to conduct a market trial, and are only permitted to lease trial equipment to unlicensed trial participants.  *Id.*  Defendants' Commercial Trading does not fall into any of the permitted categories and demonstrates a pattern of marketing devices and offering services for hire.

50.     Irrespective of any rules or waivers that would have permitted Defendants to engage in Commercial Trading through their HFT Enterprise, Commercial Trading was not

**Supp. App. 73**

included in the parameters of the HFT Enterprise's Experimental Licenses. Defendants willingly consented to limit their operations to experimental purposes—to the exclusion of Commercial Trading—and acknowledged they were not authorized "to operate on any basis other than experimental" in their Experimental License applications. *See, e.g.*, Ex. 42-A.

51.     Skywave, on the other hand, took tangible steps to obtain a Part 73 License. *See supra* ¶ 42. Defendants' misuse of Experimental Licenses made Skywave's Part 73 License arrangements and investments commercially untenable.

### D. Defendants' Shortwave Activities

#### i. Defendants' Commercial Trading Network

52.     Defendants, through their HFT Enterprise, have constructed a worldwide network of optical fiber, microwave transmitters, and shortwave connections between trading exchanges to leverage the speed of shortwave connections and profit from Commercial Trading, including latency arbitrage trading, at their competitors' expense ("Defendants' Commercial Trading Network"). Defendants' Commercial Trading Network includes the HFT Enterprise's HFT Network.

**Supp. App. 74**



**Figure 1: Overview of Defendants' Commercial Trading Network**

53.    Defendants operate computer servers or other equipment inside the data centers where trading exchanges are managed.  These servers are connected to Defendants' Commercial Trading Network and allow their trades to be executed.  Defendants use the speed advantage of the HFT Enterprise's HFT Network (through the advantages of Experimental Licenses) to illegally dominate certain trades across global trading markets.

54.    Jump Trading and Virtu, directly or through an intermediary, operate one or more servers or other equipment at the CME Group Data Center in Aurora, Illinois;[4] at data centers in Chicago, Illinois, including the CH4 Data Center and the CME (collectively, "Cermak Road Data

---

[4] CME Group, Inc. ("CME Group") operates CME, CBOT, NYMEX, and COMEX. William Shepard (labeled "4" in Fig. 3) serves on the Board of Directors of the CME Group. Shepard also owns an interest in Jump Trading.  Saijel Kishan & Matthew Leising, *Don't Tell Anybody About This Story on HFT Power Jump Trading*, Bloomberg (July 23, 2014), https://www.bloomberg.com/news/articles/2014-07-23/don-t-tell-anybody-about-this-story-on-hft-power-jump-trading.

17

Centers"); at the NYSE Data Center in Mahwah, New Jersey; at data centers in Secaucus, New Jersey, including the NY2 Data Center, the NY4 Data Center, and the NY5 Data Center (collectively, "Secaucus Data Centers"); and at the NY11 Data Center in New Jersey.

55.     Jump Trading and Virtu, directly or through an intermediary, also operate one or more servers or other equipment at the LD4, LD5, or LD6 Data Centers in the United Kingdom; at the LSEG Data Center Docklands in the United Kingdom; at the NYSE Euronext Data Center in the United Kingdom; at the FR2 Data Center in Germany; at the Japan Exchange Group's data centers, including the OSE data center, in Japan; and at the B3 Data Center in Brazil.

56.     New Line Networks, LLC ("NLN"), a subsidiary of Virtu through NLN Holdings, LLC ("NLN Holdings"), maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center; the Cermak Road Data Centers; the NYSE Data Center; the Secaucus Data Centers; and the NY11 Data Center.  NLN, directly or through an intermediary, also operates a series of microwave transmission links that relay trading signals between Illinois and New York/New Jersey; between Illinois, New Jersey, and Canada; and between the British Isles and London.  Exs. 6-A–9-B, 13-A–34-B, 36-A–40-B, 49-A, 49-B.

57.     10Band maintains one or more microwave transmission links that transmit data to and from the CME Group Data Center and the Secaucus Data Centers; two shortwave transmission stations in Elburn, Illinois that transmit trading signals to Europe, Japan, and Washington; one or more shortwave receiving stations in Elburn, Illinois that receive trading signals from Europe, the British Isles, South America, and Asia; a shortwave transmission station in Wayne, New Jersey that transmits trading signals to Europe; and a shortwave transmission station in Snohomish, Washington that transmits trading signals to Asia.  Exs. 10-A–12-B, 35-A, 35-B.

**Supp. App. 76**

58.     10Band also maintains one or more shortwave receiving stations in Washington to accept incoming shortwave transmissions from transmitters in Illinois and Canada and a shortwave reception loop array station in the United Kingdom that receives shortwave signals from shortwave transmission stations in New Jersey, Illinois, and Canada.  Exs. 10-A–12-B.

59.     In March 2021, Defendants formed Canadian company 1291956 B.C. Unlimited Liability Company, which does business as Green Wave Radio.  Jump Trading's affiliate company Jump Operations, LLC ("Jump Operations") registered Green Wave Radio's website address, greenwaveradio.net, on July 20, 2023.  Ex. 50.  Jump Operations shares an address with Jump Trading in Chicago, Illinois, and Hinerfeld lists that same address as his address with the California State Bar.  *See Attorney Profile, Matthew Ben Hinerfeld #160961*, State Bar of Cal. (last accessed Feb. 13, 2025), https://apps.calbar.ca.gov/attorney/Licensee/Detail/160961.

60.     Green Wave Radio currently transmits shortwave trading signals from Defendants' shortwave transmission station in Ontario, Canada under a Canadian high-frequency developmental license, which is similar to U.S. Experimental Licenses.  *See Developmental License Playbook*, Gov't of Can. (Sept. 27, 2022), https://ised-isde.canada.ca/site/spectrum-management-telecommunications/en/licences-and-certificates/developmental-licence-playbook.  This link transmits shortwave signals to Defendants' receiving stations in the United Kingdom, Germany, Japan, Brazil, and Washington.

61.     Defendants constructed a hidden intermediary to connect their U.S. and Canadian networks rather than connecting them openly in their name.  For example, Defendants created a company called RuralConnect, LLC ("RuralConnect"), which acts as a local internet service provider and serves as an intermediary to Defendants.  RuralConnect owns a microwave path from

**Supp. App. 77**

Green Wave Radio's transmitter in Ontario to a field near Dunbridge, Ohio. *See* Exs. 41-A, 41-B.

Figure 2 below shows an aerial photograph of that link.



**Figure 2: Hidden Connection Between Defendants' U.S. and Canadian Networks**

62.    NLN operates a microwave link located across the street from RuralConnect's microwave link in Ohio. *See* Exs. 29-A, 29-B. There are no FCC licenses for microwave links between the NLN link and the RuralConnect link across the street.

63.    Instead of connecting these two microwave network links through a FCC license, Defendants built or caused to be built a hidden optical fiber cable that travels under a private driveway to connect the RuralConnect microwave link to the NLN microwave link. Fig. 2. This hidden optical fiber cable connects Defendants' shortwave transmission station in Ontario, Canada to Defendants' Commercial Trading Network.

20

**Supp. App. 78**

### ii.   The HFT Enterprise's Experimental Licenses

64.      The HFT Enterprise applied for its first Experimental License on September 21, 2016, under FCC Experimental Licensing System File Number 0089-EX-CN-2016 for a 60-month term at a station location in Elburn, Illinois ("Elburn I Experimental License Application").  Ex. 42-A.

65.      The Elburn I Experimental License Application listed 10Band as the "[c]orporat[e]" applicant.  Ex. 42-A.  Ronald Riley signed the application as an "[a]uthorized employee" of 10Band.  Ex. 42-A.  10Band requested that the Elburn I Experimental License Application be "withheld from public inspection" because, according to 10Band, disclosure of 10Band's narrative statement of its proposed research and experimentation supposedly "would cause significant commercial, economic, and competitive harm to 10Band and its affiliates."  Ex. 42-B.  The FCC granted 10Band's request for confidentiality.

66.      The FCC granted the Elburn I Experimental License with an effective date of November 10, 2016 and an expiration date of November 1, 2021 ("Elburn I Experimental License").  Ex. 42-C.

67.      On August 31, 2021, 10Band submitted a renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0078-EX-TC-2020 ("Elburn I Experimental License Renewal I").  Ex. 42-D.  Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the Elburn I Experimental License Renewal I.  Ex. 42-D.  The FCC granted the Elburn I Experimental License Renewal I, extending the expiration date to November 1, 2023, while also specifying that the operation was "not permitted for market trial[s] or stock trading."  Ex. 42-E.  10Band requested that the Elburn I

**Supp. App. 79**

Experimental License Renewal I be "withheld from public inspection" for the same reason as its earlier application. Ex. 42-F. The FCC granted 10Band's request for confidentiality.

68.    On August 8, 2023, 10Band submitted another renewal application for the Elburn I Experimental License under FCC Experimental Licensing System File Number 0277-EX-CM-2022 ("Elburn I Experimental License Renewal II"). Ex. 42-G. Hinerfeld—an "[a]uthorized [r]epresentative" of the 10Band "[c]orporation"—signed the renewal application. Ex. 42-G. The FCC granted the Elburn I Experimental License Renewal II, extending the expiration date to November 1, 2025. Ex. 42-H.

69.    10Band submitted several other applications for modifications to the Elburn I Experimental License that were all granted.

    a.  The modification application filed on May 1, 2020, under FCC Experimental Licensing System File Number 0078-EX-TC-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band. Ex. 42-I. The application identified 10Band as an "[o]ther" applicant. Ex. 42-I.

    b.  The modification application filed on October 19, 2021, under FCC Experimental Licensing System File Number 0234-EX-CM-2021 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 42-J. The application identified 10Band as the "[c]orporate" applicant. Ex. 42-J.

    c.  The modification application filed on November 25, 2022, under FCC Experimental Licensing System File Number 0277-EX-CM-2022 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 42-K. The application identified 10Band as the "[c]orporate" applicant. Ex. 42-K.

**Supp. App. 80**

70.     The HFT Enterprise applied for another Experimental License on January 22, 2020, under FCC Experimental Licensing System File Number 0074-EX-CN-2020 for a 60-month term at a station location in Elburn, Illinois ("Elburn II Experimental License Application"). Ex. 43-A.

71.     The Elburn II Experimental License Application listed 10Band as the "[c]orporat[e]" applicant. Ex. 43-A. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 43-A. 10Band requested that the Elburn II Experimental License Application be "withheld from public inspection" for the same reason as its earlier applications. Ex. 43-B. The FCC granted 10Band's request for confidentiality.

72.     The FCC granted the Elburn II Experimental License with an effective date of February 12, 2020, and an expiration date of February 1, 2022 ("Elburn II Experimental License"). Ex. 43-C.

73.     10Band filed a modification application for the Elburn II Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0079-EX-TC-2020. Ex. 43-D. The modification application listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band. Ex. 43-D. The application identified 10Band as an "[o]ther" applicant. Ex. 43-D. The FCC granted 10Band's application.

74.     The HFT Enterprise applied for another Experimental License on January 22, 2020, under FCC Experimental Licensing System File Number 0075-EX-CN-2020 for a 60-month term at a station location in Wayne, New Jersey ("Wayne Experimental License Application"). Ex. 44-A.

75.     The Wayne Experimental License Application listed 10Band as the "[c]orporat[e]" applicant. 44-A. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 44-A. 10Band requested that the Wayne Experimental License Application be "withheld from

23

**Supp. App. 81**

public inspection" for the same reason as its earlier applications. Ex. 44-B. The FCC granted 10Band's request for confidentiality.

76.     The FCC granted the Wayne Experimental License with an effective date of February 14, 2020, and an expiration date of February 1, 2022 ("Wayne Experimental License"). Ex. 44-C.

77.     10Band filed a modification application for the Wayne Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0080-EX-TC-2020. Ex. 44-D. The modification application listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band. Ex. 44-D. The application identified 10Band as an "[o]ther" applicant. Ex. 44-D. The FCC granted 10Band's modification request.

78.     The HFT Enterprise applied for another Experimental License on January 22, 2020, under FCC Experimental Licensing System File Number 0077-EX-CN-2020 for a 60-month term at a station location in Everett, Washington ("Everett Experimental License Application"). Ex. 45-A.

79.     The Everett Experimental License Application listed 10Band as the "[c]orporat[e]" applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 45-A. 10Band requested that the Everett Experimental License Application be "withheld from public inspection" for the same reason as its earlier applications. Ex. 45-B. The FCC granted 10Band's request for confidentiality.

80.     The FCC granted the Everett Experimental License with an effective date of February 14, 2020, and an expiration date of February 1, 2022 ("Everett Experimental License"). Ex. 45-C.

**Supp. App. 82**

81. 10Band filed a modification application for the Everett Experimental License on May 1, 2020, under FCC Experimental Licensing System File Number 0081-EX-TC-2020. Ex. 45-D. The modification application listed 10Band as the applicant. Hinerfeld signed the application as an "[i]ndividual [a]pplicant" of 10Band. Ex. 45-D. The application identified 10Band as an "[o]ther" applicant. Ex. 45-D. The FCC granted 10Band's modification request.

82. On or about March 2020, NLN acquired substantially all of Western Maritime Broadcast LLC ("Western Maritime"), including Western Maritime's Experimental License, which was initially granted under FCC Experimental Licensing System File Number 0885-EX-CN-2018 for a 24-month term at a station location in Lynnwood, Washington with an effective date of February 8, 2019, and an expiration date of February 1, 2021 ("Lynnwood Experimental License"). Ex. 46-A. On or about March 2020, NLN assigned its rights to the Lynnwood Experimental License to the HFT Enterprise. *See* Exs. 5, 46-B.

83. 10Band filed an application for consent of assignment of the Lynnwood Experimental License on March 6, 2020. Ex. 46-B. The application listed 10Band as the applicant-assignee. Hinerfeld signed the application as an "[o]fficer" of 10Band. Ex. 46-B.

84. The FCC granted the assignment of the Lynnwood Experimental License to 10Band effective April 3, 2020. Ex. 46-C.

85. 10Band submitted several other applications for modifications to the Lynnwood Experimental License that were all granted.

    a. The modification application filed on April 17, 2020, under FCC Experimental Licensing System File Number 0094-EX-CM-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[o]ffice[r]" of 10Band. Ex. 46-D. The application identified 10Band as the "[c]orporat[e]" applicant. Ex. 46-D. The

25

**Supp. App. 83**

application was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted. Ex. 46-G.

b. The modification application filed on November 25, 2020, under FCC Experimental Licensing System File Number 0268-EX-CM-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[a]uthorized employee" of 10Band. Ex. 46-E. The application identified 10Band as the "[c]orporat[e]" applicant. Ex. 46-E. The application was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted. Ex. 46-H.

c. The modification application filed on December 8, 2020, under FCC Experimental Licensing System File Number 0118-EX-TC-2020 listed 10Band as the applicant. Hinerfeld signed the application as an "[o]ffice[r]" of 10Band. Ex. 46-F. The application identified 10Band as an "[o]ther" applicant. Ex. 46-F. The application was granted with the special conditions that the operation was "for experimental purposes only," that "provision of services [was] not permitted," and that no "market trial or stock trading" was permitted. Ex. 46-I.

26

**Supp. App. 84**

## II.  DEFENDANTS' CONDUCT

### A.  Conducting Or Participating In A RICO Enterprise

#### i.  Defendants' Ordinary Business

86.     Figure 3 provides an overview of Defendants and their HFT Enterprise (10Band), including the relationships between Defendants.[5]  10Band filed an ownership chart with the FCC that reflects many of the same relationships shown in Figure 3.  Ex. 2.



**Figure 3: Overview of Defendants' HFT Enterprise**

87.     Defendants DiSomma (labeled "2" in Fig. 3), Gurinas (labeled "3" in Fig. 3), Hinerfeld (labeled "1" in Fig. 3), Madigan (labeled "16" in Fig. 3), Jump Trading (labeled "8" in

---

[5] Figure 3 represents a compilation of the information in Exhibit 1 (FINRA BrokerCheck Report for Jump Trading), Exhibit 2 (10Band Ownership Structure as Submitted to FCC), and Exhibit 3 (Declaration of John P. Madigan on Behalf of NLN Holdings as Submitted to FCC).

**Supp. App. 85**

Fig. 3), and Virtu (labeled "14" in Fig. 3) carry on functions and operations that are independent and separate from that of the HFT Enterprise (shown in a red box labeled "17" in Fig. 3).

88.     DiSomma and Gurinas founded Jump Trading in 1999.  They collectively own and operate Jump Trading through several subsidiaries including the DiSomma Trust and Gurinas Trust (respectively), Jump Financial, LLC ("Jump Financial") (labeled "6" in Fig. 3), and Jump Trading Holdings, LLC ("Jump Trading Holdings") (labeled "7" in Fig. 3).

89.     Jump Trading operates, directly or through an intermediary, computer servers inside the data centers where trading exchanges are managed and conducts trading activity, including Commercial Trading.

90.     DiSomma and Gurinas own and control 40 percent of the HFT Enterprise.  Their interest in the HFT Enterprise is held through several subsidiaries including DiSomma Trust and Gurinas Trust (respectively), ECW Wireless, LLC ("ECW Wireless") (labeled "9" in Fig. 3), World Class Wireless, LLC ("World Class Wireless") (labeled "10" in Fig. 3), NLN Holdings (labeled "11" in Fig. 3), and NLN (labeled "12" in Fig. 3).

91.     Hinerfeld is a lawyer who is employed by Jump Trading as its general counsel. Hinerfeld also holds a position on the board of NLN Holdings, a parent entity of the HFT Enterprise.

92.     Madigan is employed by Jump Trading as a Technologist and Manager of Telecom Infrastructure.  Madigan also holds a position on the board of NLN Holdings, a parent entity of the HFT Enterprise.  Ex. 3.

93.     Virtu operates, directly or through an intermediary, computer servers inside the data centers where trading exchanges are managed and conducts trading activity, including Commercial Trading.

28

**Supp. App. 86**

### ii. The HFT Enterprise

94.     10Band (labeled "13" in Fig. 3) forms an enterprise under 18 U.S.C. § 1961(4) for the purpose of building and operating an HFT network, including shortwave radio infrastructure.

95.     The HFT Enterprise's activities include applying for and operating the Elburn I, Elburn II, Wayne, Everett, and Lynnwood shortwave transmitters pursuant to 10Band's Experimental Licenses. These activities started in 2016 and have continued to the present.

96.     The HFT Enterprise's HFT Network connects to Defendants' Commercial Trading Network, providing Defendants and the HFT Enterprise with access to a tranche of various optical fiber, microwave, and shortwave links and infrastructure, both domestically and internationally.

97.     Defendants control 10Band. For example, Hinerfeld and Madigan—employees of Jump Trading—have directed and operated 10Band's affairs, including both legal and technical operations. Both Hinerfeld and Madigan have held themselves out as representatives or employees of 10Band and have signed sworn documents on 10Band's behalf. *See infra* ¶¶ 104–115. For example, Jump Trading, through Hinerfeld as its general counsel, directed and operated 10Band's legal operations, including Hinerfeld's regular engagement with and participation in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses. By way of another example, Jump Trading, through Madigan as its Technologist and Manager of Telecom Infrastructure, directed and operated 10Band's technical operations, as demonstrated by his regular engagement with and participation in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses. By way of another example, DiSomma and Gurinas, as owners of Jump Trading, direct and control 10Band's operations through Jump Trading and its employees, including Hinerfeld and Madigan. By way of another example, DiSomma, Gurinas, and Virtu are owners of NLN Holdings and NLN, which

29

**Supp. App. 87**

direct and control 10Band's operations. DiSomma, Gurinas, and Virtu directed members of NLN Holdings' board—including Hinerfeld and Madigan—to regularly engage with and participate in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses. Many of 10Band's FCC applications direct mail to a physical 10Band address and email correspondence to an NLN email domain. *See, e.g.*, Ex. 42-D. Furthermore, NLN and 10Band are both registered in Illinois and maintain places of business at 600 West Chicago Avenue, Chicago, Illinois, albeit in different suites.

98.    Madigan also has direct and indirect connections with Virtu. For example, Madigan was registered as a broker with Virtu Americas LLC, a subsidiary of Virtu, from 2014 to 2017. Exs. 52, 53 at 87. This overlapped with the time period during which Madigan was an employee of KCG Americas LLC ("KCG") and predated when Virtu formally acquired KCG in 2017. Exs. 52, 54 ¶ 29. Madigan has retained connections with Virtu traders and trading desks to this day, along with retaining a broker's license for conducting Commercial Trading.

### iii.    Defendants' Association With The HFT Enterprise

99.    DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu direct, control, manage, and conduct the affairs of the HFT Enterprise.

100.    DiSomma, Gurinas, and Virtu own the HFT Enterprise. DiSomma, Gurinas, and two minority shareholders own 50 percent of the HFT Enterprise. DiSomma and Gurinas collectively own a controlling interest in ECW Wireless through DiSomma Trust and Gurinas Trust, respectively. ECW Wireless owns a controlling interest in World Class Wireless. World Class Wireless owns a 50 percent interest in NLN Holdings. Virtu owns the other 50 percent of NLN Holdings. NLN Holdings is a parent entity of 10Band, which is the HFT Enterprise. The HFT Enterprise is therefore ultimately owned and controlled by DiSomma, Gurinas, and Virtu,

30

**Supp. App. 88**

which direct, control, and manage the HFT Enterprise. Jump Trading, DiSomma, and Gurinas also have control over Jump Trading employees who hold positions on NLN Holdings' board, including Madigan, Hinerfeld, and Marcus Washco, and direct, control, and manage the HFT Enterprise. Exs. 3, 5. Jump Trading and Virtu conduct Commercial Trading over the HFT Enterprise's HFT Network.

101. Hinerfeld, Jump Trading's general counsel, has signed numerous statements on behalf of the HFT Enterprise in FCC filings for Experimental Licenses. Ex. 4. Hinerfeld has been identified in those submissions as an "[a]uthorized [r]epresentative of [c]orporation," part of the "[o]ffice of applicant corporation or association," an "[i]ndividual [a]pplicant," an "[o]fficer of [a]pplicant [c]orporation or [a]ssociation," and an "[a]uthorized employee" of the HFT Enterprise. *See, e.g.*, Exs. 42-D, 43-A, 43-D, 45-C, 46-D.

102. Madigan supervised and participated in the preparation, submission, and prosecution of the HFT Enterprise's FCC filings for Experimental Licenses, and he supervised the development of the technology for the HFT Enterprise's transmission systems, all while holding a position as Jump Trading's Technologist and Manager of Telecom Infrastructure. *See* Ex. 3.

### iv.  Defendants' Pattern Of Racketeering Activity

103. Since 2016, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu have worked and continue to work in concert to direct, control, manage, and conduct the affairs of the HFT Enterprise's HFT Network for Commercial Trading. Together, Defendants fraudulently obtained and then misused the HFT Enterprise's Experimental Licenses for shortwave communications to create the HFT Network through which Jump Trading and Virtu unlawfully conduct Commercial Trading. This allows Defendants to reap ill-gotten financial benefits by dominating Commercial Trading markets, including latency arbitrage markets, where the HFT

**Supp. App. 89**

Network's speed advantage over other networks wins trades, resulting in profitable trading—profits Jump Trading and Virtu would not have made conducting Commercial Trading on slower networks. Each Defendant reaped ill-gotten financial gains from Jump Trading and Virtu's unlawful Commercial Trading: (1) Jump Trading and Virtu conducted the unlawful Commercial Trading and earned the resulting profits; (2) DiSomma and Gurinas reaped financial gains from Jump Trading's unlawful Commercial Trading profits as owners of Jump Trading; and (3) Hinerfeld and Madigan reaped financial gains from Jump Trading's unlawful Commercial Trading profits as senior employees of Jump Trading.

### 1. *Fraudulent Filings With The FCC*

104. Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by intentionally making false statements, false promises, or material misrepresentations to the FCC over interstate wires for the purpose of obtaining shortwave Experimental Licenses for Commercial Trading. Defendants' scheme sought to leverage the speed advantage of shortwave communications operated under Experimental Licenses to gain a dominant advantage over market participants, including latency arbitrage, to win trades and reap the resulting financial benefits of those trades.

105. Defendants devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by using their HFT Enterprise as a proxy for applying for shortwave Experimental Licenses. Defendants' scheme involved using Hinerfeld and Madigan, Jump Trading's employees and collaborators, to make numerous favorable certifications on the HFT Enterprise's FCC license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests that ran counter to Defendants' real intention of using the shortwave Experimental Licenses for Commercial Trading.

**Supp. App. 90**

106.    Through the HFT Enterprise, Defendants made false statements, false promises, or material misrepresentations to the FCC.  Defendants' predicate acts of racketeering include the submission of each license application, modification application, renewal application, consent of assignment application, and confidentiality request for the HFT Enterprise's Experimental Licenses—each of which constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

107.    On information and belief, DiSomma, Gurinas, Jump Trading, and Virtu directed Hinerfeld, Madigan, and 10Band to make false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise in FCC license applications.  Both Hinerfeld and Madigan hold positions on the board of NLN Holdings and are employees of Jump Trading. *See* Exs. 3–5.

108.    In each license application, modification application, renewal application, and consent of assignment application, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.  *See* Fig. 4-A.  In each renewal application, 10Band or Hinerfeld certified to the U.S. government that all statements in the application were considered material representations.  *See* Fig. 4-B.

33

**Supp. App. 91**

---

**Certification**

THE APPLICANT CERTIFIES THAT:

    a. Copies of the FCC Rule Parts 2 and 5 are on hand; and
    b. Adequete financial appropriations have been made to carry on the program of experimentation which will be conducted by qualified personnel; and
    c. All operations will be on an experimental basis in accordance with Part 5 and other applicable rules, and will be conducted in such a manner and at such a time as to preclude harmful interference to any authorized station; and
    d. Grant of the authorization requested herein will not be construed as a finding on the part of the Commission:
        1. that the frequencies and other technical parameters specified in the authorization are the best suited for the proposed program of experimentation, and
        2. that the applicant will be authorized to operate on any basis other than experimental, and
        3. that the Comission is obligated by the results of the experimental program to make provision in its rules including its table of frequency allocations for applicant's type of operation on a regularly licensed basis.

THE APPLICANT FURTHER CERTIFIES THAT:

    e. All the statements in the application and attached exhibits are true, complete and correct to the best of the applicant's knowledge; and
    f. The applicant is willing to finance and conduct the experimental program with full knowledge and understanding of the above limitations; and
    g. The applicant waives any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the USA.

**Figure 4-A: Exemplary Certification Excerpt from Exhibit 42-A**

---

**Certification**

- Neither the applicant nor any other party to the application is subject to a denial of Federal benefits that includes FCC benefits pursuant to Section 5301 of the Anti-Drug Abuse Act of 1988, 21 U.S.C. Section 862, because of a conviction for possession or distribution of a controlled substance.
- The applicant hereby waives any claim to the use of any particular frequency or electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise, and requests authorization in accordance with this application. (See Section 304 of the Communications Act of 1934, as amended.)
- The applicant acknowledges that all statements made in this application and attached exhibits are considered material representations, and that all the exhibits part hereof and are incorporated herein as if set out in full in this application; undersigned certifies that all statements in this application are true, complete and correct to the best of his/her knowledge and belief and are made in good faith.

**Figure 4-B: Exemplary Certification Excerpt from Exhibit 42-D**

109.    The HFT Enterprise, through 10Band and Hinerfeld, falsely stated, falsely promised, or materially misrepresented that all of 10Band's activities and operations under the Experimental Licenses would be "experimental" in nature. However, the HFT Enterprise had already provided, would provide, or would continue to provide its HFT Network to Jump Trading and Virtu for Commercial Trading to exploit the technical advantages of shortwave transmitters operated under the custom-designed parameters of the HFT Enterprise's Experimental Licenses to gain a speed advantage over Commercial Trading competitors.

110.    The HFT Enterprise, through 10Band and Hinerfeld, also falsely stated, falsely promised, or materially misrepresented that the modem equipment used under each of the HFT Enterprise's Experimental Licenses—TrellisWare TW-621—would not be capable of

34

**Supp. App. 92**

broadcasting station identification. Broadcasting station identification has been possible since the advent of radio broadcasting through the use of equipment that could produce Morse code. In addition, the TrellisWare TW-621 is an advanced, modern modem. 10Band uses the TrellisWare TW-621 to broadcast station identification information in Canada. FirstToken, *Shortwave HFT (High Frequency Trading) Station, CGA984 with Morse ID, 20152 kHz, 30 October, 2022*, YouTube (Nov. 5, 2022), https://www.youtube.com/watch?v=yLWMnrRJd7U; Ex. 47.

111. The HFT Enterprise, through Madigan, signed at least one Experimental License declaratory statement on behalf of 10Band that contains false statements, false promises, or material misrepresentations. For example, Madigan falsely certified that 10Band had conducted its operations over the preceding six years "pursuant to experimental authority," despite knowingly exceeding the bounds of that authority with each commercial trade. *See* Ex. 3.

112. The HFT Enterprise, at least through 10Band, Hinerfeld, and Madigan, transmitted or caused to be transmitted the identified false statements, false promises, or material misrepresentations over wire communications between 10Band (in Chicago, Illinois) and the FCC (in Washington, DC) in interstate and foreign commerce and did so for the purpose of executing Defendants' scheme to defraud the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses and making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental.

113. Even if the HFT Enterprise made truthful statements in its initial license application, each subsequent license application and modification application falsely stated, falsely promised, or materially misrepresented that "[a]ll operations" under the HFT Enterprise's

**Supp. App. 93**

Experimental Licenses would "be on an experimental basis."  10Band and Hinerfeld knew at the time of the FCC filings that 10Band had operated or would soon thereafter operate shortwave transmitters under Experimental Licenses for Commercial Trading by Jump Trading and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the FCC filings that 10Band would be operating shortwave transmitters under the Experimental Licenses for purposes other than experimentation.

114.    Each renewal application falsely stated, falsely promised, or materially misrepresented that the "[n]ature" of Defendants' activities under the HFT Enterprise's Experimental Licenses was "experimental."  10Band and Hinerfeld knew at the time of the FCC filings that 10Band had operated or would soon thereafter operate shortwave transmitters under Experimental Licenses for Commercial Trading by Jump Trading and Virtu.  In other words, 10Band and Hinerfeld knew at the time of the FCC filings that 10Band would be operating shortwave transmitters under its Experimental Licenses for purposes other than experimentation.

115.    Each license application, modification application, renewal application, consent of assignment application, and confidentiality request for the HFT Enterprise's Experimental Licenses was submitted in furtherance of Defendants' scheme to defraud the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental.

**Supp. App. 94**

## 2. Unlawful Commercial Trading

116. Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by making false statements, false promises, or material misrepresentations in their FCC license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests. Defendants then misused interstate wires to transmit orders for financial instruments in furtherance of that scheme.

117. Defendants devised and engaged in a scheme to defraud the FCC and the Commercial Trading market by using their HFT Enterprise as a proxy for applying for shortwave Experimental Licenses.

118. Through the HFT Enterprise, Defendants made false statements, false promises, or material misrepresentations to the FCC in the submission of each license application, modification application, renewal application, consent of assignment application, and confidentiality request.

119. The HFT Enterprise operates shortwave transmitters under Experimental Licenses, and Defendants use those transmitters to engage in Commercial Trading. Defendants' predicate acts of racketeering include each commercial trade made by Defendants using shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, and Lynnwood Experimental License. Each such commercial trade constitutes the use of wire for the purpose of executing Defendants' racketeering scheme and is an act of wire fraud in violation of 18 U.S.C. § 1343.

120. Defendants violate and unlawfully use the HFT Enterprise's Experimental Licenses to engage in Commercial Trading. On information and belief, no known Part 73 Licenses for Commercial Trading via shortwave exist. Yet a retrospective analysis of latency arbitrage trading

**Supp. App. 95**

shows that a large amount of Commercial Trading via shortwave has occurred since as early as 2017. That retrospective analysis reflects Defendants' Commercial Trading under Experimental Licenses through their HFT Enterprise. *See infra* ¶¶ 143–148. Defendants developed their extensive, global network to engage in Commercial Trading at major worldwide market exchanges, including the NASDAQ, ICE, CME, CBOT, NYMEX, COMEX, NYSE, CBOE, BATS, BZX, BYX, Chi-X, LSE, Deutsche Börse, JPX, TSE, OSE, TOCOM, and B3.

121. To date, Defendants have engaged in unlawful Commercial Trading using interstate or intercontinental wires.

122. On information and belief, DiSomma and Gurinas managed and directed the HFT Enterprise to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

123. Jump Trading engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License. On information and belief, Jump Trading managed and directed the HFT Enterprise, at least through DiSomma, Gurinas, Hinerfeld, and Madigan, to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

124. Virtu engages in Commercial Trading using one or more shortwave transmitters operated by 10Band under an Experimental License. On information and belief, Virtu managed and directed the HFT Enterprise to use its shortwave infrastructure to carry out Commercial Trading through the HFT Enterprise's Experimental Licenses.

125. Virtu's SEC disclosures also suggest that it is part of joint ventures that use "microwave communication networks" to engage in "trading activities." Ex. 48. Specifically, in its 2024 SEC 10-K Form, Virtu states that it "pay[s] monthly fees for the use of the microwave

38

**Supp. App. 96**

communication networks" of Virtu's joint ventures "in connection with" those joint ventures' "***respective trading activities***." Ex. 48 (emphasis added). Virtu specifies that it has a "50.0% noncontrolling interest in one of those joint ventures." Ex. 48. Upon information and belief, that joint venture includes the HFT Enterprise—*i.e.*, 10Band—as well as NLN Holdings and NLN. *See* Fig. 3. NLN, a parent entity of 10Band and the subsidiary of NLN Holdings, operates the microwave communications portions of Defendants' Commercial Trading Network. *Id.*

### B. Conspiring To Conduct Or Participate In A RICO Enterprise

#### i. Defendants' Intent To Effect A Racketeering Scheme

126. Defendants understood that their goal was to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity. Upon information and belief, Defendants intended to further the conspiracy scheme through their actions, including making false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise in FCC filings and engaging in Commercial Trading through the HFT Enterprise's Experimental Licenses.

#### ii. Defendants' Agreement To Effect A Racketeering Scheme

127. On information and belief, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu agreed to direct, control, manage, and conduct the affairs of the HFT Enterprise through a pattern of racketeering activity by engaging in Commercial Trading through the HFT Enterprise's Experimental Licenses. Such an agreement has been in existence since at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis. *See infra* ¶¶ 143–148.

128. On information and belief, DiSomma, Gurinas, Hinerfeld, Madigan, Jump Trading, and Virtu agreed to direct, control, manage, and conduct the affairs of an enterprise through a pattern of racketeering activity by making false statements, false promises, or material

**Supp. App. 97**

misrepresentations on behalf of the HFT Enterprise in FCC filings for Experimental Licenses. Such an agreement has been in existence since at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

129.    Defendants agreed that Hinerfeld, Madigan, 10Band, or another party on 10Band's behalf would commit at least two predicate acts to accomplish their goal of enacting their RICO scheme.

### iii.    Defendants' Overt Acts In Furtherance Of Their Conspiracy

130.    DiSomma, Gurinas, Jump Trading, and Virtu directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by directing their employees and collaborators to fraudulently obtain and misuse 10Band's Experimental Licenses to engage in Commercial Trading.  Such acts date back to at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis.  *See infra* ¶¶ 143–148.

131.    Hinerfeld and Madigan directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by preparing FCC filings containing false statements, false promises, or material misrepresentations for Experimental Licenses on behalf of the HFT Enterprise and then filing those submissions.  Such acts date back to at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

132.    DiSomma, Gurinas, Jump Trading, and Virtu directed, controlled, managed, and conducted the affairs of an enterprise through a pattern of racketeering activity by preparing FCC

**Supp. App. 98**

filings containing false statements, false promises, or material misrepresentations for Experimental Licenses on behalf of the HFT Enterprise and then filing those submissions. Such acts date back to at least 2016, as evidenced by their continuous submission of license applications, modification applications, renewal applications, consent of assignment applications, and confidentiality requests reciting the same false statements, false promises, or material misrepresentations.

133. Hinerfeld and Madigan directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity by directing their employees and collaborators to fraudulently obtain and misuse the HFT Enterprise's Experimental Licenses to engage in Commercial Trading. Such acts date back to at least 2017, as evidenced by Deutsche Börse's retrospective A7 analysis. *See infra* ¶¶ 143–148.

134. Defendants agreed that Hinerfeld, Madigan, 10Band, or another party on 10Band's behalf would commit at least two predicate acts to accomplish their goal of enacting their RICO scheme. The agreement was carried out by Defendants through the HFT Enterprise.

## C. Skywave's Discovery Of Defendants' Racketeering Scheme

135. In December 2016, Skywave learned that 10Band had filed applications with the FCC to obtain Experimental Licenses to operate shortwave transmitters. At the time, however, Skywave had no reason to believe that Defendants or 10Band would misuse the HFT Enterprise's Experimental Licenses for Commercial Trading, nor that Jump Trading or Virtu were affiliated with 10Band as managing entities of the HFT Enterprise.

136. In 2017, ▮ became concerned that if a person or entity were to use 10Band's shortwave transmitter under an Experimental License for Commercial Trading, that person or entity would have a dominant latency (*i.e.*, speed) advantage over other traders using optical fiber and microwave networks and over the Skywave Network, which would operate under Commercial

**Supp. App. 99**

License conditions.  At that time, Skywave was not aware of any information that Jump Trading or Virtu were affiliated with 10Band as managing entities of the HFT Enterprise.  Nor was there any publicly available data showing, or any method available to determine, whether Jump Trading, Virtu, or others were misusing Experimental Licenses for Commercial Trading.

137.    ██ did not believe the partnership could reasonably compete against persons or entities misusing the advantages of Experimental Licenses for Commercial Trading.  Given its concern about this possibility, ██ sought to exit the partnership with Skywave and ██.  In March 2017, Skywave, ███████ agreed to release ██ from the partnership.

138.    In the fall of 2018, Skywave found ████████████████████



█████████.  ████████████████ Skywave to further develop its innovative shortwave network technology.

139.    In 2020, ██ requested, and Skywave agreed, to dissolve the original partnership. At that time, Skywave was still not aware of any information showing Jump Trading, Virtu, or any other trading firm was affiliated with 10Band.  Nor was there any publicly available data showing, or any method available to determine, whether Jump Trading, Virtu, or others were misusing Experimental Licenses for Commercial Trading.

140.    In October 2020, ████████ and Virtu entered into a non-disclosure agreement to discuss Skywave's innovative shortwave network technology.  Representatives of ████████, Skywave, and Virtu subsequently met on or about October 8, 2020.  ████████████



42

**Supp. App. 100**

**Supp. App. 101**

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████  ██████████████████████████████████

████████

141.    Skywave continued to develop the Skywave Network.  Skywave focused on modem development, network architecture, site selection optimization, and microwave license applications and acquisitions.

142.    In October 2021, 10Band submitted a modification request for the Experimental License using call sign WI2XNX, the ***first*** among its portfolio of license applications, modifications, and renewals to be filed with a narrative statement that was ***not*** protected by a confidentiality request.  The modification request indicated 10Band's intention to use its Experimental License to conduct limited-scope market trials of high-frequency technology.  Ex. 42-L.

143.    In 2022, Skywave discovered that the German financial exchange services company, Deutsche Börse Group ("Deutsche Börse"), offered a market analytics tool called A7. The A7 tool enabled examination of Eurex—which was and continues to be owned and operated by Deutsche Börse[6]—and CME trading data for evidence of Commercial Trading using shortwave networks.  Such an analysis was previously unavailable.

---

[6] The Eurex financial exchange is operated by Eurex Frankfurt AG, which is a wholly owned subsidiary of Deutsche Börse.  Deutsche Börse became the sole owner of Eurex in 2012. *See* Rajeev Dhir, *Eurex: What It Is, History, Trading Technology*, Investopedia (May 30, 2022), https://www.investopedia.com/terms/e/eurex.asp;  *Organisation*, Deutsche Börse Group, https://www.deutsche-boerse.com/dbg-en/about-us/deutsche-boerse-group/organisation/subsidiaries (last accessed Feb. 13, 2025).

**Supp. App. 101**

144.    Using the A7 tool, Skywave was first able to discover evidence of Commercial Trading using shortwave.  For example, the A7 tool showed two different latencies for latency arbitrage trading of the E-Mini (abbreviated as "ES" in Fig. 5) and the FDAX.  *See* Fig. 5.  First, E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 37 milliseconds later.  That 37-millisecond latency indicates trading over networks comprised of conventional optical fiber and microwave transmitters.  Second, the A7 data also showed E-Mini price moves on the CME correlated with FDAX trading activity on the Eurex peaking approximately 28 milliseconds later.  That relatively low 28-millisecond latency indicates trading over networks that included shortwave transmissions.



**Figure 5: XCME/XEUR Latency Data**[7]

---

[7]    Stefan    Schlamp,    *Stefan    Schlamp's    Post*,    LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Feb. 13, 2025).

44

**Supp. App. 102**

145.    In fact, Deutsche Börse's head of quantitative analytics concluded that the A7 latency data showing this approximately 9-millisecond advantage in some trades was evidence of Commercial Trading using shortwave.  Fig. 6.



**Figure 6: Stefan Schlamp's A7 Analysis**[8]

146.    According to Deutsche Börse's retrospective A7 analysis, Commercial Trading using shortwave began in 2017, accelerated in 2019, and has dominated CME/Eurex latency arbitrage trading, such as E-Mini-FDAX trading, since 2020.  Correspondingly, Commercial Trading at the relatively slower optical fiber and microwave network latency gradually decreased

---

[8]    Stefan    Schlamp,    *Stefan    Schlamp's    Post*,    LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cmegroup-eurex-marketdata-activity-6948926555855192064-eXrF/ (indicating a time of publication 2 years prior to Feb. 13, 2025).

**Supp. App. 103**

after Commercial Trading using shortwave commenced.  Fig. 7 (heatmap showing shortwave network Commercial Trading on "Short-Wave" dotted line and optical fiber and microwave network Commercial Trading on "MW/Hibernia/MW" line, with white indicating activity and red indicating higher activity).



**Figure 7: XCME/XEUR Network Data**[9]

147.    The rise in use of shortwave networks for Commercial Trading evidenced by these low latencies precisely matches the decline of CME traders, such as the Drendel Brothers of Bruder, who used conventional network technologies (*e.g.*, optical fiber and microwave) and were

---

[9]    Stefan    Schlamp,    *Stefan    Schlamp's    Post*,    LinkedIn, https://www.linkedin.com/posts/stefanschlamp_cme-eurex-microwave-activity-7027298230296051712-bW6x (indicating a time of publication 2 years prior to Feb. 12, 2025).

**Supp. App. 104**

eventually forced to cease CME/Eurex pairs trading because they could not compete with traders using shortwave networks.

148.    After the A7 tool became accessible in 2022, Skywave used it to identify a clear industry-based pattern of shortwave Commercial Trading for HFT, reaching back well before October 2021, when 10Band announced its ostensibly new intention to modify its license parameters to include market testing of high-frequency technology.  Upon its discovery of the clear and industry-based pattern of shortwave Commercial Trading, its knowledge and awareness of the HFT Enterprise's Experimental Licenses, and its knowledge and awareness of Jump Trading and Virtu's direction, control, management, and conduct through the HFT Enterprise, Skywave had no choice but to put its business plans on hold and pause efforts to commercialize the Skywave Network in view of the HFT Enterprise's HFT Network's dominant latency advantage for Commercial Trading.

149.    Despite efforts to try to determine whether the HFT Enterprise's Experimental Licenses could be or were being used by Defendants for Commercial Trading after Skywave's October 2020 meeting with Virtu, Skywave was unable to discover any information demonstrating or showing a reasonable likelihood of Defendants' misconduct or misuse of the HFT Enterprise's Experimental Licenses for Commercial Trading until the A7 tool became available in 2022.  Nor could Skywave have reasonably discovered Defendants' misconduct or misuse of the HFT Enterprise's Experimental Licenses for Commercial Trading prior to 2022 because of the lack of available tools for performing the same functions as A7.  Skywave had previously monitored Defendants' signals periodically but was only ever able to confirm that Defendants were transmitting shortwave data signals.  Skywave did not have access to financial exchange information to correlate the signals to actual Commercial Trading until the A7 data became

47

**Supp. App. 105**

available. The HFT Enterprise, meanwhile, represented to the FCC in its application-related submissions that it was only experimenting with its shortwave transmission equipment.

150. Through Defendants' electronic communications to the FCC, Defendants also frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under the Experimental Licenses for the purpose of executing Defendants' scheme. By repeatedly requesting that the FCC "with[o]ld from public inspection" 10Band's narrative description of its purported experimental work under the HFT Enterprise's Experimental Licenses, Defendants made information pertaining to their misuse of Experimental Licenses unavailable and prevented Skywave and other competitors from investigating and uncovering Defendants' unlawful scheme. Defendants, in their own words and by their own efforts, precluded information about their misuse of Experimental Licenses from being available to the public or made available from any other source. For example, in each license application, renewal, and modification accompanied by a confidentiality request, Defendants represented that their "[c]onfidential [i]nformation" was not "available to the public and . . . [was] not generally available from any other source." *See, e.g.*, Ex. 42-B.

151. Through Defendants' electronic communications to the FCC, Defendants also frustrated and obfuscated identification or investigation of the true commercial nature of the operations Defendants conducted under the Experimental Licenses for the purpose of executing Defendants' scheme. By repeatedly falsely stating, falsely promising, or materially misrepresenting that the equipment used under each of Defendants' Experimental Licenses was not capable of station identification, Defendants impeded the FCC, Skywave, and other competitors from investigating the connections between Defendants and Defendants' Commercial Trading Network. Had Defendants complied with the station identification requirements for their

**Supp. App. 106**

Experimental Licenses, the FCC, Skywave, and other competitors would have been able to more readily track precisely when and where Defendants were using the HFT Enterprise's shortwave transmitters to send shortwave signals and then tie those signals to Commercial Trading data.

### D. Skywave's Injury

152.    Due to Defendants' unlawful conduct, Skywave has been unable to secure business partners, complete building the Skywave Network, operate the Skywave Network, access trading markets, or profit from the trading, including HFT trading, that would have been performed over the Skywave Network.  Defendants' misconduct is the direct and proximate cause of Skywave's economic injuries, including sunk costs and the loss of trading profits from its HFT network.

153.    Skywave ███████████████████████████████ as part of the ██ Agreement.  Pursuant to its obligations under the ███ and ████████, Skywave ██████ ███████████████████ to develop the Skywave Network's infrastructure.  Now, that development work is a sunk cost.

154.    Because of Defendants' unlawful conduct, Skywave was forced to pause aspects of its network construction.  This delay resulted in further opportunity costs to Skywave and an inability to leverage its innovative technology in the market.  For example, Skywave was unable to (1) complete its purchase of transmitters and antennas; (2) close on land acquisitions for U.S. shortwave transmitter locations; and (3) develop shortwave receiver locations in the United Kingdom and Germany.

155.    As a result of the failure to complete its network construction, Skywave was never able to operate the planned Skywave Network.  Under the ██████████████, ███ had agreed to ████████████ over the Skywave Network with Skywave and ███.  Similar to Defendants' trading structure, Skywave and ███ had agreed to ████████████████

49

**Supp. App. 107**



██████████████████████████████████████████████████████████████

████████████████████████████████████████. Thus, Skywave lost ██

████████████ due to Defendants' unlawful conduct. For example, ████████████████

████████████████████ latency arbitrage trading, the success of which is predicated on the speed of the trading network. If ████████████████ had a 1-millisecond speed advantage over other traders in a latency arbitrage trade, it would win that trade and reap financial benefits. The Skywave Network would have provided a speed advantage of more than 1 millisecond over conventional optical fiber and microwave networks for Commercial Trading between, for example, the CME and Eurex. But for Defendants' scheme to fraudulently obtain Experimental Licenses and then unlawfully use them for Commercial Trading over the HFT Enterprise's HFT Network, Skywave would have completed the Skywave Network, and ██████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████.

156. Due to Defendants' unlawful conduct and the resulting injury to traders (such as Bruder and the Drendel Brothers) who have been forced out of business because they could not compete with dominant speed advantages provided by the HFT Enterprise's HFT Network, Skywave has also been unable to license its shortwave network technology, know-how, and patents.

### E. Injury To Other Traders

157. Defendants' racketeering scheme is also the direct and proximate cause of economic injury to competitor traders, including pairs traders in cross-exchange international markets, who had no choice but to cease trading operations because they could not compete with Defendants' approximately 9-millisecond advantage due to misuse of shortwave transmitters operated under the HFT Enterprise's Experimental Licenses.

50

**Supp. App. 108**

158.     The trading operations of the Drendel Brothers via Bruder is illustrative.  As Defendants' racketeering scheme continued and advanced over time, competitor traders such as the Drendel Brothers and Bruder relinquished such cross-exchange trading or ceased operations altogether, and Skywave lost potential customers for its shortwave network technology, know-how, and patents.

159.     After decades of floor trading at the CME, the Drendel Brothers launched Bruder to focus on algorithmic strategies in pairs trading.  Algorithmic trading involves the use of algorithms, or specific sets of instructions, to execute trades, allowing traders to make profits faster and more often than traditional floor trading.

160.     As high-frequency pairs traders, the Drendel Brothers took advantage of small but frequent changes in financial markets.  They sought to make profits from these small changes by aggregating large quantities of high-frequency trades over time.

161.     Bruder relied on the Algo Design Lab ("ADL"), a platform owned by Trading Technologies International, Inc., to place its trades.  The ADL platform allows traders to customize their own trading algorithms.

162.     The Drendel Brothers began using the ADL platform to trade independently in March 2013.  By February 2015, they launched Bruder and continued to use ADL.  Bruder customized the ADL platform's building blocks to account for variables including volatility, correlation, profitability, contract price, and volume.

163.     In addition to customizing the algorithms, Bruder ran thousands of simulation trades that mirrored market activity.  Bruder relied on those simulations to determine which trades to execute and how to refine its algorithms.

**Supp. App. 109**

164.    Bruder's algorithms propelled the company to significant early success, generating more than $3 million in revenue from its launch through the end of 2016.  Bruder traded a variety of equity, currency, agriculture, and interest rate contracts.  At its peak, Bruder traded thousands of contracts per day and made a daily profit for roughly twenty days each month.

165.    Following its early success, Bruder expanded its business to collaborate with seven independent traders.  The independent traders paid licensing fees to Bruder for access to Bruder's proprietary algorithms.

166.    Although Bruder sometimes traded during regular market hours, its algorithms often targeted correlated markets in off-market hours and identified opportunities for greater profit at lower risk.  For example, Bruder traded pairs based on the correlation between the FDAX in Europe and the NASDAQ in the United States.  The FDAX opens at 8 a.m. local time, with pre-market trades starting an hour earlier.  Whenever one of Bruder's algorithms identified an opportunity for profit, the algorithm took a snapshot at 7 a.m. to serve as an origination point.  The algorithm then made trades from 7 a.m. to 8 a.m. every few ticks.[10]

167.    If the spread, or the difference in price between pairs, grew wider from the origination point every few ticks during that hour, the algorithm sold a FDAX contract and instantaneously purchased a NASDAQ contract.  The algorithm did the opposite if the spread grew narrower from the origination point.  Under normal circumstances—and prior to Defendants' misuse of Experimental Licenses—Bruder was able to profit off the trades as the spread ebbed and flowed.

168.    However, in 2017—shortly after the FCC granted the Elburn I Experimental License—Bruder began to observe market irregularities.  Bruder's algorithms would identify an

---

[10] A tick is the smallest possible change in price on an exchange.

**Supp. App. 110**

opportunity for profit and automatically purchase the associated financial instrument. But prices would fluctuate faster than Bruder's algorithms could execute the corresponding trade. As a result, Bruder's revenue began to decline.

169.    Those irregularities and Bruder's ensuing decline in revenue continued through 2018 and 2019. Bruder's simulations could no longer accurately predict market behavior, and Bruder was forced to stop certain types of trading activity. By February 2020—shortly after the FCC granted the Elburn II Experimental License, the Wayne Experimental License, and other licenses—Bruder ended its collaboration with some of the independent traders because Bruder's business could no longer support those relationships. Finally, in July 2021, the Drendel Brothers were forced to dissolve Bruder.

170.    At the time, the Drendel Brothers did not suspect that Bruder was losing money due to a speed disadvantage. Bruder traded under the Rosenthal Collins Group, a Chicago-based entity that served as an intermediary between exchange members and customers like Bruder. The Drendel Brothers believed that they had access to all available tools and advantages through the Rosenthal Collins Group.

171.    Deutsche Börse's retrospective A7 analysis confirms that trading at shortwave latencies began in 2017. This timing coincides with the market irregularities that Bruder observed and ultimately portended the company's end. That shortwave trading activity was the product of Defendants' misuse of Experimental Licenses for Commercial Trading. As a result of Defendants' misuse of Experimental Licenses, Bruder lost revenue, and the Drendel Brothers were ultimately forced to dissolve the company.

**Supp. App. 111**

172.     Defendants' racketeering scheme is the direct and proximate cause of Bruder's losses.  But for and as a result of Defendants' unlawful activity, Bruder would have earned at least $4 million more in revenue between November 2016 and its dissolution.

## III.     CAUSES OF ACTION

### A.  COUNT I: Violation Of 18 U.S.C. § 1962(c)

173.     Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–172 as if fully set forth herein.

174.     The HFT Enterprise, which comprises 10Band, constitutes an enterprise as defined by 18 U.S.C. § 1961(4).

175.     The purpose of the HFT Enterprise is to build and operate its HFT Network, including shortwave radio infrastructure, and to obtain licenses from the FCC to operate that network.

176.     Defendants and the HFT Enterprise engage in interstate commerce.

177.     As required by 18 U.S.C. § 1962(c), each Defendant has continuously directed, controlled, managed, and conducted the affairs of the HFT Enterprise.  Virtu directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through its 50 percent ownership interest in NLN Holdings, the Virtu employees that hold positions on the board of NLN Holdings, and its use of the HFT Enterprise's HFT Network.  Jump Trading directs, controls, manages, and conducts the affairs of the HFT Enterprise through the Jump Trading employees that hold positions on the board of NLN Holdings, its employees Hinerfeld and Madigan that manage and conduct the HFT Enterprise's operations, and its use of the HFT Enterprise's HFT Network.  DiSomma directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through his ownership interest in NLN Holdings, through Jump Trading, and through the Jump Trading

**Supp. App. 112**

employees that hold positions on the board of NLN Holdings and in the HFT Enterprise.  Gurinas directs, controls, manages, and conducts the affairs of the HFT Enterprise at least through his ownership interest in NLN Holdings, through Jump Trading, and through the Jump Trading employees that hold positions on the board of NLN Holdings and in the HFT Enterprise.  Hinerfeld directs, controls, manages, and conducts the affairs of the HFT Enterprise.  Madigan directs, controls, manages, and conducts the affairs of the HFT Enterprise.

178.    Since 2016, each Defendant has continuously directed, controlled, managed, and conducted the affairs of the HFT Enterprise through a pattern of racketeering activity, including multiple—*i.e.*, more than two—varied acts of wire fraud, each of which is a violation of 18 U.S.C. § 1343 and a predicate act.

179.    Defendants, through the HFT Enterprise, devised and engaged in a scheme to defraud the FCC and the Commercial Trading market to obtain shortwave Experimental Licenses for Commercial Trading.

180.    In many—*i.e.*, more than two—of the HFT Enterprise's interstate FCC filings related to new Experimental Licenses and modifications, renewals, assignments of, and confidentiality requests for Experimental Licenses, the HFT Enterprise made multiple—*i.e.*, more than two—false statements, false promises, or material misrepresentations that the Experimental Licenses would be used for only experimental purposes.  In each license application, modification application, renewal application, consent of assignment application, and confidentiality request, 10Band or Hinerfeld certified to the FCC that all statements in the application were true, complete, and correct to the best of 10Band or Hinerfeld's knowledge.  In each license application, modification application, renewal application, consent of assignment application, and confidentiality request, 10Band or Hinerfeld certified to the U.S. government that all statements

55

**Supp. App. 113**

in the application were considered material representations.  Madigan signed Experimental License declaratory statements and other filings on behalf of 10Band that contain false statements, false promises, or material misrepresentations.

181.    Defendants, through the HFT Enterprise, also used or caused the use of interstate wires to transmit orders for financial instruments.  The HFT Enterprise operates shortwave transmitters under Experimental Licenses, and Defendants, including at least Jump Trading and Virtu, use those transmitters to engage in Commercial Trading.  Each commercial trade made by Defendants uses shortwave networks granted to 10Band under the Elburn I Experimental License, Elburn II Experimental License, Wayne Experimental License, Everett Experimental License, or Lynnwood Experimental License.  Defendants have conducted Commercial Trading over the HFT Enterprise's HFT Network from approximately 2017 through the present.

182.    Defendants, through the HFT Enterprise, intended to defraud the FCC and the Commercial Trading market as demonstrated by the fact that the Experimental Licenses were intended for use in the HFT Enterprise's HFT Network, which Defendants created and use for Commercial Trading.

183.    Defendants, through the HFT Enterprise, used or caused the use of interstate wires to transmit false statements, false promises, or material misrepresentations to the FCC, as well as orders for financial instruments to various trading exchanges.

184.    To the extent that DiSomma, Gurinas, Jump Trading, and Virtu did not directly sign or certify the false statements, false promises, or material misrepresentations on behalf of the HFT Enterprise, they are responsible for those predicate acts because they agreed that the HFT Enterprise would commit those acts.  DiSomma and Gurinas are responsible for the false statements, false promises, or material misrepresentations through their direction, control, and

56

**Supp. App. 114**

management of the HFT Enterprise and through Madigan and Hinerfeld, who are employees of Jump Trading, which is owned by DiSomma and Gurinas. Jump Trading is responsible for and agreed to the false statements, false promises, or material misrepresentations through its direction, control, and management of the HFT Enterprise, as well as through Jump Trading's employees, Madigan and Hinerfeld. Virtu is responsible for and agreed to the false statements, false promises, or material misrepresentations through its direction, control, and management of the HFT Enterprise.

185.    Defendants' racketeering acts reflect open-ended continuity or—at a minimum—closed-ended continuity. Defendants continue to direct, control, manage, and conduct the affairs of the HFT Enterprise to defraud the FCC and the Commercial Trading market in filings related to new Experimental Licenses and the modification or renewal of existing Experimental Licenses. Defendants continue to direct, control, manage, and conduct the affairs of the HFT Enterprise to misuse the Experimental Licenses for Commercial Trading and leverage the ill-gotten advantages of Experimental Licenses. Defendants' racketeering has harmed multiple different victims, including Skywave, the Drendel Brothers, Bruder, and other parties engaged in Commercial Trading. Because Skywave could not compete with the HFT Enterprise's HFT Network, Skywave suffered economic injury, including because it was forced to halt its efforts to commercialize its technology, and as a result, Skywave lost out on trading profits it would have acquired from operating its shortwave network. Similarly, traders such as the Drendel Brothers, through their trading operation, Bruder, lost trading profits they would have continued to realize had Defendants not misused Experimental Licenses.

57

**Supp. App. 115**

186. Defendants' individual racketeering acts through the HFT Enterprise are attributable to all Defendants. Defendants' predicate acts exceed the requisite two required to sustain a RICO violation finding.

187. Defendants' racketeering directly and proximately caused and continues to cause injury to Skywave and other trading entities.

### B. COUNT II: Violation Of 18 U.S.C. § 1962(d)

188. Skywave repeats and realleges each and every allegation set forth in Paragraphs 1–187 as if fully set forth herein.

189. Since 2016, Defendants unlawfully, knowingly, and intentionally combine, conspire, and agree together to direct, control, manage, and conduct the affairs of an enterprise—as defined by 18 U.S.C. § 1961(4)—through a pattern of racketeering activity as required by 18 U.S.C. § 1962(d).

190. Each Defendant participated in the conspiracy.

191. Each Defendant agreed to direct the affairs of the HFT Enterprise.

192. Defendants and Defendants' HFT Enterprise engage in interstate commerce.

193. By facilitating the HFT Enterprise's racketeering activities, each Defendant intended to further their goal of defrauding the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses through the HFT Enterprise, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that Defendants' operations would only be experimental, misusing the Experimental Licenses for Commercial Trading, and leveraging the ill-gotten

**Supp. App. 116**

advantages of the HFT Enterprise's Experimental Licenses at their competitors' expense. Defendants' racketeering activities affect interstate commerce.

194.    Defendants' violations of 18 U.S.C. § 1343 were in furtherance of Defendants' conspiracy to conduct an enterprise and to defraud the FCC and the Commercial Trading market by obtaining shortwave Experimental Licenses through the HFT Enterprise, making false statements, false promises, or material misrepresentations in their applications for new licenses, modified applications, renewal applications, consent of assignment applications, and confidentiality requests for Experimental Licenses that their operations would only be experimental, misusing the Experimental Licenses for Commercial Trading, and leveraging the ill-gotten advantages of their Experimental Licenses at their competitors' expense.

195.    Defendants' conspiracy is attributable to all Defendants.  Defendants agreed to perform the requisite two required predicate acts to sustain a RICO violation finding.

196.    Defendants' racketeering directly and proximately caused and continues to cause injury to Skywave.

## **PRAYER FOR RELIEF**

WHEREFORE, Skywave requests the following relief:

A.    Entry of judgment holding each Defendant liable for violating 18 U.S.C. § 1961 *et seq.*;

B.    An injunction restraining each Defendant, and Defendants' officers, agents, employees, affiliates, and all other persons in concert with, in participation with, or for them, from any further direct or indirect misuse, including for Commercial Trading, of Experimental Licenses (1) held by 10Band, or (2) held by another entity under the direction or control of or acting in concert with Defendants, or (3) in the possession of any Defendant;

**Supp. App. 117**

C.    An award of damages for the economic harm suffered by Skywave—including

without limitation its lost profits and amounts by which Defendants have been unjustly enriched—

due to Defendants' racketeering together with pre-judgment and post-judgment interest;

D.    An award of damages—including without limitation treble damages, attorney fees,

and litigation costs—in accordance with the civil remedy provisions of 18 U.S.C. § 1964(c); and

E.    Any and all additional legal and equitable relief that may be available under law

and that the Court may deem proper.

## DEMAND FOR A JURY TRIAL

Skywave hereby demands a trial by jury on all issues so triable.


Dated: February 13, 2025                    Respectfully submitted,

                                            /s/ Justin A. Barker


Justin Wilcox (admitted *pro hac vice*)          Justin A. Barker (IL 6274518)
Goutam Patnaik (admitted *pro hac vice*)         Ariana Garcia-Moore
Jamie Dohopolski (admitted *pro hac vice*)       NELSON MULLINS RILEY & SCARBOROUGH LLP
Thomas Romanchek (admitted *pro hac vice*)       123 N. Wacker Drive, 21st Floor
DESMARAIS LLP                                    Chicago, Illinois 60606
1899 Pennsylvania Avenue, NW, Suite 400          Tel: 312.376.1014
Washington, D.C. 20006                           Fax: 312.264.9491
Tel: 202.451.4900                                justin.barker@nelsonmullins.com
Fax: 202.451.4901                                ariana.garciamoore@nelsonmullins.com
jwilcox@desmaraisllp.com
gpatnaik@desmaraisllp.com
jdohopolski@desmaraisllp.com                     *Attorneys for Plaintiff Skywave Networks,*
tromanchek@desmaraisllp.com                      *LLC*


Steven Balcof (admitted *pro hac vice*)
Peter Kotecki (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Avenue, 26th Floor
New York, New York 10169
Tel: 202.351.3400
Fax: 202.351.3401
sbalcof@desmaraisllp.com
pkotecki@desmaraisllp.com

**Supp. App. 118**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SKYWAVE NETWORKS, LLC,

       Plaintiff,

v.

WILLIAM J. DISOMMA,
PAUL A. GURINAS,
MATTHEW HINERFELD,
JOHN MADIGAN,
JUMP TRADING, LLC,
VIRTU FINANCIAL, INC.,

       Defendants.

Civil Action No. 1:24-cv-9650

Judge Georgia N. Alexakis

**<u>JURY TRIAL DEMANDED</u>**

## DEFENDANTS' MEMORANDUM
## IN SUPPORT OF THEIR MOTION TO DISMISS
## <u>THE FIRST AMENDED COMPLAINT</u>

**Supp. App. 119**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL ALLEGATIONS OF THE FAC AND THE PUBLIC RECORD ............................... 4

ARGUMENT ...................................................................................................................... 7

    I.     THE COURT LACKS JURISDICTION TO ADJUDICATE THE FAC. ............................ 7

    II.    SKYWAVE HAS NOT ALLEGED AN INJURY "BY REASON OF" A VIOLATION OF
           SECTION 1962. ......................................................................................... 12

        A.   Only the Victim Directly Injured by Racketeering Activity Can Sue Under RICO. ..... 12

        B.   Skywave's Claimed Injury. ..................................................................... 14

        C.   Skywave Was Not a Direct Victim Under *Holmes* and Its Progeny. ............................. 16

    III.   SKYWAVE DOES NOT PROPERLY ALLEGE WIRE FRAUD. ...................................... 24

        A.   As a Matter of Law, the Alleged Misrepresentations to the FCC to Obtain Licenses Do
           Not Constitute Wire Fraud. ....................................................................... 24

        B.   Skywave's Backup Theory Fares No Better. ................................................... 26

    IV.   SKYWAVE'S CLAIMS ARE TIME-BARRED. ............................................................ 28

CONCLUSION ................................................................................................................. 33

**Supp. App. 120**

## TABLE OF AUTHORITIES

**CASES**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
   483 U.S. 143 (1987)..................................................................................... 28

*All-Tone Commc'ns, Inc. v. Am. Info. Tech.*,
   1991 WL 166532 (N.D. Ill. Aug. 26, 1991)............................................... 22

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006).............................................................................. 12, 13

*Baker v. Atl. Richfield Co.*,
   2021 WL 3726050 (N.D. Ind. Aug. 23, 2021) .......................................... 30

*Barr Laboratories, Inc. v. Quantum Pharmics, Inc.*,
   827 F. Supp. 111 (E.D.N.Y. 1993) ..................................................... 20, 21

*Bobb v. Swartz-Reston P.C.*,
   2018 WL 4384292 (N.D. Ill. Sept. 14, 2018) ........................................... 22

*Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*,
   559 F.3d 671 (7th Cir. 2009)............................................................... 28, 31

*CE Design Ltd. v. Prism Bus. Media, Inc.*,
   2009 WL 2496568 (N.D. Ill. Aug. 12, 2009).............................................. 8

*Ciminelli v. United States*,
   598 U.S. 306 (2023)..................................................................................... 25

*Cleveland v. United States*,
   531 U.S. 12 (2000)....................................................................................... 25

*Coal. for Pres. of Hisp. Broad. v. F.C.C.*,
   931 F.2d 73 (D.C. Cir. 1991)....................................................................... 11

*Daniels v. Union Pac. R.R. Co.*,
   530 F.3d 936 (D.C. Cir. 2008)..................................................................... 11

*Devon Drive Lionville, LP v. Parke Bancorp, Inc*,
   791 F. App'x 301 (3d Cir. 2019) ................................................................ 19

*Eckstein v. Balcor Film Invs.*,
   58 F.3d 1162 (7th Cir. 1995) ...................................................................... 31

*Eli Lilly & Co. v. Roussel Corp.*,
   23 F. Supp. 2d 460 (D.N.J. 1998) ......................................................... 19, 20

ii

**Supp. App. 121**

*F.C.C. v. ITT World Commc'ns, Inc.*,
 466 U.S. 463 (1984) ....................................................................................................... 7

*Gaunce v. deVincentis*,
 708 F.2d 1290 (7th Cir. 1983) ....................................................................................... 9

*Goren v. New Vision Int'l, Inc.*,
 156 F.3d 721 (7th Cir. 1998) ....................................................................................... 26

*Gov't App Sols., Inc. v. City of New Haven*,
 2024 WL 1299993 (9th Cir. Mar. 27, 2024) ......................................................... 18, 20

*Grow Michigan, LLC v. LT Lender, LLC*,
 50 F.4th 587 (6th Cir. 2022) ................................................................................... 13, 14

*Hemi Grp., LLC v. City of New York*,
 559 U.S. 1 (2010) ......................................................................................................... 12

*Hollinger Int'l, Inc. v. Hollinger Inc.*,
 2004 WL 2278545 (N.D. Ill. Oct. 8, 2004) ................................................................ 28

*Holmes v. Securities Investor Protection Corp.*,
 503 U.S. 258 (1992) ................................................................................... 12, 13, 21, 22

*In re Honey Transshipping Litig.*,
 87 F. Supp. 3d 855 (N.D. Ill. 2015) ............................................................................ 14

*In re NextWave Pers. Commc'ns, Inc.*,
 200 F.3d 43 (2d Cir. 1999) ............................................................................................ 7

*In re Surescripts Antitrust Litig.*,
 2020 WL 4905692 (N.D. Ill. Aug. 19, 2020) ............................................................... 4

*Kelly v. United States*,
 590 U.S. 391 (2020) ..................................................................................................... 25

*Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*,
 805 F. Supp. 1277 (D.S.C. 1992) ........................................................................... 20, 21

*Longmont United Hosp. v. Saint Barnabas Corp.*,
 2007 WL 1850881 (D.N.J. June 26, 2007) ................................................................. 19

*McKinney v. Panico*,
 2022 WL 4551695 (N.D. Ill. Sept. 29, 2022) ............................................................. 28

*Metro Broad., Inc. v. F.C.C.*,
 497 U.S. 547 (1990) ..................................................................................................... 26

**Supp. App. 122**

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*,
    877 F.2d 1333 (7th Cir. 1989) ................................................................ 14

*Muskegan Hotels, LLC v. Patel*,
    986 F.3d 692 (7th Cir. 2021) .................................................................. 26

*N. Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*,
    437 F.3d 1206 (D.C. Cir. 2006) ................................................................ 8

*Nance v. NBCUniversal Media, LLC*,
    2018 WL 1762440 (N.D. Ill. Apr. 12, 2018) ............................................ 5

*North v. Smarsh, Inc.*,
    160 F. Supp. 3d 63 (D.D.C. 2015) .......................................................... 11

*Ordower v. Off. of Thrift Supervision*,
    999 F.2d 1183 (7th Cir. 1993) .................................................................. 9

*Orgone Cap. III, LLC v. Daubenspeck*,
    912 F.3d 1039 (7th Cir. 2019) .................................................................. 4

*Osundairo v. Geragos*,
    447 F. Supp. 3d 727 (N.D. Ill. 2020) ...................................................... 30

*Otwell v. Ala. Power Co.*,
    747 F.3d 1275 (11th Cir. 2014) ....................................................... 8, 9, 10

*Ray v. City of Chicago*,
    629 F.3d 660 (7th Cir. 2010) .................................................................. 24

*Rotella v. Wood*,
    528 U.S. 549 (2000) ................................................................... 9, 28, 32

*RWB Servs., LLC v. Hartford Computer Grp., Inc.*,
    539 F.3d 681 (7th Cir. 2008) .................................................................. 22

*Schmude v. Sheahan*,
    312 F. Supp. 2d 1047 (N.D. Ill. 2004) .................................................... 30

*Self v. Bellsouth Mobility, Inc.*,
    700 F.3d 453 (11th Cir. 2012) .................................................................. 8

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) .............................................................. 14

*Sidney Hillman Health Ctr. of Rochester v. Abbott Lab's*,
    873 F.3d 574 (7th Cir. 2017) .................................................................. 21

**Supp. App. 123**

*Slaney v. Int'l Amateur Athletic Fed'n,*
    244 F.3d 580 (7th Cir. 2001) ............................................................ 26

*Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.,*
    884 F.3d 489 (4th Cir. 2018) ............................................................ 14

*Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.,*
    990 F.3d 31 (1st Cir. 2021) ........................................................ 13, 18

*Telecommunications Rsch. & Action Ctr. v. F.C.C.,*
    750 F.2d 70 (D.C. Cir. 1984) ........................................................... 11

*United States v. Griffin,*
    76 F.4th 724 (7th Cir. 2023) ........................................................... 25

*United States v. Schwartz,*
    924 F.2d 410 (2d Cir. 1991) ........................................................... 25

*United States v. Weimert,*
    819 F.3d 351 (7th Cir. 2016) ........................................................... 27

*Walters v. McMahen,*
    684 F.3d 435 (4th Cir. 2012) ........................................................... 14

*Williams v. Dow Chem. Co.,*
    255 F. Supp. 2d 219 (S.D.N.Y. 2003) ............................................. 25

**STATUTES**

18 U.S.C. § 1343 ............................................................................. 2, 24

18 U.S.C. § 1964 ......................................................................... 3, 12, 28

28 U.S.C. § 1927 ................................................................................... 4

47 U.S.C. § 151 .................................................................................... 26

47 U.S.C. § 153 .................................................................................... 23

47 U.S.C. § 155 .................................................................................... 11

47 U.S.C. § 402 ..................................................................................... 8

**REGULATIONS**

47 C.F.R. § 1.115 .................................................................................. 7

47 C.F.R. § 5.3 .................................................................................... 10

v

**Supp. App. 124**

47 C.F.R. § 5.5 ..................................................................................................... 10

47 C.F.R. § 73 ...................................................................................................... 23

47 C.F.R. § 73.701 .............................................................................................. 23

**Supp. App. 125**

**INTRODUCTION**

This is a classic case of a plaintiff misusing the RICO statute in an attempt to redress purported injuries not cognizable in any court. On October 7, 2024, Skywave Networks, LLC ("Skywave") filed a racketeering complaint naming 14 defendants. Dkt. 7. Skywave's basic claim was that Defendants Jump Trading, LLC ("Jump Trading") and Virtu Financial, Inc. ("Virtu") conducted an enterprise that allegedly lied to the Federal Communications Commission ("FCC") to obtain experimental licenses to use shortwave radio for commercial trading in their high-frequency trading ("HFT") businesses.[1] Skywave alleged that Defendants' speed advantage using shortwave radio injured competitive trading firms and caused those competitors lost profits, and it asserted that Defendants' FCC submissions amounted to a pattern of wire fraud. Skywave is not itself a competitive trading firm; rather, it sought to be a telecommunications network technology provider to HFT firms.

Skywave claimed that it wanted to apply for a different kind of FCC shortwave license, which, if granted, would have permitted Skywave to use its "nascent" shortwave technology to provide wireless telecommunication services to trading firms that competed with Defendants. Skywave alleged that it lost an investor and a potential trading-firm client for its proposed technology because they were discouraged by Defendants' allegedly unlawful competitive advantage. As a result, Skywave said, it was injured by not being able to build out or commercialize its proposed shortwave network. Rather than accept the limitations of its own business, Skywave sought to blame others, and Defendants became its target.

---

[1] Skywave does not allege that Jump Trading and Virtu collaborate on trading. Their alleged collaboration is in connection with telecommunications technology, including shortwave technology that transmits data to facilitate each firm's independent trades.

1

**Supp. App. 126**

Defendants responded with a joint motion to dismiss demonstrating that the Complaint was meritless because, among other defects: (1) the Court had no subject matter jurisdiction; (2) Skywave did not allege a direct injury or even an injury-in-fact resulting from Defendants' alleged conduct; (3) the alleged wire fraud predicates were not directed at obtaining property as required by 18 U.S.C. § 1343, and the fraud was not alleged with particularity; and (4) the statute of limitations had long passed. Dkt. 74.

Rather than attempt to dispute these points, Skywave filed a First Amended Complaint ("FAC"), Dkt. 90, but that effort is not a whit better. The FAC dropped nine of the entity defendants, but it doubled down on the incurable defects in the Complaint, even adding another individual defendant to the list of people accused of criminal conduct on legal theories consistently rejected by the Supreme Court. In a vain effort to avoid some of the fatal problems in the Complaint, Skywave resorts to simply omitting prior factual allegations. Ultimately, the FAC fails for the same reasons as Skywave's original complaint:

***First***, the Court lacks subject matter jurisdiction over Skywave's claims. The FAC still asks the Court to second guess the issuance and use of FCC licenses. This is a clear collateral attack on FCC agency action that cannot be heard by this Court. Skywave does not even attempt to plead around this fatal defect. Skywave's claims turn on the validity of experimental licenses issued to an entity owned by Jump Trading and Virtu, but that matter is committed exclusively to the jurisdiction of the FCC and the U.S. Court of Appeals for the D.C. Circuit. Moreover, almost all of the challenged licenses are final agency actions that Skywave never appealed or challenged at the time they were issued, meaning it cannot now ask *any* court to consider the propriety of those license grants.

2

**Supp. App. 127**

*Second*, the FAC continues to allege that the direct victims of the supposed racketeering activity here are Defendants' competitors in the high-frequency trading business, but Skywave is a tech company, not a trading entity. Under 18 U.S.C. § 1964(c), a RICO plaintiff must be the directly injured victim of the purported racketeering activity—but on Skywave's own theory, its injury is remote and derivative, and it depends on independent decisions by intervening actors. Indeed, Skywave still has not even alleged but-for causation because, as it admits, the type of license it claims that it would have used for its own shortwave technology does not even exist. *See* FAC ¶ 120. On the contrary, the FCC has rejected license applications essentially identical to the license application that Skywave says it would have made (but never did make), and Defendants are not alleged to have interfered with Skywave's never-submitted "application" in any way.

*Third*, Skywave's wire fraud theory has not changed and fails as a matter of law. It still alleges two purported varieties of what it characterizes as "wire fraud," but neither exists. The first theory—that Defendants defrauded the FCC to obtain the shortwave licenses—fails because a government license is not "property" within the meaning of the wire fraud statute. The second theory—that Defendants somehow committed wire fraud against their respective counterparties to trades—fails because (i) Skywave never explains the nature of the fraud on these counterparties, neither with particularity nor even generally; (ii) Skywave does not have standing to pursue alleged frauds committed against third parties; and (iii) claims of wire fraud in the purchase of securities are not cognizable under Section 1964(c).

*Fourth*, RICO's four-year statute of limitations requires dismissal: Skywave pleads knowledge in 2017 of its purported "injury" from the very licenses it complains about. Skywave attempts to retract some of its prior allegations that it was put on notice of Defendants' activities

3

**Supp. App. 128**

seven years before the Complaint was filed, but this cannot salvage its claims. The FAC still makes clear that Skywave knew of these injuries well outside of the limitations period.

Plaintiff's filing of an amended complaint rather than simply dismissing the case serves no purpose other than to vexatiously multiply the proceedings. *See* 28 U.S.C. § 1927. The FAC should be dismissed with prejudice.

## FACTUAL ALLEGATIONS OF THE FAC AND THE PUBLIC RECORD

Defendants Jump Trading and Virtu are high-frequency algorithmic trading firms that operate on exchanges worldwide. FAC ¶¶ 89, 93. Jump Trading and Virtu indirectly formed a joint venture known as New Line Networks LLC (referred to as "NLN" in the FAC) and a subsidiary shortwave transmission research company called 10Band.[2] *Id.* ¶¶ 86, 123–24. Both Jump Trading and Virtu had been participants in the low-latency trading community for years. In 2016, 10Band first applied to the FCC for an "[e]xperimental" license under Part 5 of the FCC regulations to test the use of shortwave radio technology to transmit financial market data. *Id.* ¶ 64. In December of that year, Skywave became aware of that application, *id.* ¶ 135, and around that same time, it "heard rumors" that Jump Trading or Virtu may have been affiliated with 10Band, Dkt. 7, Compl. ¶¶ 60–61.[3] The FCC staff granted 10Band's application for a five-year term, ending in 2021. FAC ¶ 66.

---

[2] Plaintiffs have also named Jump Trading's owners, general counsel, and a networking employee as defendants.

[3] After seeing Defendants' initial motion to dismiss, which argued that knowledge of these rumors in 2016 barred Skywave's claims under the statute of limitations, Dkt. 74 at 24–28, Skywave omitted this critical fact from the FAC. But Skywave cannot elide this admitted fact from the record, and the Court can and should consider it. "An amended pleading does not operate as a judicial *tabula rasa*. Under some circumstances, a party may offer earlier versions of its opponent's pleadings as evidence of the facts therein." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1048 (7th Cir. 2019) (citation omitted) (upholding dismissal); *see also In re Surescripts Antitrust Litig.*, 2020 WL 4905692, at *4 (N.D. Ill. Aug. 19, 2020) (granting summary judgment on antitrust

4

Beginning in January 2020, 10Band applied for multiple renewals and modifications of this license, as well as for related licenses and their renewals and modifications, and the FCC granted the applications each time.[4] *Id.* ¶¶ 67–85. In 2023, 10Band's renewal was granted for a two-year term to expire on November 1, 2025. *Id.* ¶ 68. Until this 2023 license renewal, Skywave never challenged or appealed any of these license grants. Skywave alleges that Defendants used the licenses for shortwave radio signals that transmit data to facilitate inter-continental HFT and other low-latency trading. *Id.* ¶¶ 52–53. Skywave contends that this usage is akin to commercial trading and thus not authorized under an "experimental" license. *Id.* ¶ 48.

Skywave also asserts that it wanted to get into the business of licensing its own shortwave radio technology and capability to other HFT firms. *Id.* ¶¶ 32, 39, 40. It alleges that it "planned" to acquire—but does not allege that it actually did receive (or even applied for)—a different type of FCC license, a multi-use "Part 73" "commercial" license. *Id.* ¶¶ 36, 38. Even Skywave acknowledges that this type of license did not actually exist. *Id.* ¶¶ 38, 120. In fact, Skywave's business plan never materialized: in 2017, one of Skywave's business partners withdrew from their venture, because it "did not believe the partnership could reasonably compete" against 10Band's network. *Id.* ¶¶ 136–39; *see also* Dkt. 7, Compl. ¶ 62.

Six years after Skywave's investor raised the issue, in September 2023, Skywave filed with the FCC staff a "Petition for Reconsideration" of 10Band's August 2023 license renewal. *See*

---

complaint where plaintiffs engaged in artful pleading to disguise their failure to allege they were direct purchasers). In particular, a court may consider an original pleading in the interests of justice and to determine the plausibility of an amended pleading. *See Nance v. NBCUniversal Media, LLC*, 2018 WL 1762440, at *5 (N.D. Ill. Apr. 12, 2018) (dismissing claim because plaintiff "simply change[d] his story"). Here, it is not plausible to assume that Skywave was unaware of any relationship between Jump Trading, Virtu, and 10Band until within the statute of limitations period when Skywave previously admitted that it heard rumors of their affiliation as early as 2016.

[4] Since the filing of the FAC, 10Band has applied for another license renewal on April 12, 2025.

5

**Supp. App. 130**

Declaration of Neema Sahni ("Sahni Decl."), Ex. A ("Petition"). This Petition argues that 10Band "uses the experimental authorization for regular day-to-day trading," and so an experimental license "should not have been granted." *Id.* at 1. It asks the FCC staff to "reconsider and deny 10Band's application for renewal of the Experimental License"—*i.e.*, to revoke the license. *Id.* at 7. 10Band filed an Opposition to Skywave's Petition on September 28, 2023, explaining that its activity was consistent with the FCC's rules, and Skywave filed a Reply on October 12, 2023. Sahni Decl., Exs. B, C. Skywave's Petition remains pending. Unsatisfied with petitioning the FCC, Skywave has now tried to transform the very conduct it has complained of in the Petition into a RICO racketeering claim.

In the FAC, as in the original Complaint, Skywave accuses Defendants of substantive and conspiracy violations of the RICO statute based on wire fraud predicates. Although the FAC contains a substantial number of amendments—*e.g.*, adding and dropping defendants, deleting allegations that Skywave now realizes are harmful to its case, and adding more detail on Skywave's failed shortwave network—the substance remains the same. The FAC still alleges, at its core, that 10Band misled the FCC staff about the "experimental" nature of its shortwave licenses. FAC ¶ 1. Likewise, Skywave's theory of harm remains the same: this alleged fraudulent activity of lying to the FCC, in turn, supposedly allowed Defendants' network to compete effectively against other HFT firms, costing other HFT traders lost profits. *Id.* ¶ 23 (Defendants "leverag[e] the ill-gotten advantages of their Experimental Licenses at their competitors' expense"); *id.* ¶ 53 (same); *id.* ¶ 193 (same); *id.* ¶ 194 (same); *id.* ¶ 103 (Defendants used licenses to gain a "speed advantage over" Commercial Trading competitors); *id.* ¶ 109 (same). The FAC alleges that Defendants' speed and profitability advantage over competitors in turn harmed Skywave because this purported advantage caused an investor ("Investor 1") and a commercial trading firm ("Trader 1") to drop

6

**Supp. App. 131**

out of a partnership. *Id.* ¶¶ 136–39, 152, 156. Skywave seeks two forms of relief: treble damages

and an injunction barring Defendants from using the licenses issued by the FCC. *Id.*, Prayer for

Relief.

**<u>ARGUMENT</u>**

**I.       THE COURT LACKS JURISDICTION TO ADJUDICATE THE FAC.**

Skywave impermissibly asks this Court to second-guess the FCC's grant and renewal of

licenses to Defendants. Federal district courts must dismiss such collateral attacks on agency

decisions.

Under the Communications Act of 1934, the FCC has exclusive jurisdiction over spectrum

licensing decisions. *See, e.g.*, *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 54 (2d Cir. 1999).

Accordingly, the question of whether the Part 5 experimental licenses obtained by 10Band were

properly granted and renewed must be decided—and has been decided—in the first instance by

the FCC. To the extent that Skywave wanted to challenge those final determinations, its only

recourse would have been to seek review by the FCC and, in turn, seek review of that final FCC

order in the D.C. Circuit, which has exclusive jurisdiction to review FCC agency actions.[5] *F.C.C.*

*v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984); 47 U.S.C. § 402(b)(6) ("Appeals may be

taken from decisions and orders of the Commission to the United States Court of Appeals for the

District of Columbia . . . [b]y any [] person who is aggrieved or whose interests are adversely

affected by any order of the Commission granting or denying any application[.]").

For all but one of the seven grants and renewals alleged in the FAC, the time for raising

such a challenge in the proper forum has long since passed, so those decisions are final and may

not be challenged, in this Court or anywhere else. *See* 47 C.F.R. § 1.115(d) (applications for review

---

[5] Skywave is of course aware of this proper procedure given its pending Petition for
Reconsideration.

7

**Supp. App. 132**

of staff licensing decisions must be filed with the full Commission within 30 days of staff action); 47 U.S.C. § 402(b) (challenges to an FCC final licensing decision must be filed with the D.C. Circuit); *N. Am. Catholic Educ. Programming Found., Inc. v. F.C.C.*, 437 F.3d 1206, 1209–10 (D.C. Cir. 2006) (requiring dismissal of challenge to FCC licensing-related decision when complainant waited more than 30 days). As for the one license renewal for which Skywave did timely file a Petition for Reconsideration, the FCC has not yet rendered a final decision on Skywave's Petition, which is all the more reason why this Court has no jurisdiction to hear a challenge to it.

Skywave nevertheless seeks to launch a belated collateral attack on final regulatory decisions committed to the FCC's and D.C. Circuit's exclusive jurisdiction. In asking the Court to assess whether Defendants lied to the FCC by representing that 10Band qualified for an experimental license, Skywave necessarily asks this Court to overrule the FCC's determination that 10Band *did so qualify*. Skywave's attempt to sidestep Congress's carefully prescribed process for challenging the FCC's licensing determination by pleading to this Court that Defendants defrauded the FCC is blatantly improper. *See CE Design Ltd. v. Prism Bus. Media, Inc.*, 2009 WL 2496568, at *12 (N.D. Ill. Aug. 12, 2009) (claim is impermissible collateral attack where "the complaint filed in the district court raise[s] the same issues and seek[s] the same relief in substance as" in the FCC's proceedings (citation omitted)), *aff'd*, 606 F.3d 443 (7th Cir. 2010).[6] And because the FCC's licensing decisions can be challenged only through the administrative process and

---

[6] *Accord Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 462 (11th Cir. 2012) (affirming dismissal for lack of jurisdiction where "claims necessarily conflict with final orders of the FCC and thereby depend on the district court being able to collaterally review the correctness or validity of those orders"); *Otwell v. Ala. Power Co.*, 747 F.3d 1275, 1282 (11th Cir. 2014) ("[N]on-parties to the proceedings before the [agency] may not contest the agency's final decision in an alternative forum by bringing challenges that are inescapably intertwined with a review of the agency's final determination.").

8

**Supp. App. 133**

reviewed only in the D.C. Circuit—steps which Skywave failed to timely take as to the earlier license grants—Skywave's RICO claims predicated on those earlier grants cannot now be heard in *any* court.

Even more fundamentally, in seeking treble damages for use of the licenses and to enjoin any further use of them, Skywave is expressly asking this Court to penalize and undo a licensing decision made by the FCC. *See* FAC, Prayer for Relief; *Rotella v. Wood*, 528 U.S. 549, 557–58 (2000) (purpose of civil RICO treble-damages remedy is to deter and penalize the prohibited practices). But the Seventh Circuit has made clear that where, as here, "Congress places review of an administrative decision in the court of appeals, *district judges may not enjoin or penalize action that the agency has approved* or that is the natural outcome of the agency's decision." *Ordower v. Off. of Thrift Supervision*, 999 F.2d 1183, 1188 (7th Cir. 1993) (emphasis added). In other words, this Court has no jurisdiction to grant Skywave the remedies it seeks. *Id.*; *see also Gaunce v. deVincentis*, 708 F.2d 1290, 1292–93 (7th Cir. 1983) (dismissing for lack of jurisdiction where lawsuit was "in derogation of the well settled principle that collateral attacks upon administrative orders are not permissible"). And it makes no difference that Skywave has styled its challenge under the guise of RICO; that does not and cannot fix its jurisdictional problem. *See Otwell*, 747 F.3d at 1281 ("[Litigants] cannot escape [the statute's] strict judicial review provision by arguing that they are pursuing different claims and different relief than the parties before the [agency].").

*Otwell v. Alabama Power Co.* is instructive. There, the Federal Energy Regulatory Commission ("FERC") had renewed Alabama Power's license to operate a dam project on a lake. *Id.* at 1278. An association of local property owners participated in and opposed the license proceedings, and filed a petition for rehearing with FERC. *Id.* FERC denied the petition, and the property owners brought a number of tort claims against Alabama Power in federal district court,

9

**Supp. App. 134**

alleging unreasonable actions in operating the dam project. *Id.* at 1278–79. The Eleventh Circuit held that the lawsuit was an impermissible collateral attack because—under a statute analogous to that governing review of FCC orders—the court of appeals has exclusive jurisdiction to set aside an order of FERC. *Id.* at 1281. It did not matter that the plaintiffs technically "assert[ed] different claims and request[ed] different relief," because their requested injunction involved "proposals expressly considered and rejected by FERC in its relicensing proceedings, in the order issuing the 2010 License, and in its order denying rehearing." *Id* at 1281–82. Because the plaintiffs were "attempting to obtain the same results and to place the same constraints on Alabama Power rejected by the agency in the exercise of its institutional expertise, and their claims [were] inescapably intertwined with a review of the FERC's final decision," the district court lacked jurisdiction to hear the claims. *Id.* at 1282. So too here.

There is no better illustration of the FAC's failings in this regard than Skywave's currently pending Petition for Reconsideration of the Elburn I Renewal Grant—the *only* licensing decision that Skywave chose to timely challenge before the FCC (and one that issued well after Skywave's alleged harm occurred in 2017, *see infra* Section IV). There, Skywave makes the very same arguments to the FCC that the FAC asks *this Court* to consider: that 10Band "uses the experimental authorization for regular day-to-day trading," and so its experimental license "should not have been granted." Pet. at 1.[7] The agency has not yet adjudicated Skywave's Petition for Reconsideration, which was filed with the FCC's Office of Engineering & Technology. If that Office issues a decision on the Petition adverse to Skywave, Skywave would need to file an

---

[7] These claims are based on a false dichotomy between "experimental" and commercial activities. The FCC's rules permit experimental licensees to perform "[p]roduct development and market trials," 47 C.F.R. § 5.3(k), the latter of which the agency defines as "[a] program designed to evaluate product performance and customer acceptability," *id.* § 5.5, and the Commission found 10Band's activity consistent with the rules.

10

**Supp. App. 135**

application for review of that decision to the full Commission before Skywave would be permitted to appeal *that* decision to the D.C. Circuit. 47 U.S.C. § 155(c)(7) ("The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection."); *Coal. for Pres. of Hisp. Broad. v. F.C.C.*, 931 F.2d 73, 76–77 (D.C. Cir. 1991) ("In general, failure to exhaust administrative remedies bars judicial review of FCC orders.").

In other words, to the extent Skywave's RICO claims are based on this license renewal (and could somehow survive the many other defects set forth herein), this Court cannot hear those claims either. Skywave's challenge belongs with the FCC unless and until Skywave's administrative remedies have been exhausted, and then with the D.C. Circuit, pursuant to the exclusive administrative scheme and review process that Congress has carefully delineated. *See Telecommunications Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("[W]e hold that where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's *future* jurisdiction is subject to the *exclusive* review of the Court of Appeals." (first emphasis added)); *Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 942 (D.C. Cir. 2008) ("the district court lacks subject matter jurisdiction over [plaintiffs' claims] because those claims, *once final*, are subject to this Court's exclusive jurisdiction" (emphasis in original)); *North v. Smarsh, Inc.*, 160 F. Supp. 3d 63, 84 (D.D.C. 2015) (dismissing claim for lack of jurisdiction where "Plaintiffs are barred from launching such collateral attacks because they 'almost certainly implicate[ ] issues that would be addressed by the Court of Appeals upon final review of [the agency's] ruling'" (citation omitted)). In any case, even if everything went Skywave's way with its singular FCC Petition and an eventual appeal to the D.C. Circuit, Skywave still would be unable bring the RICO claims pleaded in FAC for the reasons set forth below.

11

**Supp. App. 136**

## II. SKYWAVE HAS NOT ALLEGED AN INJURY "BY REASON OF" A VIOLATION OF SECTION 1962.

### A. Only the Victim Directly Injured by Racketeering Activity Can Sue Under RICO.

Only a "person injured in his business or property by reason of a violation of section 1962 . . . may sue." 18 U.S.C. § 1964(c). Section 1964 requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). When determining proximate causation, "the central question [to] ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added). Only "the victim directly injured" by the racketeering conduct, not an "indirectly injured victim," can sue. *Holmes*, 503 U.S. at 274. "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 271, 274). Where a plaintiff's "theory of causation requires [a court] to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement." *Id.* at 10.

Three important considerations underlie the direct-relationship requirement. *First* is "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Anza*, 547 U.S. at 458. "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269. *Second*, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury." *Id. Third*, "directly injured victims can generally be counted on to vindicate the law" without the difficulties caused by allowing suits "by plaintiffs injured more remotely." *Id.* at 269–70.

12

**Supp. App. 137**

The direct-relationship requirement is applied rigorously to dismiss RICO complaints where the plaintiff is not the party that suffers the direct harm. The leading case is *Holmes*, 503 U.S. 258. There, the defendant lied to manipulate the price of certain stocks, brokers bought those stocks with their own money at inflated prices, the market learned of the deception, and the ensuing price collapse forced the brokers into liquidation. *Id.* at 262–63. SIPC (which oversees the liquidation of bankrupt securities brokers) asserted RICO claims for losses to customers who did not purchase the manipulated stocks, but whose losses resulted from the liquidation of the brokers who had. *Id.* The Supreme Court held that because the direct victims of the fraud were the brokers, their customers were only indirect victims. *Id.* at 270–74. As the Court explained, "the link [was] too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271.

The Supreme Court applied the same direct-relationship analysis to deny the plaintiff a cause of action in *Anza*, 547 U.S. 451. There, the defendant steel products company cheated the State of New York by not charging its customers sales taxes. *Id.* at 453–54. A rival company brought a RICO suit alleging that the defendant's failure to charge sales taxes to customers and filing of false tax returns allowed the defendant to charge lower prices to customers, causing losses to the plaintiff. *Id.* at 454, 457–58. The Court, relying on *Holmes*, found that the direct victim of the fraud was the State of New York and that the competitor was only an indirect victim and therefore could not state a claim. *Id.* at 458.

The directness requirement of Section 1964(c) is "demanding," *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022), and the cases applying it to reject a downstream plaintiff's RICO claims are legion. *See, e.g.*, *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 36 (1st Cir. 2021) (plaintiff failed to establish standing because its injury was

13

**Supp. App. 138**

"entirely derivative" of its potential business partner's injury); *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1335 (7th Cir. 1989) (company's owners could not establish proximate causation to sue bank under RICO because their injury was derivative of injury to the company); *Walters v. McMahen*, 684 F.3d 435, 444 (4th Cir. 2012) (although false attestations that undocumented employees were eligible to work "are one step in the chain of events that ultimately may have resulted in the employment of unauthorized aliens," depressed wages for authorized workers was not a "direct" result); *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1071, 1074 (D.C. Cir. 2001) (dismissing RICO claims against tobacco companies brought by health trust funds because "the alleged harm arising from payment of medical expenses by the funds and the nations is itself derivative of alleged injuries to individual smokers"); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 494–95 (4th Cir. 2018) (subcontractor did not have standing to bring RICO claim against building owner's insurance company because subcontractor's alleged injury was derivative of harm to building owner); *Grow Mich.*, 50 F.4th at 595–96 (6th Cir. 2022) (dismissing RICO claim where plaintiff's injury was only derivative of harm to its debtor); *In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 863–65 (N.D. Ill. 2015) (commercial bee-keepers did not suffer direct injury under RICO from scheme by importers and suppliers to defraud the government of customs duties by misbranding Chinese honey).

## B.　Skywave's Claimed Injury.

Skywave claims that Jump Trading and Virtu committed a pattern of wire fraud by lying to the FCC to obtain experimental shortwave transmission licenses. FAC ¶¶ 1, 64–85, 103–05. Armed with those licenses, Skywave says, Jump Trading and Virtu gained a "dominant speed advantage," *id.* ¶ 4, and used it "to illegally dominate certain trades across global trading markets," *id.* ¶ 53. According to Skywave, this trading allegedly permitted Jump Trading and Virtu to "reap ill-gotten

14

**Supp. App. 139**

financial benefits by dominating Commercial Trading markets . . . [where they] win[] trades, resulting in profitable trading." *Id.* ¶ 103.

But Skywave is not even in those trading markets; rather, it is at most a would-be licensor to high-frequency trading firms. Skywave says that the speed advantage and concomitant trading profit, according to the FAC, "derailed" Skywave's own efforts to commercialize a shortwave trading technology and platform it could license to other trading firms. *Id.* ¶¶ 3–4. As a result, Skywave claims it was "forced to halt its efforts to commercialize its technology." *Id.* ¶ 4; *see also id.* ¶¶ 152–56.

This is not a direct injury cognizable under RICO. In an effort to establish some linkage between the licenses obtained by Jump Trading and Virtu and Skywave's "derailed" efforts, Skywave points to the effect Defendants' speed-powered advantage supposedly had on *other* parties. It alleges that Investor 1 asked to drop out of Skywave's proposed project in 2017 because it did not believe that Skywave could compete with Jump Trading and Virtu's shortwave technology. *Id.* ¶¶ 136–37; *see also* Dkt. 7, Compl. ¶ 62. Skywave agreed to allow Investor 1 to drop out. FAC ¶ 137. Skywave also had an agreement with an HFT firm, Trader 1. ███████ ██████████████████████████████████ ████████████████████████████████████ ████████████████████████ *Id.* ¶ 40. In 2020, Trader 1, apparently also discouraged, asked to be let out of the agreement, and Skywave agreed. *Id.* ¶ 139. Skywave alleges that other potential trader clients were forced out of business by Defendants' speed advantage. *Id.* ¶ 156. Skywave claims as damages, among other things, a share of the profits it speculates traders would have paid to Skywave in payment for licensing its technology and network platform if all this had not happened. *Id.* ¶¶ 152, 155–56, Prayer for Relief.

**Supp. App. 140**

### C.     Skywave Was Not a Direct Victim Under *Holmes* and Its Progeny.

> *1.     On the allegations of the FAC, the direct victims of the alleged racketeering were other trading firms, not Skywave.*

Under Skywave's theory, the direct financial victims of Defendants' alleged scheme, if any, are Jump Trading's and Virtu's competitors in the business of trading financial instruments, not Skywave. As Skywave alleged in eight distinct places in its original Complaint, Defendants allegedly schemed:

> *to defraud the FCC* to obtain shortwave Experimental Licenses for Commercial Trading, unlawfully use those Experimental Licenses for Commercial Trading, and leverage the ill-gotten advantages of Experimental Licenses *to unfairly maximize the financial benefit that Defendants derive from trading financial instruments <u>at their competitors' expense</u>*.

Dkt. 7 ¶ 4 (emphasis added); *id.* ¶¶ 73, 82, 173, 176, 198, 203, 207–08. Accordingly, Defendants moved to dismiss that Complaint for, among other things, failure to allege proximate causation. *See* Dkt. 74 at 6–17.

Recognizing that it previously pled itself out of court with these eight express allegations that the alleged harm befell Jump Trading's and Virtu's "competitors" in high-frequency trading, Skywave deletes them, now claiming that the harm befell what it obscurely calls "market participants, including Skywave." FAC ¶ 1. This purge-*cum*-sleight-of-hand is unavailing for two reasons. Initially, it is barred by the artful-pleading doctrine. *See supra* note 3. In addition, the purge was incomplete, and the FAC still makes unmistakably clear that any direct injury fell on competitive traders, not on Skywave. Skywave repeatedly alleges, for example, that the key thing Defendants did wrong was to leverage the supposedly ill-gotten experimental licenses "at their competitors' expense." *Id.* ¶ 23; *id.* ¶ 52 (same); *id.* ¶ 193 (same); *id.* ¶ 194 (same). Defendants allegedly used the licenses to "gain a speed advantage over *Commercial Trading competitors*." *Id.* ¶ 109 (emphasis added). Investor 1 pulled out of its deal with Skywave because of alleged concerns

16

**Supp. App. 141**

about Defendants' speed "advantage over *other traders*." *Id.* ¶ 136 (emphasis added). And some traders who allegedly might have otherwise licensed Skywave's patents and technology were "forced out of business" by Defendants' dominant speed advantage. *Id.* ¶ 156; *see also id.* ¶ 103 (Defendants reaped illegal profits by "dominating Commercial Trading markets"); *id.* ¶¶ 112, 117, 120 (Defendants schemed to "defraud . . . the Commercial Trading market"); *id.* ¶ 53 (Defendants use shortwave to "dominate certain trades across global trading markets"); *id.* ¶ 179 (Defendants "scheme[d] to defraud . . . the Commercial Trading market").

Skywave still does not (and cannot) allege that it has ever been or was going to be a high-frequency (or, for that matter, any other type of) trader. In fact, the FAC shows—just as the original Complaint did—that it was not. Instead, Skywave merely proposed to provide a telecommunications network service to such traders. ██████████████████████████████

████████████████████████████████████████████████ *Id.* ¶ 41

(emphasis added). ███████████████████████████████████████████

*Id.* ¶ 40. But for Defendants' conduct, *Trader 1* would have conducted "latency arbitrage trading" via Skywave's network and (Skywave speculates) would have made successful trades. *Id.* ¶ 155. The same is true of other potential trader clients of Skywave: the injury to these other traders has resulted in Skywave being "unable to license its shortwave network technology, know-how, and patents." *Id.* ¶ 156.

This case thus falls squarely within the teachings of *Holmes*, *Anza,* and their progeny. Just like the investors seeking to recover funds lost in the collapse of their broker in *Holmes* or the competitor in *Anza* whose prices were undercut by the defendant's not paying or passing on sales taxes to customers, the financial harm (if any) to Skywave is purely derivative of the alleged harm to some other party.

17

**Supp. App. 142**

*Sterling Suffolk Racecourse*, 990 F.3d 31, is right on point. There, plaintiff Sterling was the proposed landlord for a casino that an applicant for a gaming license hoped to build. *Id.* at 34. Sterling brought a RICO claim against the winning bidder for the license, Wynn Resorts, claiming that Wynn lied to the Massachusetts Gaming Commission on its application, the alleged fraud cost Wynn's rival to lose out on the gaming license, and that, in turn, cost Sterling its opportunity to lease its land to the rival. *Id.* at 34–35. There, as here, the alleged misrepresentation was directed at a government agency in order to obtain a governmental license. There, like Trader 1 and other trading firms here, a potential business partner of the plaintiff was allegedly injured as a result of the issuance of the license. And there, as here, the downstream plaintiff who allegedly stood to be paid by the directly injured victim sought to recover under RICO. The First Circuit, applying *Holmes* and *Anza*, affirmed dismissal of the complaint, rejecting the argument that "persons who do business with an entity harmed by a RICO conspiracy may recover against the conspirators." *Id.* at 37. That perfectly describes Skywave's claim here.

> 2.    *The causal chain is broken because it depends on a series of independent and intervening factors, as well as baseless speculation.*

That a claimed injury is indirect, like Skywave's, is itself sufficient to defeat the proximate-cause requirement of Section 1964(c). But the causal chain Skywave posits between Defendants' supposed misrepresentations to the FCC and its purported injury is not merely attenuated. It is actually *broken* by a long series of independent, intervening acts by third parties, including rank speculation as to what might have happened if a chain of multiple events that never happened had happened. That independently forecloses meeting Section 1964(c)'s directness requirement because "a 'theory of liability [that] rests not just on separate *actions*, but separate actions carried out by separate *parties*' is insufficiently direct." *See Gov't App Sols., Inc. v. City of New Haven*,

18

**Supp. App. 143**

2024 WL 1299993, at *2 (9th Cir. Mar. 27, 2024) (quoting *Hemi Grp.*, 559 U.S. at 11 (finding no direct injury)).

In the first place, the supposed misrepresentations were made to the FCC, and the FCC then made a series of decisions to grant the experimental shortwave licenses to 10Band. FAC ¶¶ 66–85. Even if those FCC decisions were, as Skywave alleges, based on false statements, they are intervening acts that break the causal chain. *See Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 485 (D.N.J. 1998). *Eli Lilly* is instructive. There, Lilly brought a RICO claim against a competitor, contending that the competitor's lies to the FDA to obtain approval for bulk sales of a drug reduced Lilly's own sales. The court held that Lilly had failed to allege proximate causation because its "injury result[ed] from many intervening acts and causes," *including the FDA's approval*. *Id.*

Many other courts have reached the same conclusion where an injury involves an intervening decision by a regulator who was allegedly misled. For example, in *Devon Drive Lionville, LP v. Parke Bancorp, Inc*, 791 F. App'x 301, 306 (3d Cir. 2019), the plaintiffs claimed they were RICO victims based on the contention that the FDIC relied on the defendant bank's fraud, and that reliance caused their injuries. The court rejected the plaintiffs' proximate-causation theory because the regulators were "intervening actors who [broke] the chain of causation." *Id.* at 307. "Where a government body is an intervening actor between an alleged RICO violation and the alleged harm, courts . . . uniformly dismiss the claims for lack of proximate cause[.]" *Longmont United Hosp. v. Saint Barnabas Corp.*, 2007 WL 1850881, at *4 (D.N.J. June 26, 2007) (rejecting RICO theory that hospital chain fraudulently overbilling CMS for Medicare reduced reimbursements to plaintiff), *aff'd*, 305 F. App'x 892, 894 (3d Cir. 2009) ("[T]he Centers for Medicare & Medicaid Services ('CMS') stands between SBC's conduct and Longmont's

19

**Supp. App. 144**

injuries."); *see also Barr Lab'ys, Inc. v. Quantum Pharmics, Inc.*, 827 F. Supp. 111, 115–16 (E.D.N.Y. 1993) (rejecting RICO claim based on theory that defendant "fraudulently obtained approval to market a competing product" in part because plaintiff's "losses depend on the intervening actions of the FDA"); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1291 (D.S.C. 1992) (rejecting RICO claim in part because "[a]ny harm from the alleged conspiracy would be purely contingent on how the rate bureaus and the [Interstate Commerce Commission] acted based on the alleged predicate acts"), *aff'd*, 998 F.2d 1009 (4th Cir. 1993).

Besides the FCC's intervening decisions, the FAC also explicitly alleges another set of independent intervening actors: its prospective business partners and ultimately Skywave itself. Specifically, it alleges that as a result of Jump Trading's and Virtu's supposedly unlawfully obtained speed advantage in trading, first Investor 1 and then Trader 1 decided they wanted to get out of the partnerships they had with Skywave. Skywave agreed that they could do so. FAC ¶¶ 136–37, 139.

Independent decisions like these by other commercial actors, including Skywave itself, vitiate any claim of proximate causation under Section 1964(c). "[L]awful actions, like . . . choosing not to do business with a company, can serve as [an] independent factor[] rendering the purported injury too indirect from the predicate RICO acts." *Gov't App Sols.*, 2024 WL 1299993, at *2. In *Government App Solutions*, the plaintiff claimed it was the victim of racketeering because, after one of its contractors became involved in a bribery scheme with the mayor of Sacramento, other municipalities refused to do business with it. The court, applying the three *Holmes* factors, determined that that plaintiff had no standing to sue under the direct-relation test. *Id.*; *see also Eli Lilly*, 23 F. Supp. 2d at 485 (emphasizing the contingent nature of decisions by manufacturers,

20

**Supp. App. 145**

distributors, pharmacies, and consumers as intervening between the fraudulent statements and the alleged injury to plaintiff); *Lifschultz Fast Freight*, 805 F. Supp. at 1291 (harm to plaintiff was contingent on "the customers' taking action based on the ICC action"); *Barr Laboratories*, 827 F. Supp. at 115–16 (plaintiff's losses depended in part on defendants' customers' actions).

Beyond these intervening decisions, Skywave's lost-profits claim depends on a number of other speculative and contingent events, including that: (1) Skywave would actually have submitted an FCC license application; (2) the FCC would have granted it a Part 73 license for trading (even though such a license does not exist, *see infra* Section II(C)(4), and Skywave itself acknowledges as much, *see* FAC ¶ 120); (3) Skywave would have built out its network by purchasing transmitters and antennas, closing on land acquisitions for U.S. transmitter locations, and "develop[ing]" receiver locations in the U.K. and Germany, each of which is dependent on third parties' actions (*id.* ¶ 154); (4) Skywave's technology would have been effective and better than any competing technology; (5) traders would have wanted to do business with Skywave (a dubious proposition given the history of one of its founders[8]); and (6) traders who licensed its technology would have traded successfully and made profits.

> 3.    *The principles underlying the Supreme Court's Section 1964(c) jurisprudence highlight why Skywave is not a proper RICO plaintiff.*

Each of the reasons articulated by the Supreme Court in *Holmes* and *Anza* for permitting only the direct victim to sue applies here. Specifically, there is no way to disentangle the effects of the alleged misconduct from other independent acts and decisions that led to Skywave's alleged damages. *See Holmes*, 503 U.S. at 269; *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys*,

---

[8] One of the co-founders of the company is Kevin Babich. FAC ¶ 31. Babich—when running a former company—skimmed $680,000 in payments from a client to pay personal bills and other expenses (and, as a result, pled guilty to federal mail and wire fraud). *See United States v. Babich*, Plea Agreement, 2:14-cr-56-RLM, Dkt. No. 2 (N.D. Ind. 2015). Babich was still on probation at the time Skywave was allegedly ready to commercialize its business.

21

873 F.3d 574, 577 (7th Cir. 2017). Moreover, because any harm Skywave alleges fell first on Jump Trading's and Virtu's HFT competitors, the Court would have to create complicated apportionment of damages rules—first apportioning them among those competitors and only then to Skywave if Skywave could show that one of more of those competitors would have contracted with Skywave. *See Holmes*, 503 U.S. at 269. And even if Skywave were right about the purported scheme it alleges and any resulting harm to HFT competitors—to be clear, it is not—then there are more directly injured parties who could vindicate the law. *Id.* at 269–70.

4.     *Skywave has not even alleged but-for causation.*

There is also a second, independent reason why this claim fails the test of Section 1964(c): Skywave has not even adequately alleged but-for causation. "The typical question asked in determining cause-in-fact is counterfactual: would the claimed injury still have happened if the defendant had not engaged in the tortious conduct alleged?" *RWB Servs., LLC v. Hartford Comput. Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008); *see also Bobb v. Swartz-Retson P.C.*, 2018 WL 4384292, at *8 (N.D. Ill. Sept. 14, 2018) (finding no but-for causation); *All-Tone Commc'ns, Inc. v. Am. Info. Tech.*, 1991 WL 166532, at *4 (N.D. Ill. Aug. 26, 1991) (same).

Here, to establish but-for causation, Skywave would have to plausibly allege that it could and would have entered the market for providing shortwave services to trading firms with a Part 73 license, which it refers to as a "commercial license." On its theory, getting the Part 73 license was the *sine qua non* of selling shortwave services to such firms. However, Skywave does not allege that it ever even applied for a Part 73 license, only that it planned to do so. FAC ¶¶ 3, 36. Nor does it allege that the FCC rules provide for issuance of such a license for the purpose that Skywave has posited: to privately transmit market or trading data between an HFT firm in the U.S. and its servers at European exchanges using transoceanic shortwave communications. *Id.* ¶¶ 31–36.

22

**Supp. App. 147**

It is little wonder that Skywave omits these allegations: there is no such license under Part 73. Part 73 pertains to "Radio Broadcast Services." *See* 47 C.F.R. § 73 ("Radio Broadcast Services"). The term "broadcasting" for purposes of the Federal Communications Act "means the dissemination of radio communications *intended to be received by the public*, directly or by the intermediary of relay stations." 47 U.S.C. § 153(7) (emphasis added); 47 C.F.R. § 73.701(a) ("*directly by the general public*" (emphasis added)). But Skywave's proposed transmissions, by design and definition, are not to the general public, but rather private and point-to-point, so a particular trader with uniquely fast access to data can make a split-second profit. *See* FAC ¶¶ 29–30.

The FAC in fact admits that there is no license under Part 73 for private data transmission for purposes of trading financial instruments (as opposed to broadcasting programs to the general public). *Id.* ¶ 120. Instead, it says Skywave wanted to sidestep the rules and "*design* a multi-use Part 73 license" under which it would split transmission of private commercial trading data and public high-class "musical performances." *Id.* ¶ 38 (emphasis added). It spoke to FCC staff about the idea almost a decade ago and claims that the staff "encouraged" Skywave to apply. *Id.* However, tellingly, Skywave never alleges that it actually applied for such a license, let alone received one, nor that the Commission has ever granted such a license to anyone.

Skywave also omits to mention that, whatever the opinion of FCC staff may have been years ago, the Commission itself has recently rejected the same multi-use proposal from other parties. *See In the Matter of DPA Mac LLC,* IHF-C/P-20201228-00010 (FCC DA 25-70A Jan. 17, 2025) (rejecting proposal to pair shortwave transmission of "investment data" that requires "purpose-built equipment to transmit, receive, encode, and decode the supplemental datacast for the benefit of fee-for-service customers" with free over-the-air broadcast of financial news); *In the*

23

**Supp. App. 148**

*Matter of Parable Broad. Co., LLC*, IHF-C/P-20200427-00001 (FCC DA 25-71 Jan. 17, 2025) (rejecting attempt to pair private encrypted datacast with public broadcasting of religious programs); *In the Matter of Turms Tech LLC*, IHF-C/P- 20200710-00002 (FCC DA 25-67 Jan. 17, 2025) ("[T]he station must provide only the international broadcasting service, as defined in 47 CFR § 73.701, ensuring the broadcast is not encoded or encrypted."). These orders of the Commission, holding that private data transmissions like that which Skywave considered are not "broadcasting" under Part 73, are properly the subject of judicial notice. *See Ray v. City of Chicago*, 629 F.3d 660, 665 (7th Cir. 2011) ("[D]istrict courts may take judicial notice of certain documents—including records of administrative actions—when deciding motions to dismiss."). They demonstrate that even if Jump Trading and Virtu had not obtained experimental licenses— indeed, even if neither company ever existed—Skywave could not have obtained the license it claims to have wanted and that it claims would have allowed it to build and provide its shortwave network to prospective investors and clients. Therefore, any action by Defendants could not have been the but-for cause of Skywave's supposed injury.

## III.    SKYWAVE DOES NOT PROPERLY ALLEGE WIRE FRAUD.

The pattern of racketeering activity alleged here consists entirely of a supposed set of wire frauds in violation of 18 U.S.C. § 1343. But the FAC does not properly allege even a single wire fraud by any Defendant, let alone a pattern of wire fraud pleaded with the required particularity against each Defendant.

### A.    As a Matter of Law, the Alleged Misrepresentations to the FCC to Obtain Licenses Do Not Constitute Wire Fraud.

The heart of Skywave's case is that Defendants sent misrepresentations to the FCC through interstate wire communications in order to defraud the FCC into issuing Part 5 experimental licenses to them. FAC ¶¶ 104–15. The Supreme Court has established, however, that "the federal

24

**Supp. App. 149**

fraud statutes criminalize only schemes to deprive people of traditional property interests," *Ciminelli v. United States*, 598 U.S. 306, 309 (2023), and a license is not property in the hands of the licensing authority, *Cleveland v. United States*, 531 U.S. 12, 26–27 (2000). *Cleveland* forecloses Skywave's wire-fraud theory.

In *Cleveland*, the defendant was charged with mail fraud for lying about the ownership of his video poker business to obtain a state license required to operate video poker machines. *Id.* at 16–17. The Court determined that the State's core concern in requiring such licenses was "regulatory"—to prevent gaming activities from being infiltrated by criminal elements. *Id.* at 20–21. While the State also received application fees and made money on taxing video poker machines, the Court held that a government regulator does not part with "property" when it issues a license because "a license is not 'property' in the government regulator's hands." *Id.* at 20; *see also Kelly v. United States*, 590 U.S. 391, 400 (2020) (reversing a wire fraud conviction for a scheme to restrict the traffic flow over a toll bridge because the object of the scheme was not to obtain money or property from the victim but to affect regulatory interests); *United States v. Griffin*, 76 F.4th 724, 738 (7th Cir. 2023) (a "scheme to alter a regulatory decision, such as a scheme to obtain a state or municipal license from a government regulator" does not suffice as a scheme to deprive the government of property as required for wire fraud).

The same rule applies where, as here, the regulatory authority issuing the license is an agency of the United States. *See United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991) ("[T]he government's interest in the unissued export licenses is ancillary to its power to regulate, and is not a property interest within the meaning of the wire fraud statute."); *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 225–26 (S.D.N.Y. 2003) (alleged lie by chemical company to

25

**Supp. App. 150**

obtain EPA regulatory approval did not constitute mail or wire fraud because it was not directed at money or property).

There can be no doubt that the FCC's interest in issuing radio spectrum licenses here is regulatory, not one based in property. The FCC was created "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio . . . ." 47 U.S.C. § 151. The agency is charged with granting licenses in the "public interest, convenience, or necessity," and that licensing authority is necessitated by "the limited number of frequencies on the electromagnetic spectrum." *See Metro Broad., Inc. v. F.C.C.*, 497 U.S. 547, 597 (1990), *overruled on other grounds by Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). Because the FCC is exercising sovereign powers in issuing radio spectrum licenses, the Part 5 licenses at issue here are not property in the FCC's hands, and there can be no wire fraud predicated on obtaining such a license. Without wire fraud predicates, there can be no RICO claim.

### B.     Skywave's Backup Theory Fares No Better.

Skywave also alludes to a second type of supposed wire fraud, namely, that the alleged false statements to the FCC to obtain the experimental licenses somehow turn each commercial trade into a fraud against the commercial trading market, that is, competitive HFT firms. FAC ¶¶ 116–25. This effort to recast its fraud on the FCC theory in another guise is equally doomed.

First, it fails the particularity requirement of Federal Rule of Civil Procedure 9(b). Where, as here, the alleged predicate acts of racketeering involve fraud, the plaintiff must plead with specificity the "who, what, when, where, and how" of the alleged fraudulent activity. *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) (citation omitted); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 729 (7th Cir. 1998). Skywave has failed to even plead the basic elements of wire fraud, which require that the defendant make "a material false statement, misrepresentation, or promise, or

26

**Supp. App. 151**

conceal[] a material fact"; have a specific intent to defraud; and have used the wires in furtherance of a scheme to defraud. *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). Most fundamentally, Skywave never explains *what* the nature of the fraud against competitors was, *what* any alleged false statement in connection with any trade was, or *how* Defendants transmitting trading-related information by shortwave amounts to a fraud on its counterparties to trades. There is no allegation that Defendants bought or sold instruments at other than market prices. There is no allegation of market manipulation or spoofing or any other recognized form of securities or commodities fraud. There is no allegation that the counterparties to trades with Jump Trading or Virtu have any expectation about what technologies Defendants use to transmit market information, or even that they know who they are trading against. There is no allegation that Jump Trading or Virtu made any fraudulent representation—or any representation at all—to counterparties about how their market information is being transmitted. And there is not a single particularized allegation of a fraudulent trade—and certainly no allegation of who, what, when, or how any was allegedly made.

Second, this theory of "fraudulent trading" highlights that, at its heart, the FAC is trying to transmute an alleged fraud on other parties—the FCC and competitive HFT trading firms—into a fraud against Skywave. There is no authority supporting this theory, and it underlines that Skywave itself has not suffered an injury proximately caused by the alleged pattern of wire fraud as required by Section 1964(c). *See supra* Section II.

Third, the FAC says that the purpose of the HFT enterprise was "to trade financial instruments," which it defines as "Commercial Trading." FAC ¶ 1.[9] Financial instruments include

---

[9] The FAC goes on to use the term "Commercial Trading"—that is, trading financial instruments—another 114 times.

**Supp. App. 152**

"stocks." *Id.* ¶ 25. But the trading of securities is not actionable under Section 1964(c), which specifically exempts "any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). The bar extends not only to explicit securities fraud claims but also those that "plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO *if such offenses are based on conduct that would have been actionable as securities fraud.*" *Hollinger Int'l, Inc. v. Hollinger Inc.*, 2004 WL 2278545, at *5 (N.D. Ill. Oct. 8, 2004) (emphasis in original) (quoting H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.)); *see also McKinney v. Panico*, 2022 WL 4551695, at *8–9 (N.D. Ill. Sept. 29, 2022). In other words, if Skywave's secondary fraud theory is based on some allegedly fraudulent trading of financial instruments including securities, such a claim is not cognizable under the civil RICO statute.

## IV. SKYWAVE'S CLAIMS ARE TIME-BARRED.

Even if Skywave could have stated a plausible RICO claim, the time has long since passed for it to bring such a claim, providing yet another reason to dismiss the FAC with prejudice.

Civil RICO claims have a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). The four-year period begins to run when a plaintiff knows "or should have known of [its] injury." *Rotella*, 528 U.S. at 553–54. "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). Thus, if Skywave knew or reasonably should have known of its alleged injuries before October 2020 (four years before the Complaint was filed), its claims are time-barred.

Skywave's own allegations make clear that it knew of its injuries *by March 2017*. Skywave alleges harm from the "termination of Skywave's [valuable] partnership with [Investor 1 and

28

Trader 1] and the associated resulting costs and losses." Dkt. 7, Compl. ¶ 190; *see also* FAC ¶¶ 152 ("Due to Defendants' unlawful conduct, Skywave has been unable to secure business partners . . . . Defendants' misconduct is the direct and proximate cause of Skywave's economic injuries, including sunk costs[.]"); *id.* ¶ 153 (describing termination of partnerships with Investor 1 and Trader 1 as a "sunk cost"); *id.* ¶ 155 (further alleging harms from termination of partnerships with Investor 1 and Trader 1). And Skywave alleges that it knew—in 2017—that this termination and associated sunk costs and losses purportedly resulted from the 10Band experimental licenses it complains about.

Specifically, Skywave alleges that "[i]n 2017, [Investor 1] became concerned that if a person or entity were to use *10Band's shortwave transmitter under an Experimental License* for Commercial Trading, that person or entity would have a dominant latency (*i.e.*, speed) advantage over other traders . . . operat[ing] under Commercial License conditions." FAC ¶ 136 (emphasis added). Because "[Investor 1] did not believe the partnership could reasonably compete against persons or entities misusing the advantages of Experimental Licenses for Commercial Trading, [it] . . . sought to exit the partnership with Skywave and [Trader 1]." *Id.* ¶ 137; *see also* Dkt. 7, Compl. ¶ 62 (Investor 1 did not believe partnership could "reasonably compete against any unlawfully used 10Band Experimental License for Commercial Trading"). In March 2017, in light of Investor 1's concerns about the use of 10Band's license, "Skywave . . . agreed to release [Investor 1] from the partnership." FAC ¶ 137. In other words, taking its allegations as true, Skywave knew of the injuries about which it now complains by March 2017, and it knew the alleged (albeit remote) cause of those injuries was the licenses granted to 10Band.

Skywave has also made allegations and submitted materials showing that it knew or could easily have discovered before October 2020 that *all* Defendants were affiliated with those 10Band

29

**Supp. App. 154**

experimental licenses that allegedly caused it harm. For example, Skywave (1) previously pleaded that, around December 2016, it had "heard rumors in the industry that Jump or Virtu (both trading firms) may be affiliated with 10Band," Dkt. 7, Compl. ¶ 60; (2) pleads that Defendant Hinerfeld was the signatory on 10Band's license applications in January, March, and May 2020—which were publicly available at the time, *e.g.*, FAC ¶¶ 69, 70–71, 73, 75, 77, 79, 81, 83; (3) included in the FAC as an exhibit an ownership chart publicly filed with the FCC in May 2020 that names Defendants DiSomma and Gurinas as indirect owners of 10Band, *see id.* ¶ 86 & n.5; *compare* FAC, Ex. 2, *with* Sahni Decl., Ex. D[10]; and (4) pleads that "Madigan was registered as a broker with Virtu Americas, LLC, a subsidiary of Virtu, from 2014 to 2017," citing the publicly available "BrokerCheck" database run by the Financial Industry Regulatory Authority, FAC ¶ 98, Ex. 52. Although Skywave's FAC omits to mention what Skywave alleged in its original complaint—that Skywave had heard rumors, as of December 2016, of a Jump Trading-Virtu-10Band affiliation (*see* Dkt. 7, Compl. ¶ 60)—the Court can consider that allegation, *see supra* note 3—and in all events, Skywave cannot even attempt to plead around the wealth of public information available to it before October 2020 that linked Defendants to 10Band.

Skywave nonetheless attempts to plead around this defect by claiming it "was not aware of any information that Jump Trading or Virtu were affiliated with 10Band as managing entities of

---

[10] Available at https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=1307651602&attachmentKey=20870671&attachmentInd=applAttach. The Court may consider these records in determining whether Skywave had sufficient constructive notice. *Baker v. Atl. Richfield Co.*, 2021 WL 3726050, at *1 (N.D. Ind. Aug. 23, 2021) ("Public records—such as court orders, agency decisions, administrative body reports, and government websites—are appropriate subjects of judicial notice." (collecting cases)); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) ("[I]t is routine for courts to take judicial notice of both newspaper articles and court records, among other things."); *accord Osundairo v. Geragos*, 447 F. Supp. 3d 727, 740 n.8 (N.D. Ill. 2020) (applying *Schmude* and taking judicial notice of a *Chicago Tribune* article).

the HFT Enterprise." FAC ¶ 136; *see also* Dkt. 7, Compl. ¶ 61 ("At that time, Skywave was not aware of any information *confirming the rumors that Jump or Virtu were affiliated with 10Band* . . . ." (emphasis added)). That cannot rescue Skywave's untimely claim. Plaintiffs are "not allowed to bury their heads in the sand—to know you've been injured and make no effort to find out by whom is the very laxity that statutes of limitations are designed to penalize." *Cancer Found.*, 559 F.3d at 676. Based on public records, Skywave easily could have confirmed that Jump Trading and Virtu were affiliated with 10Band before October 2020. *See Eckstein v. Balcor Film Invs.*, 58 F.3d 1162, 1168–69 (7th Cir. 1995) (claims barred under the statute of limitations where registration statements available to the plaintiffs furnished information about the defendants).

Indeed, it requires almost no effort to connect the Defendants and entities named in Exhibit 2 of the FAC—again, a publicly available May 2020 chart setting forth 10Band's owners filed with the FCC—to Jump Trading or Virtu. For example, the same chart identifies Jump Trading's co-founders—Defendants DiSomma and Gurinas—as indirect owners of 10Band. *See* FAC, Ex. 2. That Defendants DiSomma and Gurinas are the owners of Jump Trading, LLC and Jump Financial, LLC is very well known and has been well known for more than a decade. Citing just some judicially noticeable sources on this point: *as early as 2008*, Jump Financial, LLC's registration with the Illinois Secretary of State (also available online) listed William DiSomma and Paul A. Gurinas as managers. *See* Sahni Decl., Ex. G[11]; *see also id.*, Ex. H[12] (publicly available "BrokerCheck" database run by the Financial Industry Regulatory Authority listing DiSomma and Gurinas as associated with Jump Trading since 2006, and listing Madigan as associated with Jump

---

[11] Available at https://apps.ilsos.gov/businessentitysearch/businessentitysearch.

[12] Available at https://brokercheck.finra.org/.

31

Trading since 2017); *id.*, Ex. I.[13] Defendant John Madigan was also identified in dozens of public applications and other filings with the FCC as the individual to contact for New Line Networks, *see, e.g.*, *id.*, Ex. J[14]; *id.*, Ex. K[15]; *id.*, Ex. L[16], and in at least six such filings as the individual to contact for 10Band LLC, *see, e.g.*, *id.*, Ex. M[17]; *id.*, Ex. N[18]; *id.*, Ex. O[19]—all before October 2020. Finally, at least as early as 2018, news articles publicly announced that New Line Networks LLC— which owns 10Band LLC, as set forth on Exhibit 2 to the FAC—is a "joint venture of Chicago-based Jump Trading LLC and New York-based Virtu Financial Inc., according to Kane County records," and that "public records point to [New Line Networks'] testing the idea of using shortwave technology to convey data between the CME facility and key exchanges around the globe." *See id.*, Ex. E[20]; *see also id.* Ex. F[21] (2019 Bloomberg article also announcing that New Line Networks LLC is a "joint venture of Chicago's Jump Trading LLC and Virtu Financial Inc.").

Moreover, "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555. Here, Skywave knew of its injury when Investor 1 exited

---

[13] Available at
http://online.wsj.com/article/SB10001424052702303918204577447222628346192.html.

[14] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11637775.

[15] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11637946.

[16] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11919511.

[17] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11472072.

[18] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11472086.

[19] Available at
https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=11472093.

[20] Available at https://www.bloomberg.com/news/articles/2018-06-18/hft-traders-dust-off-19th-century-tool-in-search-of-market-edge.

[21] Available at https://www.bloomberg.com/news/features/2019-03-08/the-gazillion-dollar-standoff-over-two-high-frequency-trading-towers.

32

**Supp. App. 157**

the partnership, citing concerns about "use [of] 10Band's shortwave transmitter under an Experimental License for Commercial Trading." *See* FAC ¶ 136–37. Notably, even Skywave's 2023 Petition for Reconsideration to the FCC of 10Band's August 2023 license renewal grant came more than six years after it alleges it knew it was injured. Skywave could have timely challenged 10Band's earlier grants and renewals—including those granted in 2020 and 2021, *see, e.g., id.* ¶¶ 67, 72, well after it knew of its injuries—but chose not to. The time for doing so has long since passed.[22]

Simply put, Skywave knew of its alleged financial injury and the supposed causes of that injury *seven years ago*. It further knew of every Defendant's alleged connection to that harm by around that time, and to the extent it chose to avoid such knowledge in the face of "rumors" and public records making abundantly clear the individuals and entities affiliated with 10Band, such willful blindness cannot toll the limitations period. Skywave is at least three years too late.

## CONCLUSION

For the reasons set forth above, Defendants respectfully submit that this matter should be dismissed in its entirety with prejudice.

---

[22] Thus, even if Skywave were made to wait until after it exhausted its administrative remedies to bring suit and any limitations period was tolled in the interim, *see* Section I, *supra*, it would still be too late.

**Supp. App. 158**

Dated: April 21, 2025

Neema Sahni (admitted *pro hac vice*)
J. Hardy Ehlers (admitted *pro hac vice*)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
(424) 332-4757
nsahni@cov.com
jehlers@cov.com

Gerard J. Waldron (admitted *pro hac vice*)
COVINGTON & BURLING LLP
850 10th St NW
Washington, DC 20001
(202) 662-6000
gwaldron@cov.com

Respectfully submitted,

*/s/ Chris Gair*
Chris Gair (ARDC # 6190781)
Ingrid Yin (ARDC # 6339857)
GAIR GALLO EBERHARD LLP
1 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900
cgair@gairgallo.com
iyin@gairgallo.com

*Attorneys for Defendants William J. DiSomma, Paul A. Gurinas, Matthew Hinerfeld, John Madigan, and Jump Trading, LLC*

Robert Y. Sperling (ARDC #2688093)
Katherine B. Forrest (admitted *pro hac vice*)
Andrew G. Gordon (admitted *pro hac vice*)
Jessica S. Carey (admitted *pro hac vice*)
Kristina A. Bunting (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3148
rsperling@paulweiss.com
kforrest@paulweiss.com
agordon@paulweiss.com
jcarey@paulweiss.com
kbunting@paulweiss.com

*Attorneys for Defendant Virtu Financial, Inc.*

**Supp. App. 159**

# EXHIBIT A

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**


In the Matter of                              )
                                              )
10Band LLC                                    )         File No. 0497-EX-CR-2023
Application for renewal of                    )
the Experimental License WI2XNX               )

To:  Office of Engineering Technology


### Petition for Reconsideration


Skywave Networks LLC, by counsel, and pursuant to Section 1.106 of the Commission's rules,

47 C.F.R. §1.106, hereby requests reconsideration of the Office of Engineering and Technology's

("OET") grant of another renewal period to 10Band LLC to operate on 2-25 MHz.

10Band filed its application for renewal of the captioned license on August 8, 2023.[1]  OET

granted it nine days later, on August 17, 2023.  There was no reasonable opportunity to comment on or

informally object to the grant of the application.  Because 10Band has completed its experiments and now

uses the experimental authorization for regular day-to-day trading, it should not have been granted.  OET

should reconsider its grant and deny 10Band's renewal application.

In support, Skywave submits:

1. **Skywave's Interest**

Skywave develops technology that is capable of fixed, long-distance, non-voice

communications in the 2-25 MHz Band.  It is intensely interested in the operations in the 2-25 MHz

Band.  Further, its CTO, Kevin Babich, is an amateur radio licensee.[2]  As such, he has experienced first-

hand, the consequences of 10Band's experimental operations, as are more fully documented in the

---

[1] Section 5.71 of the Commission's rules specifies the License period and terms of renewal for Experimental Radio Licenses.  Section 5.71(a)(2) specifies that a license may be renewed for an additional term not exceeding five (5) years upon an adequate showing of need to complete an experiment.  47 C.F.R. §5.71(a)(2).  The captioned experimental license was first renewed September 21, 2021.  *See* file no. 0507-EX-CR-2021.

[2] Amateur Radio License N9IAA, issued to Kevin J. Babich on November 16, 2018.  Mr. Babich operates his HF amateur radio station within an area that may be affected by 10Band's operations at Elburn, Illinois.

**Supp. App. 161**

comments in docket, RM-11953, the Shortwave Modernization Coalition's ("SMC") Petition for Rulemaking.

2.      **The Experimental License**

Section 5.83 of the Commission's rules, 47 C.F.R. §5.83 notes the tentative status of experimental licenses.  Section 5.83(a) provides that an experimental license does not confer any right to conduct an activity of a continuing nature.  Section 5.83(b) further provides that the grant is subject to change or cancellation by the Commission at any time without notice or hearing, if in the Commission's discretion, the need for such action arises.  Section 5.71(a)(2) of the Commission's rules, 47 C.F.R. §5.71(a)(2) provides that a license may be renewed … upon an adequate showing of need to complete the experiment.  There is no renewal expectancy in an experimental license.

The history of the 10Band's experimental license is set forth below:

- 10Band's original application for a conventional experimental license was granted November 10, 2016 (File No. 0089-EX-CN-2016) for transmissions from the Chicago area to Europe ("Chicago/EU Link").[3]

- On February 12, 2020, an additional conventional experimental license, WK2XSY, was granted (application File No. 0074-EX-CN-2020) for transmissions from the Chicago area to Washington/Asia ("Chicago/Washington").

- On February 14, 2020, a third conventional experimental license, WK2XTI, was granted (application File No. 0077-EX-CN-2020) for transmissions from the Washington state area to Asia ("Washington/Asia").

- On February 14, 2020, a fourth conventional experimental license, WK2XTH, granted (File No. 075-EX-CN-2020) for transmissions from the New Jersey area to Europe ("NJ/Europe").

- In March of 2020, successful daily use for production operations began.

- On April 3, 2020, the Commission consented to 10Band's acquisition of facilities licensed under call sign WJ2XXI from Western Maritime Broadcast LLC.

---

[3] Under Section 5.71(a) of the Commission's rules, 47 C.F.R. §5.71(a), the application for renewal should not have been granted.  Under the rule, an experimental radio licensee is allowed the regular license term of two years and one renewal term of up to five (5) years and no more.  Under that calculation, 10Band's allowance expires once and for all on November 7, 2023.

2

**Supp. App. 162**

- On May 1, 2020, 10Band LLC reported change of ultimate ownership documentation for 10Band.[4]

- On November 30, 2020, 10Band applied to modify the facilities acquired from Western Marine Broadcasting to use 24 kHz and 48 kHz bandwidths, consistent with 10Band's existing operations. The application was granted on December 8, 2020. (File No. 0268-EX-CM-2020)

- In 2020, ultra-low latency microwave links were established between transmit sites in the United States and nearby relevant exchanges.

- On September 1, 2021, 10Band filed for renewal of the conventional experimental license for the Chicago/EU link (File No. 0507-EX-CR-2021). On September 21, 2021, the Commission renewed the conventional experimental license without modification, subject to express conditions.

- On October 19, 2021, 10Band applied to modify its conventional experimental license into a "market trial" license while combining New Jersey and Washington state locations with the Chicago/EU link (File No. 0234-EX-CM-2021). The Commission granted the modified application on January 18, 2022.

- On November 25, 2022, 10Band filed an application to reorganize the Chicago/EU, New Jersey/EU, Chicago/Washington state, and Washington state/Asia links all under Call Sign WI2XNX for a market trial (File No. 0277-EX-CM-2022). The Commission granted the modified application on December 23, 2022.

- On August 8, 2023, 10Band LLC submitted renewal of its market trial experimental license with no changes (File No. 0497-EX-CR-2023) (the "Application"). The Commission granted the Application on August 17, 2023.

3.     **Grant of the Application Exceeded the
       <u>Renewal Period Available Under Section 5.71(a)</u>**

The Experimental Radio License regime is set forth in Part 5 of the Commission's rules, 47 C.F.R §5.1 *et. seq.* Under Section 5.71(a)(2) of the Commission's rules, 47 C.F.R. §5.71(a)(2), the application for renewal should not have been granted. Under the rule, an experimental radio licensee is allowed one renewal term of up to five (5) years and no more. 10Band's license was renewed September 21, 2021. That was its one renewal term under Section 5.71(a)(2). Grant of the Application exceeded the bounds of the Commission's rule.

---

[4] The ultimate owners of 10Band's shortwave experimental licenses and low-latency microwave licenses, transferred their interests into trusts. *See* file no. 0028-EX-TU-2020.

4.      **Application**

No supporting information is included in the Application.  Rather, 10Band relies on its Narrative Statement to justify renewal.  In a slight nod to future "experimentation," 10Band asserts that grant of renewal of the experimental authority will allow 10Band additional time to complete its program of testing, understanding of the market potential, and refinement of the customer facing market data feed.  It asserts that it needs two years to continue the experiments.[5] The 10Band Narrative Statement is insufficient to warrant renewal.

a.   *"Internal Use Case" Does not Require Market Studies*.

When considering whether an applicant is eligible for a renewal in the Experimental Radio Service,[6] Section 5.71(a) of the Commission's rules, 47 C.F.R §5.71(a) requires that the applicant provide an adequate showing of need to complete the experiment.  10Band asked the Commission to renew its Experimental License so that it may continue an almost-seven-year experiment to further understand market potential and refine its customer facing data feed.

This justification contrasts with the assertions in the SMC Petition (which 10Band cited in the Application).  Particularly, on page 9 of the SMC Petition, the SMC notes that its members' proposed use case contemplates only private internal communications.  Because only private internal communications are contemplated, there is no "customer" market to explore; there is no need to refine its customer facing data feed.

The Narrative Statement cannot support renewal because it relates only to services to "customers" and by its own assertions in the SMC petition, 10Band does not propose service to customers.

---

[5] Somehow, the Petition for Rulemaking filed by the Shortwave Modernization Coalition ("SMC") appears to have been a precondition for grant of 10Band's renewal of its experimental authority.  *See* paragraph 4 of 10Band's Narrative Statement.  As such, the precondition links information revealed through said proceedings to the Application..

[6] Section 5.5 of the Commission's rules, 47 C.F.R. §5.5, defines Experimental Radio Service as a service in which radio waves are employed for purposes of experimentation in the radio art for purposes of providing essential communications for research projects that could not be conducted without the benefit of such communications.

4

**Supp. App. 164**

b.   *Real-world Assessments; Metrics*

In support of its request for another renewal term to continue its almost-seven-year-old experiment, 10Band offers real-world assessments conducted by academic researchers and metrics about content, quality and timeliness of the received data.  It references real-world assessments and metrics, but it does not provide them.

Further 10Band asserts that delivering time-sensitive financial market data across a low latency HF link presents unique challenges such as lossy, low-bandwidth data services.  10Band says that it continues to experiment with HF technology and signal processing techniques to mitigate such issues.  Empirical evidence derived from time-stamped, market data proves that the aforementioned challenges were overcome in March of 2020.

### 5.   The Experiment

An experimental licensee's daily operation of the Licensed facilities indicates that the experiment is over.  10Band is operating the experimental facilities as a regular full-time means of transmitting financial information to gain an edge in the financial markets.  For this reason, the Commission should not have granted renewal of 10Band's experimental license.

This is not unlike the situation in *Wilfredo G. Blanco-Pi*, 32 FCC Rcd 3100 (2017), in which the Commission found that because the experimental licensee was using the experimentally licensed facilities on a daily basis, in his regular operations, he had completed his experiments.  Without any apparent further experimental benefit to attain production level status, renewal of the experimental license was not justified.

### 5.  Shortwave Modernization Coalition

In its narrative, 10Band mentions the Shortwave Modernization Coalition ("SMC") Petition for Rulemaking recently filed with the Commission as fulfilment of a commitment to the Commission.  The SMC Petition for Rulemaking received over 800 comments, mostly deriding the proposal as a brazen spectrum land grab that would benefit financial traders and cause destructive interference to incumbents

5

**Supp. App. 165**

and adjacent services.[7] 10Band's implementation (using wide bandwidths and relaxed emission masks) closely mirrors the heavily criticized features of the Petition.  It is stunning that 10Band would attempt to use the Petition for Rulemaking as justification for grant of a renewal of its Experimental License, when the commenters have suggested that the current experimental operations have been interfering with adjacent services.  10Band fails completely to address the allegations of interference.  For that reason alone, the application should be denied.

6.     **Layers of Users**

In 10Band's narrative to support its market trial, it states that it has "secure[d] an agreement with a provider of financial data with established customer relationships for potential trial participants and with the requisite market data licenses. This network provider will serve as the interface between 10Band and trial participants and will help ensure anonymity of survey feedback from participants."  Representations from the SMC Petition reveal that 10Band's related companies, Jump Trading and Virtu Financial, through joint venture, are 10Band's "customers" who share NLN Holdings and its subsidiary Newline Networks ("NLN") for the provision of financial services data.  Under Section 5.602(c) of the Commission's rules, 47 C.F.R. §5.602(c), NLN as the user of the experimental facilities (providing services to the related Jump Trading and Virtu Financial) must have its own experimental license to operate on facilities currently licensed to 10Band.  Clearly, NLN must have its own experimental license to provide the services to Jump Trading and Virtu Financial.  Because 10Band allowed a related company's unlicensed operations on the experimentally licensed facilities, the Application must be reconsidered and denied.

---

[7] It appears that extended and expansive use of experimental licenses for production purposes is driving deliriously flawed rulemaking proposals (e.g., regressive interference proposals and spectrum hogging) that are not in accordance with Commission principles nor are they in the long-term interest of financial industry participants outside of the SMC.

6

**Supp. App. 166**

**7.     Upon Reconsideration the Application Should be Denied**

10Band's application for renewal of WI2XNX should never have been granted. Section 5.71(a)(2) allows for a single renewal period of five (5) years. As is clear from the license timeline set forth, this is not 10Band's first renewal request and, if granted, it would extend the term of the experimental license beyond that authorized by Section 5.71(a)(2).

Additionally, 10Band's assertions set forth in the Narrative Statement filed with its renewal application are in direct contradiction with its assertions set forth in the SMC Petition and acknowledged by 10Band's notation of the SMC Petition in the Narrative Statement. The Narrative Statement presupposes that 10Band will serve customers; the SMC Petition states clearly that the use case for the experimental facilities is internal use only.

Finally, 10Band is no longer experimenting. For years, 10Band has used and continues to use the facilities day in and day out to conduct financial trades. After years of highly profitable production trading and market dominance, a limited "market trial" is a *non sequitur*. No further experimentation is needed. Under the rule established in *Blanco-Pi,* renewal of the experiment is not justified.

In light of the foregoing, Skywave asks that the Commission reconsider and deny 10Band's application for renewal of the Experimental License, WI2XNX.

Respectfully submitted,

SKYWAVE NETWORKS LLC

By: _____
       Marjorie K. Conner
       Its Counsel
       (703) 626-6980
       mkconner@mkconnerlaw.com

September 18, 2023

7

**Supp. App. 167**

Declaration of Timothy J. Eloe

CEO – Skywave Networks LLC


      I serve as Chief Executive Officer of Skywave Networks LLC.  I have reviewed the foregoing Petition for Reconsideration.


      I hereby verify that the facts asserted in the Petition for Reconsideration are true and correct to the best of my knowledge, information, and belief.  The assertions are proffered under penalty of perjury.

_____

Timothy J. Eloe

Chief Executive Officer


**Supp. App. 168**

CERTIFICATE OF SERVICE

       I hereby certify that on this 18th day of September 2023, I transmitted a true, correct, and complete copy of the foregoing Petition for Reconsideration by electronic mail to:


William K. Keane, Esq.
Duane Morris LLP
901 New York Avenue, NW
Suite 700 East
Washington, DC 20001-4795
kkeane@duanemorris.com


_____

Marjorie K. Conner

# EXHIBIT B

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| 10Band LLC | )     File No. 0497-EX-CR-2023 |
| Application for Renewal of | ) |
| Experimental License WI2XNX | ) |

To: Office of Engineering and Technology

### OPPOSITION TO PETITION FOR RECONSIDERATION

10Band LLC ("10Band"), by its counsel, hereby opposes the Petition for Reconsideration ("Petition") filed by Skywave Networks, LLC ("Skywave").  Skywave seeks reconsideration of the Office of Engineering and Technology's ("OET's") grant of 10Band's renewal application.  As shown below, the Petition is procedurally deficient, and even if it were able to be considered, it lacks substantive merit.  OET's August 17, 2023 grant of the renewal application (the "License") is consistent with the Commission's rules and past practice.  Accordingly, the Petition should be denied, if not dismissed.

### I.     The Petition is Procedurally Deficient.

Skywave must demonstrate compliance with basic requirements for filing a petition for reconsideration.  It fails to meet that test in two respects and should be dismissed.

### A.  Skywave Fails to Show an Adverse Effect and Therefore Lacks Standing.

If a petition for reconsideration is "filed by a person who is not a party to the proceeding, it shall state with particularity the manner in which the person's interests are adversely affected by the action taken . . . ."[1]  This is akin to a requirement that Skywave have standing to file the

---

[1] 47 C.F.R. § 1.106(b)(1).

**Supp. App. 171**

Petition.[2]  While Skywave has alleged that "[t]here was no reasonable opportunity to comment on or informally object" to 10Band's application prior to grant, this alone does not convey standing; Skywave's own interests must actually be adversely affected by the Commission action.[3]

However, Skywave never alleges that grant of the License actually adversely affects it. Skywave asserts it is "intensely interested" in operations within the 2-25 MHz band, but stops short of claiming harm from 10Band's operation within the same band.

Skywave also claims that its chief technology officer, Kevin Babich, has "experienced firsthand, the consequences of 10Band's experimental operations, as are more fully documented in the comments in docket, RM-11953, the Shortwave Modernization Coalition's ("SMC") Petition for Rulemaking."[4]  But once again, not only does the Petition itself fail to identify those "consequences" (much less assert any harm caused thereby), but it further fails to even cite where in the docket of that unrelated matter it allegedly shows that Mr. Babich was harmed as a consequence of 10Band's experimental operations.  These allegations do not come close to showing that Skywave has suffered a "direct injury" as a result of the License grant -- a key element of the Commission's standing analysis -- or allege that reversing the grant will prevent or redress any injury.[5, 6]

---

[2] *In re Metro. Transp. Auth. Proposed Order & OOR*, 31 FCC Rcd. 1436, 1440-41 (2016).

[3] *Id.*

[4] Petition at 1-2.

[5] *Metro. Transp. Auth.*, 31 FCC Rcd. at 1440-41.

[6] To the extent the asserted consequences relate to the SMC Petition for Rulemaking, that is a separate matter in which Skywave has already filed comments addressing its concerns.  Moreover, it may also be noted that petitioners may not sit back with vague and conclusory allusions to consequences for purposes of standing, and only later attempt to explain what those allegations mean.  *See In re Matters of Falcon First Commc'ns, L.P.*, 14 FCC Rcd. 7277, 7282 (1999) (a "tender of new, unsupported factual information for the first time in [a] reply … comes too late for Bureau consideration").

**B.  The Petition is Procedurally Deficient in Other Respects.**

Perhaps the closest Skywave gets to a claim of adverse effect is its statement that Mr. Babich "operates his HF amateur radio station within an area that may be affected by 10Band's operations at Elburn, Illinois."[7]  While this claim does not confer standing for the reasons stated above, it also fails for additional reasons.

First, Mr. Babich is not the petitioner; Skywave is.  Skywave and Mr. Babich are two different legal "persons," and Skywave cannot piggyback off of Mr. Babich's standing (if he were to show he actually has standing).[8]

Second, a conclusory allegation that amateur radio operations "may be affected" with no further documentation or evidence of harm does not show a "concrete and particularized" injury for purposes of standing.[9]  On the contrary, alleging that something "may" happen is a classic example of a "conjectural or hypothetical" harm.[10]

And third, any petition that "[o]mit[s] information required by these rules to be included . . . such as the affidavit required by paragraph (e) of [§ 1.106] (relating to electrical interference)" is an example of a petition that "plainly do[es] not warrant consideration by the Commission" and which should be dismissed or denied.[11]  Here Skywave seems to rest claims of "adverse effect" on the notion that Babich's amateur operations "may" be affected by interference from 10Band.  However, Skywave has not provided a qualified engineer's affidavit, or any information at all for that matter, showing "that electrical interference will be caused to [Babich's]

---

[7]  Petition at n.2.
[8] *See, e.g.,* 47 C.F.R. § 5.5 ("*Person*. An individual, partnership, association, joint stock company, trust, corporation, or state or local government.").
[9] *Metro. Transp. Auth.,* 31 FCC Rcd. at 1441.
[10] *Id.*
[11] 47 C.F.R. § 1.106(p), (p)(6).

3
**Supp. App. 173**

station . . ." as required by subsection (e) of Rule 1.106.[12]   This deficiency likewise warrants

dismissal of the Petition.

## II.     Renewal of the License Was Not Time-Barred.

Skywave's argument that OET could not renew the License beyond November 1, 2023

lacks merit.

Preliminarily, we note that -- unlike the case with Rule 5.71(d) covering Spectrum Horizon

licenses -- the plain language of Rule 5.71(a), (b), and (c) contains no explicit limitation on the

number of renewals available for conventional, program, medical testing, compliance testing, and

broadcast experimental licenses.  That a conventional license "may be renewed for an additional

term" does not mean that it cannot be renewed a second time "for an additional term."  Rule

5.71(d), which covers Spectrum Horizons experimental licenses, states that licenses "may not be

renewed."  Contrasting Rule 5.71(a) against Rule 5.71(d), it is apparent that when the Commission

intends to limit the renewability of an experimental license, it uses very clear language to do so.

Furthermore, we note that when the Commission made significant changes to Rule 5.71 in

2013, it noted, "Currently, the rules allow for an experimenter to apply for the conventional

experimental license to cover a single or several closely related experiments for 2-5 year periods

with options for renewal**s** for up to 5 years."[13]  The Commission did not rescind that interpretation

in the 2013 Report and Order or in any subsequent modifications to Rule 5.71.  In fact, when the

Commission adopted requirements for program experimental licenses, it expressly noted that

program licenses could also "be granted for five year, renewable term**s**," and that availability of

---

[12] Skywave's generalized reference to comments filed by amateurs in the rulemaking does not suffice for demonstrating that Skywave or Babich have suffered interference from 10Band's transmissions.

[13] *In the Matter of Promoting Expanded Opportunities for Radio Experimentation and Market Trials*, FCC 13-15, at ¶ 20 (2013) (emphasis added).

multiple renewals "followed directly from requirements already in place for conventional experimental licenses."[14]

Moreover, Skywave's argument is premised on its claim that "10Band's license was renewed September 21, 2021." However, when 10Band filed its application in October 2021, it was to modify the license in order to conduct the market trial.[15] In response, OET issued a new, modified license on January 18, 2022 authorizing the market trial.[16] The recent grant of the renewal application on August 17, 2023 amounts to the first renewal of the modified license, and should be viewed as within the 7- to 10-year term authorized by Rule 5.71, even as that rule is (mis)interpreted by Skywave.

Finally, in practice, OET extends licenses beyond ten-year terms when it is reasonable to do so. *See*, *e.g.*, Motorola Solutions, Inc., Application for Renewal of Experimental License, File No. 0502-EX-CR-2021 (granted Aug. 27, 2021) (granting license renewal application for a cumulative period of thirteen years); AT&T Corp., Application for Renewal of Experimental License, File No. 0116-EX-RR-2015 (granted Mar. 4, 2015) (granting license renewal application for a cumulative period of twelve years). It was likewise reasonable for OET to grant 10Band's renewal.[17]

---

[14] *Id*. at ¶ 47.

[15] *See* Narrative Statement, Experimental Authorization Application - Modification, File No. 0234-EX-CM-2021 (Oct. 21, 2021).

[16] Experimental License, File No. 0234-EX-CM-2021, granted January 18, 2022 to expire November 1, 2023. The market trial application in effect superseded the September 21, 2021 grant.

[17] For the sake of completeness and if, despite all of the above, OET were prepared to consider Skywave's view of Rule 5.71, it could, and should, grant 10Band a waiver pursuant to Rule 1.925. A waiver is appropriate where the "underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest." 47 C.F.R. Section 1.925(b)(3)(i). 10Band explained that its experimentation could lead to "more efficient utilization of the 2-25 MHz spectrum." Narrative Statement, File No. 0497-EX-CR-2023. Applying Rule 5.71 as advocated by Skywave would frustrate the

5

**Supp. App. 175**

### III.     10Band's Experiments Are Not Complete.

Skywave claims that 10Band has "completed its experiments and now uses the experimental authorization for regular day-to-day trading." It further argues that, "Empirical evidence derived from time-stamped, market data proves that the aforementioned challenges were overcome in March of 2020." These claims -- which are unsupported by any evidence beyond Skywave's bald assertion -- are baseless.

For openers, Skywave fails to provide any of the referenced "market data," or any analysis of that data showing that the "challenges were overcome," and for a good reason -- 10Band's experimentation is not complete. As stated in its Narrative Statement accompanying its request for renewal of the License, 10Band has encountered challenges in terms of both technical factors such as bandwidth and reliability, as well as end-user challenges such as the use of a lossy data service in this ionospheric environment, and it "continues to experiment with HF technology and signal processing techniques to mitigate such issues."[18]

Skywave's citation to *In re Wilfredo G. Blanco-Pi* is unavailing. In that case, the experimental licensee "ma[de] it clear that he seeks to retain the Stations, not based on any further experimentation, but rather on their value as full-time re-broadcasters of . . . programming . . . ."[19] By contrast, 10Band's experimentation is ongoing.

10Band explained its market trial in detail, and it determined to modify its license after consultation with OET staff. Moreover, its program of experimentation appears similar to that

---

purpose of the experimental radio service. 10Band's ongoing experiment -- which includes tests of the usefulness of the HF band for the intended purpose, and enhancement of customer-facing data feeds via a market trial -- directly advances stated purposes of the experimental radio service as stated in Rule 5.1(b).

[18] Narrative Statement, File No. 0497-EX-CR-2023.

[19] 32 FCC Rcd. 3100, 3104 (2017).

**Supp. App. 176**

approved by the OET for other parties.[20]  10Band has also fulfilled its representation that continued testing would be accompanied by a petition for rulemaking to allow regular licensed operation.

**IV.     Skywave Confuses the SMC Petition for Rulemaking with 10Band's Experimentation.**

Citing SMC's Petition for Rulemaking, Skywave argues that 10Band's experimental work contemplates "only private internal communications," and thus, "there is no 'customer' market to explore."[21]  While 10Band's experimentation (and that of other SMC members) has provided a real-world foundation for adoption of proposed changes to Part 90, the ongoing experimentation conducted with industry participants and leading academics will enable 10Band to resolve for itself certain HF performance and digital signal processing issues.  Furthermore, Skywave's argument fails to consider the simple, real-world fact that a petition for rulemaking for one potential use case (i.e., internal communications) does not preclude further experimentation and market trials in other areas (i.e., a customer market).  The HF-band issues explored by 10Band affect delivery of low-latency data not just for financial firms but potentially other industries as well.[22]  In other words, there is nothing inconsistent between 10Band's License and the SMC Petition.

---

[20] *See, e.g.*, 3DB Communication Inc., File No. 0453-EX-CR2023 (granting fourth license renewal application on August 17, 2023 for a cumulative period of eight years to "advance high-frequency hardware, software, and transmission technologies"); Skycast Services LLC, File No. 0725-EX-CR-2022 (granting third license renewal application on January 4, 2023 for a cumulative period of nine years to permit applicant to continue to conduct "(i) scientific or technical radio research; (ii) technical demonstrations of equipment or techniques; and (iii) the development of radio technique, equipment, operational data, and engineering data").

[21] *Id*. at 4.

[22] *See* Narrative Statement for File No. 0497-EX-CR-2023 ("Participating academic researchers and a limited number of market trial participants have provided real-world assessments of our technology's suitability for this purpose compared to other means of delivery.  Metrics include the content, quality, and timeliness of the received data.  Delivering time-sensitive financial market data across a low latency HF link presents unique challenges in terms of both technical factors such as bandwidth and reliability, as well as end-user challenges such as the use of a lossy data service in this ionospheric environment.  10Band continues to experiment with HF technology and signal processing techniques to mitigate such issues.").

7

**Supp. App. 177**

## V.     Conclusion

Skywave has failed to show standing to seek reconsideration of the License grant, and its Petition is procedurally deficient under Rule 1.106.  Accordingly, the Petition for Reconsideration should be dismissed.  Should OET nevertheless choose to consider the Petition on the merits, the Petition fails to set forth any basis for reconsidering grant of 10Band's renewal and it should be denied.

Respectfully submitted,

**10Band LLC**

By: _____
William K. Keane
Drew T. Dorner
Duane Morris LLP
901 New York Avenue N.W., Suite 700 East
Washington, DC 20001
(202) 776-7800

*Its Counsel*

September 28, 2023

8

**Supp. App. 178**

Case: 26-1015     Document: 33     Filed: 05/04/2026     Pages: 188

# Attachment A
# (Declaration)

DocuSign Envelope ID: FB020BA8-B570-4C44-9347-064A804F9F60

## DECLARATION

I, John P. Madigan, declare:

1.     I am competent to provide this Declaration.

2.     My business address is New Line Networks LLC, 600 West Chicago Avenue, Suite 640, Chicago, IL 60654.

3.     I have been employed by Jump Trading Group ("Jump") as a Technologist since 2017, and in that role, I provide services to and on behalf of 10Band LLC ("10Band").

4.     In connection with my role, I am familiar with, and am responsible for, implementation of 10Band's high frequency facilities.

5.     I have read the Opposition to Petition for Reconsideration ("Opposition") to which this Declaration is attached.

6.     Based on my personal knowledge, the factual representations in the Opposition are true to the best of my belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  September 28, 2023

DocuSigned by:

_John Madigan_____
1F223B4F6C8FE4F8...
John P. Madigan

**Supp. App. 180**

Case: 26-1015     Document: 33     Filed: 05/04/2026     Pages: 188

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September, 2023, I transmitted a true, correct, and complete copy of the foregoing Opposition to Petition for Reconsideration by electronic mail to.

Marjorie K. Conner
Attorney at Law
2413 N. Dearing Street
Alexandria, VA 22302
mkconner@mkconnerlaw.com

_____
Drew T. Dorner

**Supp. App. 181**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SKYWAVE NETWORKS, LLC,

                Plaintiff,

v.

WILLIAM J. DISOMMA;
PAUL A. GURINAS;
MATTHEW HINERFELD;
JOHN MADIGAN;
JUMP TRADING, LLC; AND
VIRTU FINANCIAL, INC.,

                Defendants.

Case No. 1:24-cv-9650

Honorable Judge Georgia N. Alexakis

## PLAINTIFF'S NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Appellate Procedure 3(a)(1) and 4(a)(1) and Circuit Rule 3, Plaintiff Skywave Networks, LLC hereby appeals to the United States Court of Appeals for the Seventh Circuit from the Memorandum Opinion and Order (ECF Nos. 118–19) and Judgment (ECF No. 120) of the United States District Court for the Northern District of Illinois entered on December 2, 2025 .

Dated: December 31, 2025

                Respectfully submitted,

                */s/ Justin P.D. Wilcox*
                Justin P.D. Wilcox (admitted *pro hac vice*)
                Thomas Derbish (admitted *pro hac vice*)
                Jamie Dohopolski (admitted *pro hac vice*)
                Thomas Romanchek (admitted *pro hac vice*)
                **Desmarais LLP**
                1899 Pennsylvania Avenue, NW, Suite 400
                Washington, D.C. 20006
                Tel: (202) 451-4900
                Fax: (202) 451-4901
                jwilcox@desmaraisllp.com

1

**Supp. App. 182**

tderbish@desmaraisllp.com
jdohopolski@desmaraisllp.com
tromanchek@desmaraisllp.com

Steven Balcof (admitted *pro hac vice*)
Peter Kotecki (admitted *pro hac vice*)
**Desmarais LLP**
230 Park Avenue, 26th Floor
New York, New York 10169
Tel: (202) 351-3400
Fax: (202) 351-3401
sbalcof@desmaraisllp.com
pkotecki@desmaraisllp.com

*Counsel for Skywave Networks, LLC*

Justin A. Barker
Ariana Garcia-Moore
**Nelson Mullins Riley & Scarborough LLP**
123 North Wacker Drive, Suite 2100
Chicago, Illinois 60606
Tel: (312) 376-1014
justin.barker@nelsonmullins.com
ariana.garciamoore@nelsonmullins.com

2

**Supp. App. 183**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that he caused the foregoing Notice of Appeal to

be filed and served upon counsel of record via the Court's ECF system on December 31, 2025.


<u>/s/     *Justin A. Barker*     </u>
Attorney for Plaintiff

**Supp. App. 184**

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2026, a copy of the foregoing supplemental appendix was filed electronically through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM